IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

GINA KUHLMAN,                                    Case No. 1:22-cv-00536

                   **Plaintiff,**

    -vs-                                         JUDGE PAMELA A. BARKER

CITY OF CLEVELAND, et al.,
                                                 MEMORANDUM OPINION & ORDER
                   **Defendants.**

This matter is before the Court upon the Renewed Motion to Dismiss of Defendant City of Cleveland (the "City") (Doc No. 45, the "City's Motion"), the Renewed Motion to Dismiss of Defendant Chief Calvin D. Williams ("Williams") (Doc. No. 46, "Williams's Motion"), and the Renewed Motion for Partial Dismissal of Defendants David Grasha ("Grasha") and Samantha Haggerty ("Haggerty") (Doc. No. 47, "Grasha and Haggerty's Motion"), all filed on October 28, 2022 (together, "Defendants' Motions").  Plaintiff Gina Kuhlman ("Plaintiff") filed Oppositions to Defendants' Motions on November 28, 2022 (Doc. Nos. 54-56), to which the various Defendants filed Replies on December 8, 2022 (Doc. Nos. 57-59).

For the reasons set forth herein, Defendants' Motions are GRANTED IN PART and DENIED IN PART.

I.  **Background**

A.  **Factual Allegations**

By way of background, the events giving rise to this lawsuit as alleged in Plaintiff's Second Amended Complaint ("SAC") occurred after Cleveland police officers were called to a Chipotle restaurant upon receiving a report that Plaintiff had driven over a curb in the restaurant's parking lot

(the "incident").  The details surrounding the incident are not clearly delineated in the SAC.  Rather, the vast majority of the allegations contained in the SAC relate to the events that took place subsequent to the incident, including: the police officers' interactions with Plaintiff at the scene of the incident and at Fairview Hospital, and her arrest by them; Plaintiff's resulting criminal prosecution, trial and conviction; and the Eighth District Court of Appeals' reversal of her conviction.

The SAC sets forth the following allegations.  On or about December 30, 2018, Plaintiff was alleged to have driven her vehicle onto a curb in a Chipotle parking lot.  (Doc. No. 43-2, ¶ 15.)  The witnesses to this incident, and the Cleveland police officers who later arrived at the scene and investigated the incident, Defendants Grasha and Haggerty, all later testified at Plaintiff's criminal trial.  A Chipotle employee who saw the incident but did not interact with Plaintiff called 911 and informed police that Plaintiff was drunk inside the restaurant.  (*Id.* at ¶ 16.)  This employee later testified at Plaintiff's criminal trial that she did not actually know if Plaintiff was intoxicated, but assumed she was because she had "never seen anyone drive on a curb like that."  (*Id.*)  Another Chipotle employee also testified at Plaintiff's criminal trial that Plaintiff was upset, "slurring her words," and appeared to have a bump on her head.  (*Id.* at ¶ 18.)

A Chipotle customer testified that Plaintiff's car's sunroof was smashed, there was glass everywhere, and Plaintiff was bleeding.  (*Id.* at ¶ 19.)  That customer assisted Plaintiff in walking but did not smell any alcohol.  (*Id.*)  "There was no testimony that the sunroof broke at the scene and all indication was that some traumatic event had taken place that day prior to [Plaintiff] arriving at Chipotle."  (*Id.* at ¶ 20.)  A mechanic testified that something large and heavy must have fallen on the sunroof to cause that level of damage.  (*Id.* at ¶ 21.)

2

Defendant Grasha, a police officer for the City of Cleveland, arrived on the scene and later testified that Plaintiff was incoherent.  (*Id.* at ¶ 22.)  Grasha saw that Plaintiff's sunroof was shattered and it appeared that Plaintiff may have injured her head and had complained about a migraine headache.  (*Id.*)  Grasha "acknowledged that the only actual damage to the vehicle was to the sunroof and a small impact area from the curb with no indication of additional damage from any other erratic driving."  (*Id.*)  Grasha also testified that he observed a drink in Plaintiff's car and thought it may have contained alcohol because it smelled like apple cider.  (*Id.* at ¶ 23.)  Grasha testified that this drink was not tested for alcohol and Plaintiff informed Grasha the drink did not contain alcohol.  (*Id.* at ¶ 24.)  Grasha also testified that he interacted with Plaintiff and she "had no smell of alcohol on her breath."  (*Id.*)

Defendant Haggerty, as lead officer and partner to Grasha, was also at the scene and later testified that Plaintiff had "slow speech and was swaying and confused with drooping eyes[,] which she felt meant Plaintiff was on a narcotic and was not intoxicated with alcohol."  (*Id.* at ¶ 40.)  "Haggerty testified that she conducted this as an OVI investigation because of what she heard on the dispatch call and because Plaintiff had prior OVIs on her record which she knew of."  (*Id.* at ¶ 38.)  Haggerty testified that she did not investigate the shattered roof, but based upon the condition of the car, it had to have [been shattered] that day.  (*Id.* at ¶ 43.)  Haggerty further testified that "she was unaware if Plaintiff suffered a head injury," and she did not evaluate Plaintiff's head injury prior to her arrest.  (*Id.* at ¶ 43.)  Haggerty also testified that the cup found in Plaintiff's car was not tested for alcohol because "she was not concerned with any possible alcohol because she did not believe Plaintiff was intoxicated with alcohol."  (*Id.* at ¶ 45.)

3

Grasha testified that the officers at the scene did not conduct a field sobriety test because "they do not do them in parking lots and they cannot detect intoxication." (*Id.* at ¶ 26.) Haggerty said she did not conduct any field sobriety tests because she did not believe it would show evidence of drug intoxication. (*Id.* at ¶ 42.)

Plaintiff alleges that Grasha and Haggerty were not qualified to be handling suspected OVI stops without the assistance of a superior officer based on the following testimony adduced at Plaintiff's criminal trial. (*Id.* at ¶ 37.) Grasha testified that he had no prior training for OVI enforcement, had "never been involved in an OVI with urine or blood testing," and had only seen a field sobriety test performed one time. (*Id.* at ¶ 25.) "Haggerty testified that the current extent of her OVI experience was approximately 20 investigations prior to the trial in this matter and it is unknown how few she had participated in at the time of this incident." (*Id.* at ¶ 37.)

At some point, Grasha spoke to Plaintiff's sister on the phone "and falsely and slanderously informed Plaintiff's sister that Plaintiff was 'clearly intoxicated,' having conducted no [field sobriety tests], having smelled no alcohol, and having failed to recognize the shock, and resulting disorientation, of an exploding sunroof while driving." (*Id.* at ¶ 27.) Upon hearing Defendants Grasha and Haggerty talking with each other and with supervisors on the phone about obtaining a refusal or a test, Plaintiff told Grasha and Haggerty that she would submit to a urine test. (*Id.* at ¶ 28.)

The officers called EMS, "but they did not thoroughly examine Plaintiff." (*Id.* at ¶ 29.) Plaintiff denied medical transport because she knew she had not suffered a head injury and did not want to incur the unnecessary costs of an emergency transport and hospital visit. (*Id.*) Defendants Grasha and Haggerty, however, took Plaintiff to the hospital, allegedly for an examination of a

4

possible head injury and assessment.  (*Id.* at ¶ 30.)  Plaintiff alleges there was no bump on her head, or any other outward sign of a head injury, aside from a possible cut from the shattered glass.  (*Id.*)

Plaintiff alleges that "the only reason Defendants Haggerty and Grasha, with approval, authorization and directive of one or more superior officers, detained Plaintiff and transported her to the hospital [was] for the sole purpose of obtaining urine and/or blood evidence, or, to obtain a refusal."  (*Id.* at ¶ 33.)  "Defendants Grasha and Haggerty discussed with themselves, other officers, and their supervisor(s), that all Defendant Haggerty had to do was to get Plaintiff to sign a refusal or take the test at the hospital."  (*Id.* at ¶ 44.)  Thus, Plaintiff alleges that requiring her "to go to the hospital allegedly to make sure she was OK [sic] was a ruse."  (*Id.* at ¶ 44.)  Haggerty further testified that it was department policy to take suspects to the hospital for testing at either St. Vincent or Metro Health, but for convenience and speed, they took Plaintiff to Fairview Hospital.  (*Id.* at ¶ 46.)

The SAC is not entirely clear as to the events that occurred when Grasha, Haggerty, and Plaintiff arrived at Fairview Hospital.  At some point, Haggerty "requested Plaintiff to submit to [a] blood/urine chemical test and directed the hospital to obtain such."  (*Id.* at ¶ 46.)  Plaintiff agreed to the tests and "at no time refused to supply urine or blood samples."  (*Id.* at ¶¶ 46, 57.)  The hospital tested Plaintiff's urine and blood samples and the test results showed that they were "negative for alcohol and all drugs of abuse."  (*Id.* at ¶ 56.)  According to a note from the emergency department provider signed by Jeffrey Ruwe, M.D., "Patient is coherent, walking with stable gait.  Respectful to me, although somewhat argumentative to police.  Patient has no slurred speech.  Stable for discharge."  (*Id.* at ¶ 41.)

Haggerty testified that "in her limited experience[,] the hospital gives her the collected specimen to take to the lab for testing."  (*Id.* at ¶ 47.)  Plaintiff alleges that according to the police

department's policy: "Every effort shall be made to administer chemical tests within three hours of the violation." (*Id.* at ¶ 48.) And as to urine and blood samples, the policy provides: "Samples shall be immediately transported to SIU (or Central Prison Unit when SIU is closed) using the re-sealable specimen transport bag. The white copy of Form BVM 2255 and the ORIGINAL Alcohol/Drug Influence Report shall accompany samples." (*Id.* at ¶ 48.) Here, however, according to body cam footage, Haggerty instructed the hospital to "pour out" the urine provided by Plaintiff and tested by the hospital and chose not to request any part of the sample for further testing. (*Id.* at ¶¶ 47, 58, 64.)

Also at issue is a "BMV Form 2255."[1] Here again, the SAC is unclear. At some point, Plaintiff signed this form while at the hospital. Grasha also signed the BMV Form 2255 "as a witness that it was read to Plaintiff and that she signed it." However, Grasha testified that "he never actually heard the Form 2255 advisements being read to Plaintiff and that he did not see her sign it." (*Id.* at ¶ 35.) Thus, Plaintiff alleges Grasha's signature as a witness thereof was fraudulent. (*Id.*) Haggerty, however, testified that she and Grasha were both in the room when Plaintiff signed the BMV Form 2255. (*Id.* at ¶ 81.)

Grasha and Haggerty then arrested Plaintiff and she was charged with: (1) simple OVI, refusal, without specifying a substance in violation of Ohio Revised Code 4511.19(A)(1)(a); (2) OVI refusal with prior OVI within 20 years in violation of Ohio Revised Code. 4511.10(A)(2)(a); and (3) minor misdemeanor failure to control in violation of ORD 431.34(a). (*Id.* at ¶ 13.) Plaintiff alleges that Defendants had no probable cause to arrest Plaintiff. (*Id.* at ¶ 62.) At the time of the incident, "Plaintiff questioned Defendants Haggerty and Grasha as to why she was arrested for an OVI, to

---

[1] In a relevant opinion, the Eighth District Court of Appeals refers to this form as the "Report of Law Enforcement Officer Administrative License Suspension/Notice of Possible CDL Disqualification/Immobilization/ Forfeiture." *City of Cleveland v. Kuhlman*, 2020 WL 3467729, at *2 (Ohio Ct. App. June 25, 2020).

which Defendant Haggerty stated it didn't matter, and 'do you see urine in my hand?'"  (*Id.* at ¶ 65.)

Plaintiff further alleges that "Defendants' conduct in ordering the destruction of material evidence

exculpatory to Plaintiff, and in portraying Plaintiff's continued non-refusals as a refusal, [and]

falsifying an official police record, was unduly prejudicial against Plaintiff and directly resulted in

[an] unconstitutional investigation, arrest and conviction."  (*Id.* at ¶ 69.)

Plaintiff alleges that during the incident, Haggerty and Grasha stated to each other that they

had to do "whatever it takes to cover our behinds," and that is "why Plaintiff had a lawyer."  (*Id.* at

¶ 72.)  Another Cleveland police officer arrived on the scene to facilitate the towing of Plaintiff's car

and told Haggerty to "call the supervising Lieutenant and to do 'whatever it takes' to cover your

butts."  (*Id.* at ¶ 73.)  Grasha then "radioed the supervising Lieutenant and told him that they had done

what they had to do to cover their behinds."  (*Id.* at ¶ 74.)  However, "Grasha specifically advised the

supervising Lieutenant that 'all tests were negative.'"  (*Id.* at ¶ 75.)

The City submitted Plaintiff's charges to the Cleveland Municipal Court and it was assigned

case number 2018 TRC 037812.  (*Id.* at ¶ 14.)

As to the Defendant City's and Grasha and Haggerty's supervisors' roles in these events,

Plaintiff alleges the following:

> 49. The actual pattern, practice and custom of the City and the CPD, is to obtain chemical tests without probable cause, and, to destroy and/or interfere with exculpatory evidence.
>
> . . .
>
> 52. All named Defendants, and supervising officials with policy making authority, ratified and instructed the unconstitutional actions of officers to proceed to act, without probable cause, determining only to do what it took to obtain a refusal or to obtain chemical tests.

53. Superior officers knew or should have known that Defendants Haggerty and Grasha had no probable cause to "escort" Plaintiff to the hospital under false pretense for the purpose of obtaining chemical tests.

54. The City of Cleveland, instructed, ratified, and pursued baseless charges against Plaintiff evincing the de facto policy of not requiring probable cause for detention and arrest for the purpose of seeking chemical tests.

. . .

76. Upon information and belief, from the phone conversations of Defendants Grasha and Haggerty, the supervising Lieutenant condoned and actively directed the unconstitutional arrest knowing of the negative testing results, and instructed Defendants Grasha and Haggerty to place Plaintiff under arrest and take her to the County for booking.

(*Id.* at ¶¶ 49, 52-54, 76.)

Plaintiff references two cases in which the City previously sought OVI convictions without probable cause:

a. Cleveland v. Krivich, 2016-Ohio-3072, 65 N.E.3d 279 (officer's observations that defendant was driving his vehicle without his headlights illuminated, and that he detected odor of alcohol while speaking with defendant, was insufficient to provide officer with probable cause to arrest for OVI).

b. City of Cleveland v. Bruner, 2002-Ohio-6512, ¶ 15 (Further, despite the officer's testimony that the defendant was unable to complete a recitation of the alphabet, her successful completion just moments later during the field sobriety tests belies his assertion. We therefore find, in viewing the totality of the circumstances, that competent, credible evidence exists to support the trial court's determination that no probable cause existed to arrest the defendant for driving under the influence.).

(*Id.* at ¶ 55.)

Plaintiff's case eventually went to trial.  Because Plaintiff submitted to a chemical test at the hospital, the jury found Plaintiff not guilty of the "OVI refusal with prior charges" count.  (*Id.* at ¶ 83.)  As to the other charges, the jury found Plaintiff guilty of the OVI under R.C. 4511.19(A)(1)(a) and the court found Plaintiff guilty of the failure to control charge as it was a minor misdemeanor and

Plaintiff had no right to a jury trial on that charge.  (*Id.* at ¶ 83.)  "In addition to a severely long probation sanction, driver's license suspension[,] and other sanctions[,] Plaintiff was sentenced to serve thirty (30) days in county jail which she requested be stayed pending an appeal. The stay was denied, and Plaintiff served the jail time."  (*Id.* at ¶ 84.)

After her conviction, Plaintiff appealed.  The Eighth District Court of Appeals vacated Plaintiff's OVI conviction because the toxicology report reflected no positive results from the urine specimen submitted by Plaintiff.  *City of Cleveland v. Kuhlman*, 2020 WL 3467729, at *5 (Ohio Ct. App. June 25, 2020).  The court further vacated Plaintiff's failure to control conviction because there was no evidence that she operated her car on a street or highway as required by the state statute.  *Id.*

The court went on to explain:

{¶ 36} Although we have vacated Kuhlman's convictions based upon the sufficiency of the evidence, we note that this trial was fraught with error and we are thus compelled to address some of the issues raised in the other assignments of error.

{¶ 37} Without addressing Kuhlman's prosecutorial misconduct claim, charges in this case should have never been filed. The city was, or should have been aware, that Kuhlman, at the request of arresting Officer Haggerty, did submit a urine specimen during treatment at Fairview Hospital and the city knew, or should have known, that Haggerty was advised in the emergency department that the specimen did not show the presence of alcohol or any drug. That the officers failed to take custody of the specimen and transport it to a laboratory of their choice for testing is no fault of Kuhlman. Further, the evidence that Haggerty instructed a nurse to "pour out" the urine specimen is appalling and could be construed as tampering with evidence.

{¶ 38} With respect to the charge of failure to control, again, there is simply no evidence in that Kuhlman was driving on a street or highway without using reasonable care. It is apparent that she was in a disoriented state in the parking lot. However, when or where this state of disorientation arose and whether it occurred on a street or highway is unknown to us and wholly absent from the record.

{¶ 39} Based upon the foregoing, the trial court should have granted Kuhlman's Crim. R. 29 motion for acquittal.

*Id.* at *5-6.

9

Plaintiff alleges that the City "has a long-standing custom, pattern and practice of rewarding the number of arrests and 'good arrests' in the form of performance reviews."  (*Id.* at ¶ 103.)  Plaintiff cites to the Cleveland General Police Order which "expressly includes the number of arrests as a factor in performance reviews."  (*Id.* at ¶ 104.)  Plaintiff alleges that "Defendants ignored evidence of Plaintiff's innocence and instigated, influenced[,] and participated in the prosecution of Plaintiff despite lacking probable cause and in spite of knowledge of Plaintiff's innocence, and instead being aware of or knowing that there was immediate evidence of Plaintiff's innocence."  (*Id.* at ¶ 106.)  Further, "Defendant Officers willfully ignored and acted to undermine evidence that showed conclusively that Plaintiff was innocent." (*Id.* at ¶ 107.)

Plaintiff alleges that this misconduct was undertaken pursuant to the policies and practices of the Defendant City, the Cleveland Police Department, and the Cleveland Law Department.  (*Id.* at ¶ 108.)  Specifically, Plaintiff alleges:

> 110.  The misconduct described in this Complaint was undertaken pursuant to the policy of the Defendant City and the CDP in that the City and CDP had inadequate policies, training, and supervision on the following: Cleveland police officers' obligation to disclose exculpatory and impeachment evidence; the fabrication of evidence or police reports; the handling, preserving, and disclosure of exculpatory or impeachment evidence; officers' obligations not to intimidate suspects; the conduct of arrests; and writing of police reports, even though the need for such policies, training, and supervision was obvious.

(*Id.* at ¶ 110.)

Plaintiff then cites to the Consent Decree entered in *United States v. City of Cleveland*, No. 1:15-cv-01046 (N.D. Ohio), which requires the City of Cleveland to investigate all allegations of officer misconduct.  (*Id.* at ¶ 114.)  The Consent Decree further requires supervisors to review "each arrest report by officers under their command."  (*Id.* at ¶ 116.)  Plaintiff alleges that the City "knew

10

of these problems" and "made decisions not to implement adequate policies, training, or supervision." (*Id.* at ¶ 117.) Plaintiff then cites to the Consent Decree's requirement to ensure that accurate performance evaluations were being conducted of the City's police officers. (*Id.* at ¶ 119.) Plaintiff alleges that the City and the police department have "consistently failed to provide proper performance evaluations that would identify and correct/discipline poor performance." (*Id.* at ¶ 120.) Plaintiff alleges the constitutional violations complained of in her Complaint "were a highly predictable consequence of a failure to equip Cleveland police officers" with training on how to handle evidence, conduct witness interviews, disclose exculpatory or impeachment evidence, conduct arrests, write police reports, and discipline and provide corrective measures for misconduct. (*Id.* at ¶ 122.)

Lastly, Plaintiff alleges that the constitutional violations that occurred in this case resulted from the City's "policies and practices of pursuing wrongful convictions by: (a) relying on profoundly flawed investigations and coercive or intimidating policing tactics; (b) fabricating inculpatory evidence and suppressing exculpatory evidence; (c) failing to adequately train, supervise, monitor, and discipline its police officers; (d) and maintaining the police code of silence." (*Id.* at ¶ 126.) Plaintiff then cites to four cases to evidence the "widespread, clear, and persistent pattern of practice of the officers in the Cleveland Police Department to destroy evidence, lie under oath, and to engage in other violations." (*Id.* at ¶¶ 127-28.)

### B. Procedural History

Plaintiff filed suit in this Court against Defendants on April 5, 2022, as a refiling of an earlier case, No. 1:21-cv-243. (Doc. No. 1.) Upon the Court's review of the Complaint, it was not clear that Plaintiff had asserted any federal claims or that diversity jurisdiction existed. (Apr. 6, 2022 non-

doc. Order.)  Thus, the Court issued a show cause order requiring Plaintiff to show cause as to why the case should not be dismissed sua sponte for lack of subject matter jurisdiction.  (*Id.*)  On April 11, 2022, Plaintiff filed an Amended Complaint against Defendants.  (Doc. No. 3.)  The Court construed Plaintiff's Amended Complaint as a response to the Court's Order to Show Cause and determined sufficient cause had been shown.  (Apr. 12, 2022 non-doc. Order.)  After issues with service, and two further Show Cause Orders issued by the Court related to service, Plaintiff effectuated service on Defendants.  (Doc. Nos. 18, 21, 22, 34.)

Defendants subsequently filed Motions to Dismiss Plaintiff's Amended Complaint.  (Doc. Nos. 23, 24, 39.)  On August 30, 2022, Plaintiff filed a Motion to Amend her Amended Complaint. (Doc. No. 36.)  The Court denied Plaintiff's Motion to Amend and ordered Plaintiff to attach a proposed amended complaint if she were to further seek leave to amend.  (Aug. 30, 2022 non-doc. Order.)  On September 29, 2022, Plaintiff filed another Motion to Amend her Amended Complaint, this time attaching a proposed SAC.  (Doc. No. 43.)  Defendants did not oppose Plaintiff's Motion to Amend.  On October 14, 2022, the Court granted Plaintiff's Motion to Amend, deemed Plaintiff's proposed SAC filed, and rendered Defendants' Motions to Dismiss moot.  (Oct. 14, 2022 non-doc. Order.)  Defendants filed their Renewed Motions to Dismiss (Doc. Nos. 45-47) and Defendants Grasha and Haggerty filed an Answer (Doc. No. 48).[2]

The SAC alleges the following causes of action: (1) Malicious Prosecution and False Arrest under Ohio law and 42 U.S.C. § 1983 (Count I); (2) Abuse of process under Ohio law and 42 U.S.C. § 1983 (Count II); (3) Spoilation/Fabrication/Suppression of Exculpatory Evidence under Ohio law

---

[2] Additional briefing followed which will be addressed in a separate opinion.

and 42 U.S.C. § 1983 (Count III); (4) False Imprisonment under Ohio law and 42 U.S.C. § 1983 (Count IV); (5) Supervisor Liability under Ohio law and 42 U.S.C. § 1983 (Count V); (6) Reckless, Wanton, or Willful Conduct under Ohio Revised Code § 2921.52 and 42 U.S.C. § 1983 (Count VI); (7) Violation of Civil Rights under 42 U.S.C. § 1983 (Count VII); and (8) Intentional Infliction of Emotional Distress (Count VIII).  (Doc. No. 43-2.)  All but Count V are directed against each Defendant, and as to Defendants Grasha, Haggerty, Williams, and John Does, these Counts are alleged against them in both their individual and official capacities.  (*Id.* at 33-48.)  Count V is alleged only against Defendant Williams and Defendant John/Jane Does in their individual and official capacities.  (*Id.* at 39-41.)  Plaintiff seeks monetary damages.  (*Id.* at 49.)

## II.    Standard of Review

Each of Defendants' Motions seek dismissal of Plaintiff's claims based on Plaintiff's alleged "failure to state a claim upon which relief can be granted."  (Doc. No. 45 at 1; Doc. No. 46 at 1; Doc. No. 47 at 1.)  While Defendants do not cite to a Federal Rule of Civil Procedure, the Court presumes that the Defendants move to dismiss under Rule 12(b)(6).  Under Fed. R. Civ. P. 12(b)(6), the Court accepts Plaintiff's factual allegations as true and construes the Complaint in the light most favorable to Plaintiff.  *See Gunasekara v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009).  To survive a motion to dismiss under this Rule, "a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'a formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'"  *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)).

The measure of a Rule 12(b)(6) challenge—whether the Complaint raises a right to relief above the speculative level—"does not 'require heightened fact pleading of specifics, but only enough

13

facts to state a claim to relief that is plausible on its face.'" *Bassett v. Nat. Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (quoting *Twombly*, 550 U.S. at 555-56). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Deciding whether a complaint states a claim for relief that is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

Consequently, examination of a complaint for a plausible claim for relief is undertaken in conjunction with the "well-established principle that 'Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Specific facts are not necessary; the statement need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."'" *Gunasekera*, 551 F.3d at 466 (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)). Nonetheless, while "Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 679.

## III.    Analysis

### A.    Defendant City of Cleveland's Renewed Motion to Dismiss

#### i.    Count VII

The City moves to dismiss Plaintiff's *Monell* claim against the City under Count VII. In Count VII of her SAC, Plaintiff alleges that the City is liable under § 1983 "for constitutional violations committed pursuant to policy, procedure, practice or custom of the municipal entity, as detailed herein, by individuals with final policy making authoring, and/or officials with final authority

14

who ratified subordinate(s) wrongdoing."  (Doc. No. 43-2, ¶ 215.)  Plaintiff alleges that Defendants Haggerty, Grasha, Williams, and Doe were acting "pursuant to policy, procedure, practice or custom of the Defendants, the City, and/or the police department and law department, which were approved, encouraged and/or ratified by policymakers for the Defendant City and the Cleveland Police Department and the Law Department with final policymaking authority."  (*Id.* at ¶ 216.)

Plaintiff alleges that Defendants had a duty to maintain and protect her constitutional rights, "including not subjecting her to a known malicious prosecution and/or false arrest, prosecution involving spoilation of exculpatory evidence, abuse of process and other sanctions."  (*Id.* at ¶ 217.)

Plaintiff alleges that the City had a "policy, procedure[,] or practice that included[,] but is not limited to[,] failing to properly hire and train its employees, encouraging baseless prosecutions, covering up failures or misconduct, [and] failing to enforce its written policies."  (*Id.* at ¶ 218.) Plaintiff specifically alleges the City's policy and practices include:

> the failure to adequately train, supervise, monitor, and discipline officers who engaged in constitutional violations, pursuing wrongful convictions through reliance on profoundly flawed investigations, through reliance of destruction of exculpatory evidence, through condoning falsified official documents, through condoning false and misleading testimony, suppressing evidence and the code of silence and code of blue described in this Complaint.

(*Id.* at ¶ 220.)  Plaintiff alleges one of more of these policies, practices, and customs were maintained and implemented by the City with "deliberate indifference to Plaintiff's constitutional rights and were a moving force behind the violations of those rights."  (*Id.* at ¶ 221.)  Plaintiff alleges these "widespread practices were so well-settled as to constitute a de facto policy in the Cleveland Division of Police, and were allowed to exist because municipal policy makers with authority over the conduct exhibited deliberate indifference to the problems, thereby effectively ratifying them."  (*Id.* at ¶ 222.) Plaintiff further alleges that these practices flourished because the City "declined to implement

sufficient policies or training on unlawful arrests, disclosure/suppression/destruction of exculpatory evidence, fabrication of official law enforcement documents, use of coercion and threats against Plaintiff, even though the need for such policies and training, and supervision, was obvious." (*Id.* at ¶ 223.) Lastly, Plaintiff alleges that the City declined to implement or utilize "any legitimate mechanism of punishment of officers who committed such misconduct, thereby leading officers to believe that the[y] could violate citizens' constitutional rights with impunity." (*Id.* at ¶ 224.)

It is well established that an institution may not be sued for injuries inflicted solely by its employees or agents under § 1983. *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *see also Baynes v. Cleland*, 799 F.3d 600, 622 (6th Cir. 2015); *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014); *Heyerman v. Cty. of Calhoun*, 680 F.3d 642 (6th Cir. 2012). Rather, a plaintiff may only hold a defendant entity liable under § 1983 for the entity's own wrongdoing. *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) ("Section 1983 does not permit a plaintiff to sue a local government entity on the theory of *respondeat superior*."). Or, as the Sixth Circuit explained, "a municipality is liable under § 1983 only where, 'through its deliberate conduct,' it was 'the "moving force" behind the injury alleged.'" *D'Ambrosio,* 747 F.3d at 388-89 (quoting *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013) (citation omitted)).

"Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). To properly allege an institutional liability claim, a plaintiff must adequately allege "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of

tolerance or acquiescence [to] federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013); *see also D'Ambrosio*, 747 F.3d at 386.

The Court finds the City's two-page briefing seeking to dismiss Plaintiff's *Monell* claims wholly inadequate on this issue. (*See* Doc. No. 45 at 3-5.) Despite there being four separate bases upon which a plaintiff could adequately allege *Monell* liability, the City does not seem to recognize this or offer its theory as to what basis or bases the allegations in Plaintiff's Complaint set forth. Rather, the City points to only three areas of the SAC that it argues fail to create *Monell* liability. (Doc. No. 45 at 1.) First, the City argues that the SAC "attempts to create *Monell* liability by pleading that the 'actual pattern, practice and custom of the City and the CPD, is to obtain chemical tests without probable cause, and, to destroy and/or interfere with exculpatory evidence." (*Id.* at 4.) The City contends that "this conclusory statement is the only statement made in support of this proposition," and without citing to any case law in support, the City argues that Plaintiff's reference to "two isolated appellate opinions from 2001 and 2015 traffic stops" does not create a pattern and practice of the City seeking OVI convictions without probable cause. (*Id.*) Next, the City submits that Plaintiff's "general reference" to the City's consent decree does not have any connection to the Plaintiff's case, and without citing to any case law, it argues that a general policy of "police corruption" is not specific enough to maintain a *Monell* claim. (*Id.*) Lastly, the City submits that "Plaintiff attempts to establish a *Monell* pattern and practice by referencing random criminal cases dating back to 1975 and concluding that there must be some vague policy of pursuing wrongful convictions." (*Id.*) The City argues that all three attempts fail to identify "any pattern and practice of the City that would actually relate to the facts of her case." (*Id.* at 5.)

17

The City cites to one case, *Sistrunk v. City of Hillview*, 545 F. Supp. 3d 493 (W.D. Ky. 2021), with no further discussion of the case, for the proposition that "[l]egal conclusions and bare-bones allegations do not meet the requirements of establishing a *Monell* claim against the municipality." The court in *Sistrunk* determined that the "sum total of the Complaint's allegations" as to the plaintiff's *Monell* claims was limited to four paragraphs, all of which contained only legal conclusions. *Id.* at 499. Such is not the case here. Plaintiff's Complaint is replete with allegations related to the City's *Monell* liability. (*See e.g.*, Doc. No. 43-2, ¶¶ 52-55, 66, 69, 74-76, 103-105, 108-110, 113-128.) Here, the City fails to address a majority of those allegations.

Further, the court in *Sistrunk* only read the plaintiff's complaint to invoke the third category of *Monell* violations: a policy of inadequate training. 545 F. Supp. 3d at 489. Here, Plaintiff argues that her Complaint "sufficiently raises all four methods of proving a municipality's illegal policy or custom." (Doc. No. 55 at 7.) The City does very little, if anything, to address any of these methods head-on, i.e., (1) of the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; or (3) of the existence of a custom of tolerance of, or acquiescence to, federal rights violations.[3] The City surely does not cite to any other case law that references the requirements Plaintiff must meet in order to sufficiently allege a *Monell* violation. Thus, in the absence of a meaningful argument by the City, the Court finds that Plaintiff's *Monell* allegations against the City under Count VII are sufficiently plead.

---

[3] Under these circumstances, the Court finds that, for purposes of the instant Motion, the City has waived any argument that Plaintiff has failed to sufficiently plead a *Monell* violation under those three methods. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . put flesh on its bones.") (quoting *Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n*, 59 F.3d 284, 293–94 (1st Cir. 1995)).

18

Accordingly, the City's Motion to Dismiss Plaintiff's Count VII under 42 U.S.C. § 1983 against the City is hereby DENIED.

### ii.        Counts I, II, III, IV, V, and VI

The City argues that Counts I, II, III, IV, V, and VI as against the City under § 1983 are *Monell* claims, and thus, duplicative of Count VII. (Doc. No. 45 at 5.)  Plaintiff argues the claims are not duplicative, but rather are "separate, recognized causes of action, with different elements."  (Doc. No. 55 at 17.)  In its Reply, the City reiterates its argument that as these counts relate to the City, the counts are federal claims that fall within the parameters of *Monell*.  (Doc. No. 57 at 6.)

The Court agrees with the City.  To the extent any claim against the City is grounded in 42 U.S.C. § 1983, such a claim is a *Monell* claim, and therefore duplicative of Count VII.

Accordingly, the City's Motion to Dismiss Plaintiff's Counts I, II, III, IV, V, and VI under 42 U.S.C. § 1983 against the City is hereby GRANTED.

### iii.        State Law Claims

The City argues that Plaintiff's state law claims (Counts I, II, III, IV, V, VI, and VIII) against the City are barred by the Political Subdivision Tort Liability Act ("PSTLA").  (Doc. No. 45 at 5.) The City argues that it is entitled to protection under the PSTLA and that no exception to immunity applies.  (*Id.* at 5-6.)  Plaintiff does not dispute the City's argument.  Rather, Plaintiff asks the Court to defer its ruling on any state law claims against the City.  (Doc. No. 55 at 20.)  Plaintiff continues: "To the extent decision is not deferred, Plaintiff respectfully requests additional time to respond." (*Id.*)  In its Reply, the City argues that "Plaintiff has had more than enough time to brief why her common law claims against the City could meet some exception to statutory immunity," and in fact, no exceptions apply.  (Doc. No. 57 at 1-2.)

19

The Court deems Plaintiff to have waived any argument in opposition to the City's argument that Plaintiff's state law claims against the City are barred by the PSTLA. It is well established that, if a plaintiff fails to respond or to otherwise oppose a defendant's motion to dismiss, a district court may deem the plaintiff to have waived opposition. *See, e.g.*, *Humphrey v. U.S. Attorney Gen.'s Office*, 279 F. App'x 328, 331 (6th Cir. 2008) (finding that a plaintiff's failure to oppose arguments raised in the defendants' motion to dismiss is grounds for the district court to assume that opposition to the motion is waived); *see also Selou v. Integrity Sol. Servs., Inc.*, 2016 WL 612756, at *3 (E.D. Mich. Feb. 16, 2016) ("Plaintiff's failure to address any claim but her TCPA claim in response to LiveVox's motion to dismiss is cause for dismissing those claims."); *Ullmo v. Ohio Tpk.*, 126 F.Supp.3d 910, 919 (N.D. Ohio 2015) (finding that plaintiff abandoned claim where he failed to respond to defendant's motion to dismiss).

The Court denies Plaintiff's request for additional time to respond to the City's argument. This is the second time this argument has been raised by the City, and after the Court granted numerous other extensions for Plaintiff to oppose Defendants' Motions, the Court previously informed Plaintiff that "[n]o further extensions [would] be granted for [Plaintiff's] oppositions." (Sept. 30, 2022 non-doc. Order.) Thus, in light of Plaintiff's complete failure to respond to the City's argument, the Court finds that Plaintiff has abandoned and/or waived her state law claims as against the City.

Plaintiff further requests that if the Court should find a deficiency in Plaintiff's SAC, that Plaintiff be granted leave to file an additional amended complaint or bifurcate Plaintiff's claims against the City. (Doc. No. 55 at 23.) Plaintiff's request for leave to amend is denied since Plaintiff has failed to follow the proper procedure for requesting leave to amend. "[A] bare request in an

opposition to a motion to dismiss—without any indication of the particular grounds on which amendment is sought . . . does not constitute a motion within the contemplation of Rule 15(a)." *La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 486 (6th Cir. 2010) (quoting *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 698 (6th Cir. 2004)).  Indeed, "[a] request for leave to amend 'almost as an aside, to the district court in a memorandum in opposition to the defendant's motion to dismiss is . . . not a motion to amend.'"  *Id.* (quoting *Begala v. PNC Bank, Ohio, Nat'l Ass'n*, 214 F.3d 776, 784 (6th Cir. 2000)).  Nor does the Court see any reason to bifurcate Plaintiff's claims against the City.

Accordingly, the City's Motion to Dismiss Plaintiff's Counts I, II, III, IV, V, VI, and VII under state law against the City is hereby GRANTED.

As for Plaintiff's claims against the City, all that remains is Plaintiff's federal law claim under Count VII.

### B.  Defendants Grasha and Haggerty's Renewed Partial Motion to Dismiss

Defendants Grasha and Haggerty move to dismiss Plaintiff's Counts III, IV, VI against them, any claim against them in their official capacity, and any claim attempting to hold them liable for prosecutorial misconduct.  (Doc. No. 47 at 1.)

### i.  Spoilation (Count III)

Under Count III, Plaintiff alleges that "Defendants intentionally, willfully, wantonly, and maliciously instructed the hospital to discard critical exculpatory evidence and then prosecuted Plaintiff complaining the evidence did not exist[] (the specimen)[,] by claiming a refusal."  (Doc. No. 43-2, ¶ 162.)  Plaintiff alleges that Defendants' actions amounted to "purposeful destruction of exculpatory evidence which had been ordered at Defendants' request."  (*Id.* at ¶ 168.)  Plaintiff alleges

21

that Defendants placed her "under arrest with the intent/knowledge of pursuing legal action against her and requested chemical testing for such purpose, knowing that by their actions litigation was probable." (*Id.* at ¶ 169.) Plaintiff alleges that Defendants' actions were "designed to disrupt Plaintiff in pursuing or defending legal action," and such actions "caused disruption to Plaintiff's case." (*Id.* at ¶¶ 171-72.) Plaintiff further alleges that the spoilation caused the damages as set forth in the Damage section of the Complaint. (*Id.* at ¶ 177.)

### a.    Common Law Spoilation

Grasha and Haggerty argue that Plaintiff's common law claim of spoilation fails as a matter of law. (Doc. No. 47 at 3-4.) Grasha and Haggerty argue that Plaintiff has pled that there was no destruction of the subject specimen, and thus, this claim fails. (*Id.* at 4.) Further, Grasha and Haggerty argue that this claim fails because no damage was caused to Plaintiff as Plaintiff's urine was, in fact, tested. (*Id.*) Plaintiff argues that Grasha and Haggerty's assertion that she has pled that the subject specimen was not destroyed is a mischaracterization of the Complaint. (Doc. No. 54 at 7.) Plaintiff further argues that she has sufficiently alleged damages as Defendants' actions "disrupted Plaintiff's case and prejudiced Plaintiff," and resulted in charges that should have never been brought. (*Id.* at 8-9.)

The parties agree that the elements for a claim of spoilation under Ohio law are: "(1) pending or probable litigation involving the plaintiff, (2) knowledge on the part of defendant that litigation exists or is probable, (3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case, (4) disruption of the plaintiff's case, and (5) damages proximately caused by the defendant's acts." *Smith v. Howard Johnson Co.*, 615 N.E.2d 1037, 1038 (Ohio 1993).

The Court finds that Plaintiff has sufficiently plead a claim of spoilation under Ohio law against Defendants Grasha and Haggerty.  First, the Court finds Grasha and Haggerty's argument that Plaintiff pled that the subject specimen was not destroyed unavailing and misleading.  In support of their argument, Grasha and Haggerty point to paragraph 70 of the SAC.  (Doc. No. 47 at 4.)  That paragraph reads: "Plaintiff asked a number of times at the hospital whether she was under arrest, and, it was not until Defendants Haggerty and Grasha were advised of the negative results that Plaintiff was informed that she was under arrest."  (Doc. No. 43-2, ¶ 70.)  Nowhere in that paragraph does Plaintiff allege that the subject specimen was not ultimately destroyed.  Indeed, the Plaintiff alleges that "Defendant Haggerty, in fact, instructed the hospital to 'pour out' the urine sample, and both Defendant Haggerty and Grasha had no intention, nor sought, to take the negative sample with them." (*Id.* at ¶ 64.)  Thus, Plaintiff sufficiently alleged that the evidence was destroyed.

Next, the Court finds Grasha and Haggerty's one-line argument, unsupported by any case law, that Plaintiff's spoilation claim fails because no damage was caused unavailing.  Plaintiff has sufficiently alleged damages caused by the alleged destruction of the specimen.  Included in the Damages section of her Complaint, Plaintiff references the suspension of her driver's license which could not be rectified until long after her conviction was reversed, as well as loss of income, humiliation, embarrassment, loss of status in her profession, harm to family relationships, and the inability to attend to her father's physical needs.  (*Id.* at ¶ 239.)  Plaintiff suffered an automatic license suspension as a result of the refusal to submit a urine sample charge—a charge that resulted from Defendants' "directing and disposal of exculpatory and material evidence," the urine sample.  (Doc. No. 54 at 8-9.)  Thus, Plaintiff has sufficiently alleged that the destruction of the urine sample caused her damage.

23

Accordingly, Grasha and Haggerty's Partial Motion to Dismiss Plaintiff's Count III under common law against them is hereby DENIED.

### b.  Federal Spoilation

Grasha and Haggerty argue that there is no federal cause of action for spoilation of evidence, and thus, Plaintiff's federal cause of action for spoilation as against Defendants Grasha and Haggerty should be dismissed.  (Doc. No. 47 at 4.)  Citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963), Plaintiff argues that the "*suppression* of material evidence, whether exculpatory or impeaching, deprives the defendant of his right to due process when there is a reasonable probability that, had the favorable evidence been disclosed, the outcome of the trial would have been different."  (Doc. No. 54 at 9 (emphasis added).)   Plaintiff further argues that the fabrication of evidence violates a person's constitutional rights.  (*Id.*)

The Court determines that Plaintiff has not provided authority for a freestanding federal cause of action for the spoilation of evidence.  Further, Plaintiff has not sufficiently alleged a federal claim for the suppression of evidence or the fabrication of evidence.  Plaintiff has not sufficiently alleged that any suppression of evidence occurred, as the negative test results of the specimen were shared with Plaintiff and the jury, which ultimately led to the jury finding Plaintiff not guilty as to the refusal to submit to the urine test charge.

Nor has Plaintiff sufficiently alleged that evidence has been fabricated.  Plaintiff's citation to *Mills v. Barnard*, 869 F.3d 473, 484 (6th Cir. 2017) is unavailing.  In *Mills*, the plaintiff alleged that the defendant manufactured false inculpatory evidence by falsifying a report to indicate a DNA match where there was none.  *Id.*  Such is not the case here.  Plaintiff has not alleged that Defendants manufactured any false inculpatory evidence by destroying the urine specimen.  To the extent

24

Plaintiff attempts to allege that the Defendants falsified a police report by indicating that Plaintiff refused to submit a urine specimen, Plaintiff has not sufficiently alleged, nor could she, "that there is a reasonable likelihood that the false evidence could have affected the judgment of the jury," as Plaintiff was found not guilty as to the refusal to submit to the urine test charge.  *See id.* (quoting *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997)).

Accordingly, Grasha and Haggerty's Partial Motion to Dismiss Plaintiff's Count III under federal law against them is hereby GRANTED.

### ii.      False Imprisonment (Count IV)

Under Count IV, Plaintiff alleges that Defendants caused her to serve thirty (30) days of incarceration in the Cuyahoga County jail in violation of Ohio law and § 1983.  (Doc. No. 43-2, ¶ 180.)  Plaintiff further alleges that Defendants did not consent to her request for an appellate bond. (*Id.* at ¶ 181.)  Plaintiff alleges that the false imprisonment caused the damages as stated in the Damages section of the Complaint.  (*Id.* at ¶ 182.)

### a.      State Law False Imprisonment

Grasha and Haggerty argue that Plaintiff's claim of state law false imprisonment (Count IV) fails as a matter of law.  (Doc. No. 47 at 5.)  Grasha and Haggerty argue that "false imprisonment has no application in the context of an arrest by a police officer."  (*Id.*)  To the extent this claim can be interpreted as a false arrest claim, Grasha and Haggerty further argue that the statute of limitations has run on such a claim.  (*Id.*)  Plaintiff argues that in the case cited by Grasha and Haggerty, *Rogers v. Barbera*, 164 N.E.2d 162, 164 (Ohio 1960), the Ohio Supreme Court upheld a jury verdict against a sheriff and a deputy for false imprisonment.  (Doc. No. 54 at 11.)  Plaintiff fails to address Defendants' statute of limitations argument.

25

The Court determines that Plaintiff fails to state a claim for common law false imprisonment. As stated in *Rogers*, in a claim for false imprisonment, "the detention is purely a matter between private persons for a private end, and there is no intention of bringing the person detained before a court." 164 N.E.2d at 164. When defendants detain a plaintiff "for the purpose of bringing [her] before the court," the plaintiff has no cause of action for false imprisonment. *Nerswick v. CSX Transp., Inc.*, 692 F. Supp. 2d 866, 882 (S.D. Ohio 2010). Here, Grasha and Haggerty detained Plaintiff for the purpose of arresting her and bringing her to court, thus Plaintiff is not alleging a false imprisonment claim.

To the extent Count IV can be construed as a state law claim for false arrest, Plaintiff's failure to oppose Grasha and Haggerty's argument that the statute of limitations has run on such a claim has resulted in the waiver of an opposition. It is well established that, if a plaintiff fails to respond or to otherwise oppose an argument set forth in a defendant's motion to dismiss, a district court may deem the plaintiff to have waived opposition. *See, e.g.*, *Humphrey*, 279 F. App'x at 331.

Even if Plaintiff had not waived her opposition to Defendants' argument, however, the Court finds that Plaintiff's state law claim for false arrest is barred by the statute of limitations. In Ohio, "the one-year statute of limitations set forth in R.C. 2305.11(A) applies to claims of false arrest." *Petty v. Kroger Food & Pharmacy*, 2007 WL 2800378, at *3 (Ohio Ct. App. Sept. 27, 2007). Such a claim accrues on the day of a plaintiff's arrest. *Id.* at *4. Here, Plaintiff was arrested on December 30, 2018, and Plaintiff did not originally file suit on her false arrest state claim until December 30, 2020—two years later. Thus, Plaintiff's state law claim for false arrest is barred by the statute of limitations.

26

Accordingly, Grasha and Haggerty's Partial Motion to Dismiss Plaintiff's Count IV under state law against them is hereby GRANTED.

### b. Federal Law False Imprisonment

Grasha and Haggerty argue that Plaintiff's federal false imprisonment claim is identical to her federal false arrest claim, and thus, this claim should be dismissed as it is duplicative of Count VII. (Doc. No. 47 at 5-6.) Plaintiff argues that Count IV is not identical to Count VII because "Count VII includes specific facts and allegations against the Defendants that go beyond the allegations contained in Counts 1, 2, 3, 4, 5, and 6, even while incorporating the allegations in those Counts." (Doc. No. 54 at 11-12.)

Defendants correctly cite *Weser v. Goodson*, 965 F.3d 507, 513 (6th Cir. 2020) for the proposition that the Sixth Circuit has recognized that "[w]hen a false-imprisonment claim arises out of an alleged false arrest . . . those claims are identical." *Id.* Defendants fail to recognize, however, that the court in *Weser* did not dismiss the federal false imprisonment claim, but rather "simply refer[red] to those two claims together as a false-arrest claim." *Id.* This Court follows the Sixth Circuit's lead. Because Plaintiff alleges additional facts in Count IV (False Imprisonment) beyond those already alleged in Count I (Malicious Prosecution and False Arrest), the Court will combine the two claims and simply refer to the false imprisonment and false arrest claims together.

Accordingly, Grasha and Haggerty's Partial Motion to Dismiss Plaintiff's Count IV under federal law against them is hereby DENIED.

### iii. Reckless, Wanton, or Willful Conduct/Ohio Rev. Code § 2921.52 and 42 U.S.C. § 1983 (Count VI)

Under Count VI, Plaintiff alleges that Defendants "wantonly, and willfully committed reckless violations of the law, including maliciously prosecuting Plaintiff, arresting Plaintiff,

27

confining Plaintiff, and further frivolously objecting to Plaintiff's appeal of her conviction." (Doc. No. 43-2, ¶ 194.) Plaintiff alleges that "Defendants instituted and continued pursuit of false charges against Plaintiff," charges which were "premised upon pursuit of a sham legal process and were not lawfully issued." (*Id.* at ¶¶ 195-96.) Plaintiff alleges that Grasha and Haggerty "participated, in part, in executing false law enforcement documents." (*Id.* at ¶ 198.) Plaintiff alleges that the charging affidavit and summons were a sham, the purported BMV Form was a falsified legal instrument and a sham, and Grasha and Haggerty provided false testimony in furtherance of the sham proceeding. (*Id.* at ¶¶ 199-201.) Plaintiff alleges the "sham legal instruments were designed to make others believe that they were lawfully issued," and the "Defendants knowingly used the sham legal process to arrest, detain, search and seize Plaintiff and her property." (*Id.* at ¶¶ 203, 206.)

### a. Ohio Rev. Code § 2921.52

Grasha and Haggerty first argue that "reckless, wanton, or willful behavior" is not a distinct cause of action, and thus, Count VI should be dismissed. (Doc. No. 47 at 6.) Next, Grasha and Haggerty argue that Ohio Rev. Code § 2921.52 is inapplicable here because the statute prohibits a sham legal process which is defined as an instrument "not lawfully issued." (*Id.*) Grasha and Haggerty argue no such instrument exists here, as Plaintiff was prosecuted and tried by a court of law. (*Id.*) Thus, the legal process was "lawfully issued." (*Id.* at 5-6.) Grasha and Haggerty argue that Plaintiff's complaints fall under the parameters of an abuse of process or malicious prosecution claim. (*Id.* at 7.)

Plaintiff argues that the allegations of reckless, wanton, or willful conduct "accounts for permissible alternative pleading to potentially address, for example, exceptions to immunities." (Doc. No. 54 at 12.) Next, Plaintiff argues that she alleges in her Complaint that Grasha and Haggerty

executed false law enforcement documents, that the charging affidavit and summons were a sham, that the BMV form was falsified, and that Grasha and Haggerty provided false testimony, all in furtherance of the sham proceedings.  (Doc. No. 54 at 13.)

As an initial matter, the Court agrees with Grasha and Haggerty that "reckless, wanton, or willful conduct is not a stand-alone cause of action," however, such a claim is properly characterized as a claim under Ohio Rev. Code § 2921.52.  *Bickerstaff v. Lucarelli*, 830 F.3d 388, 399 (6th Cir. 2016).  Thus, this is not a basis on which to dismiss Plaintiff's claim.

Under Ohio Rev. Code § 2921.52, a sham legal process is defined as an instrument that (1) is "not lawfully issued"; (2) purports to: be a summons, subpoena, judgment, or order of a court, a law enforcement officer, or a legislative, executive, or administrative body; assert jurisdiction over or determine the legal or equitable status, rights, duties, powers or privileges of any person or property; or require or authorize the search, seizure, indictment, arrest, trial or sentencing of any person or property; and (3) is designed to make another person believe that it is lawfully issued.  Ohio Rev. Code § 2921.52(A)(4)(a)-(c).

This statute also provides that "[n]o person shall...(1) [k]nowingly issue, display, deliver, distribute, or otherwise use sham legal process; (2) [k]nowingly use sham legal process to arrest, detain, search, or seize any person or the property of another person; (3) [k]nowingly commit or facilitate the commission of an offense, using sham legal process; [or] (4) [k]nowingly commit a felony by using sham legal process."  *Id.* at § 2921.52(B).

Here, Plaintiff has sufficiently alleged that Grasha and Haggerty used a sham legal process when they provided false information on law enforcement documents in furtherance of criminal charges to be brought against Plaintiff.  *See Seymour v. Miller*, 2022 WL 93327, at *10 (S.D. Ohio

Jan. 10, 2022) (holding that allegations that the defendant falsified allegations against the plaintiff were enough to survive dismissal).

Accordingly, Grasha and Haggerty's Partial Motion to Dismiss Plaintiff's Count VI under state law against them is hereby DENIED.

### b. Federal Malicious, Wanton, or Willful Conduct

Grasha and Haggerty argue no federal cause of action is at issue under Count VI, and thus, Plaintiff's claim should be dismissed. (Doc. No. 47 at 7.) Plaintiff does not address this argument, and thus, the Court deems it waived. *See, e.g.*, *Humphrey*, 279 F. App'x at 331.

Accordingly, Grasha and Haggerty's Partial Motion to Dismiss Plaintiff's Count VI under federal law against them is hereby GRANTED.

### iv. Official Capacity Claims

Defendants argue that Plaintiff's claims against Defendants Grasha and Haggerty in their official capacities as police officers of the City should be dismissed because (1) "a suit against a public employee in his official capacity must be treated as a suit against the public employer itself," and (2) because state officials sued in their official capacities for money damages are not "persons" under § 1983. (Doc. No. 47 at 8.) Plaintiff does not address this argument, and thus, the Court deems it waived. *See, e.g.*, *Humphrey*, 279 F. App'x at 331.

Plaintiff does address this argument, however, in her Opposition to Defendant Williams's Motion to Dismiss. (Doc. No. 56 at 6.) Therein, Plaintiff argues that the case law does not support the dismissal of claims against Defendants Grasha, Haggerty, and Williams in their official capacities when the claims are duplicative of the claims made against the City. (*Id.*)

30

Plaintiff's argument fails. Because "[a]n official capacity suit is, in all respects other than name, to be treated as a suit against the entity," when the entity for which the named defendant is an agent has also been sued, the suit against the named defendant in his official capacity is superfluous. *Faith Baptist Church v. Waterford Twp.*, 522 F. App'x 322, 327-28 (6th Cir. 2013) (holding that such superfluous claims were properly dismissed). Thus, because Plaintiff is suing the City as well as Grasha and Haggerty in their official capacities as agents of the City, the claims against Grasha and Haggerty in their official capacities are superfluous.

Accordingly, Grasha and Haggerty's Partial Motion to Dismiss Plaintiff's claims against them in their official capacities is hereby GRANTED.

### v. Prosecutorial Conduct Claims

Lastly, Grasha and Haggerty argue that to the extent Plaintiff's claims attempt to hold them liable for prosecutorial conduct, those claims should be dismissed. (Doc. No. 47 at 9.) Defendants argue that "Plaintiff has not established how the arresting officers would be liable" for conduct related to Plaintiff's grievances with the prosecution or the judge in her underlying case. (*Id.*) Rather, Grasha and Haggerty argue that to the extent Plaintiff's claims are based on decisions of the prosecutor, those claims should be dismissed against Grasha and Haggerty. (*Id.* at 9-10.)

Plaintiff argues that Grasha and Haggerty cannot "insulate themselves from liability for their [u]nconsitutional and tortious conduct that led to the prosecution and continued incarceration of Plaintiff." (Doc. No. 54 at 13.) In their Reply, Grasha and Haggerty clarify that that they are "pointing to the fact that there is no authority to hold them liable for actions of the prosecutor or judge that are plead in the Complaint, especially as they took place after both had access to all information regarding Plaintiff's arrest and her testing at the hospital." (Doc. No. 58 at 8.) Specifically, Grasha

31

and Haggerty point to Plaintiff's allegations regarding: (1) her treatment by the Court and the prosecution in her trial and Administrative License Hearing (Doc. No. 43-2, ¶¶ 82-84); (2) the fact that certain testimony was allowed by the trial court (*id.* at ¶ 89); and (3) the fact that her sentence was not stayed pending appeal (*id.* at ¶ 181).  (Doc. No. 58 at 9.)  Grasha and Haggerty argue that Plaintiff "attempts to impute the knowledge of the prosecutor to the Defendants by complaining that the prosecution continued after her medical records were produced to the prosecutor (Doc. No. 43-2, ¶ 88).  (Doc. No. 58 at 9.)

In support of their argument, Grasha and Haggerty cite to *Greene v. Putnam Cty. Comm'n*, 2022 WL 16859739, at *8-9 (S.D.W.V. Nov. 10, 2022).  In *Greene*, the court held that the causation element for the plaintiff's § 1983 malicious prosecution claim had not been met because once a prosecutor has knowledge of allegedly fabricated evidence, the prosecutor's actions thereafter constitute superseding intervening causes between a defendant officer's alleged misconduct and the prosecution of the plaintiff.  *Id.*  Grasha and Haggerty also cite to this Court's decision in *White v. City of Cleveland*, 2020 WL 7640932, at *20 (N.D. Ohio Dec. 23, 2022).  In *White*, this Court held that a plaintiff failed to prove the first element of a malicious prosecution claim when the plaintiff's detention continued after the prosecutor learned of the alleged evidential improprieties.  *Id.*

The Court finds Grasha and Haggerty's argument persuasive.  To the extent Plaintiff is attempting to impute the knowledge of the prosecutor to the Defendants by complaining that the prosecution continued after her medical records were produced to the prosecutor, such claims fail to state a claim for which relief can be granted as against Grasha and Haggerty.  The prosecutor's and trial court's decisions, after becoming aware of Plaintiff's medical records indicating a negative test result, are superseding intervening causes from Grasha and Haggerty's conduct in this case.

Accordingly, Grasha and Haggerty's Partial Motion to Dismiss Plaintiff's claims against them to the extent the claims attempt to impute the prosecutor's and court's decisions after becoming aware of Plaintiff's medical records on Grasha and Haggerty is hereby GRANTED.

### C.    Defendant Williams's Renewed Motion to Dismiss

#### i.    Official-Capacity Claims

As to Plaintiff's claims against Defendant Williams in his official capacity, Williams argues these claims fail for two reasons.  (Doc. No. 46 at 3.)  First, Williams argues that a suit against a public employee in his official capacity must be treated as a suit against the public employer itself. (*Id.*)  Second, Williams argues that neither a state nor a state official sued in their official capacity for money damages are "persons" under § 1983.  (*Id.*)  Thus, Williams argues that the Plaintiff's claims against Defendant Williams in his official capacity should be dismissed as he is not a person within the meaning of § 1983 and those claims are duplicative of Plaintiff's claims made against the City. (*Id.* at 4.)

In her Opposition, Plaintiff argues that the cases cited by Defendant Williams "lend no credence to a 'dismissal' of official capacity claims," and "[t]here is no found authority to 'dismiss' a Defendant sued in his or her official capacity."  (Doc. No. 56 at 6-7.)

Based on the reasons the Court previously set forth for dismissing the official capacity claims against Defendants Grasha and Haggerty as duplicative of the claims against the City, the Court likewise dismisses Plaintiff's claims against Williams in his official capacity as such claims are duplicative of Plaintiff's claims against the City.

Accordingly, Williams's Motion to Dismiss Plaintiff's claims against him in his official capacity is hereby GRANTED.

33

### ii. Personal Capacity Claims

As to Plaintiff's claims against Williams in his personal capacity, Williams argues that Plaintiff has failed to allege any operative facts against Defendant Williams so as to hold him personally liable. (Doc. No. 46 at 4.)

Without citing to any specific paragraphs of the Complaint, Plaintiff argues that the Amended Complaint sufficiently sets forth that Defendant Williams, "at the least, condoned the unconstitutional actions of others." (Doc. No. 56 at 6.) Plaintiff admits that Defendant Williams "may not have had direct involvement with the incident involving Kuhlman, at least at the time of the first encounter with Cleveland Police," however, "[a] fair reading of Plaintiff's Amended Complaint, in toto, demonstrates the plausibility that former Chief Williams encouraged or condoned others into misconduct, was responsible for lack of training, overlooked police officer misconduct so as to create a policy and practice of misconduct as described more fully in Plaintiff's Complaint." (*Id.* at 8-9.)

In his Reply, Williams argues that the "only factual mention of Chief Williams is that he has supervisory responsibilities over Defendants Grasha and Haggerty," which does not meet the pleading standards. (Doc. No. 59 at 3-4.)

To state an individual-capacity claim against a government official, "a complaint must allege that the defendants were personally involved in the alleged deprivation of federal rights." *Frazier v. Mich.*, 41 F. App'x 762, 764 (6th Cir. 2002); *see also Fluker v. Cuyahoga Cty.*, 2019 WL 3718619, at *6 (N.D. Ohio Aug. 7, 2019). Taking Plaintiff's allegations as true, the Court concludes that Plaintiff fails to state an individual-capacity claim against Williams. Critically, Plaintiff pleads no facts whatsoever that suggest that, or how, or when Williams was personally involved in, or responsible for, the alleged harm Plaintiff suffered.

34

Moreover, Plaintiff does not attempt to distinguish Williams's conduct from the conduct of any other Defendant. Instead, Plaintiff lumps Defendants together, utilizing categorial references to all Defendants throughout the entire Complaint. Plaintiff's categorical references to the Defendants throughout the Complaint are insufficient to allege specific actions on Williams's behalf. *See Marcilis v. Twp. of Redford*, 693 F.3d 589, 596 (6th Cir. 2012) (affirming district court's dismissal of individual-capacity claims against two defendants because the complaint made "only categorical references to 'Defendants.'"). Indeed, Plaintiff admits that "Williams may not have had direct involvement with the incident involving Kuhlman, at least at the time of the first encounter with Cleveland Police." (Doc. No. 56 at 8.) Without more, Plaintiff has failed to alleged facts that are sufficient to state a viable claim against Williams in his individual capacity. *See Lanman v. Hinson*, 529 F.3d 673, 684 (6th Cir. 2008) ("This Court has consistently held that damage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what *each* defendant did to violate the asserted constitutional right.").

Plaintiff's assertion that Williams is liable in his individual capacity by virtue of his role as supervisor is also without merit. It is well established that personal liability under § 1983 cannot be imposed on supervisors solely on the basis of *respondeat superior*. *See Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016) (stating that it is "well settled that 'government officials may not be held liable for the unconstitutional conduct of their subordinates under the theory of *respondeat superior*'") (quoting *Iqbal*, 556 U.S. at 676)); s*ee also Heyerman*, 680 F.3d at 648; *Shehee v. Lutrell*, 199 F.3d 295, 300 (6th Cir. 1999). As the Sixth Circuit has explained:

> For individual liability on a failure-to-train or supervise theory, the defendant supervisor must be found to have "'encouraged the specific incident of misconduct or

in some other way directly participated in it.'" *Phillips v. Roane Cnty.*, 534 F.3d 531, 543 (6th Cir. 2008) (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)). **A plaintiff must demonstrate that the defendant supervisor "'at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.'"** *Id.* (quoting *Shehee*, 199 F.3d at 300). A mere failure to act will not suffice to establish supervisory liability. *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006).

*Essex v. Cty. of Livingston*, 518 F. App'x 351, 355 (6th Cir. 2013) (emphasis added). Because "[s]upervisors are often one step or more removed from the actual conduct of their subordinates . . . the law requires more than an attenuated connection between the injury and the supervisor's alleged wrongful conduct." *Peatross*, 818 F.3d at 241.

The Sixth Circuit addressed pleading standards relating to individual-capacity supervisory liability claims in *Moderwell v. Cuyahoga Cty.*, 997 F.3d 653 (6th Cir. 2021). In that case, the plaintiff brought individual-capacity supervisory liability claims, among others, against several jail executives on behalf of the estate of a detainee who committed suicide while held in the jail. *Id.* at 658. The district court denied the executives' motion for judgment on the pleadings with respect to the plaintiff's supervisory liability claims. *Id.* at 659. On appeal, the executives argued that they could not be held liable via *respondeat superior* simply because their subordinates violated the decedent's constitutional rights. *Id.* The Sixth Circuit rejected the CCCC executives' argument and affirmed the decision of the district court. *Id.* Central to the Sixth Circuit's reasoning was the fact that, in the complaint, the plaintiff specifically alleged that the executives "*personally* devised and implemented the regionalization plan—an unconstitutional policy that created an unreasonable risk of suicide, . . . *knowingly acquiesced* in unconstitutional policies, including the use of solitary confinement as a punishment for minor infractions, the conditions of the Red Zone, and the denial of food as a punishment, . . . and [ ] abandoned their duties by failing to enact policies to prevent suicide,

36

to provide adequate healthcare, to ensure appropriate supervision, and to train CCCC's correctional officers . . . ." *Id.* (internal citations omitted) (emphasis added).  According to the Sixth Circuit,

> As to whether they knowingly acquiesced in the unconstitutional conduct of a subordinate, the Executive Defendants argue that Warden Ivey acted unconstitutionally without their knowledge. However, the Executive Defendants' involvement in, and knowledge of, Ivey's unconstitutional conduct requires "facts to be fleshed out during discovery." *Guertin*, 912 F.3d at 927. Drawing all inferences in Plaintiff's favor, the Amended Complaint alleges that, in response to the severe overcrowding knowingly caused by the Executive Defendants, Ivey implemented unconstitutional policies. The Amended Complaint further alleges that the Executive Defendants were on notice of the "insufficient and inedible food" and the "life-or-death" conditions at CCCC. (R. 55 at PageID## 293, 295-296.) They also allegedly "knew of a custom, propensity, and pattern" of prison officials "failing and/or refusing to provide prompt and competent access to and delivery of medical and mental health assessment, evaluation, care, intervention, referral, and treatment, to detainees." (*Id.* at PageID## 304-05.) At summary judgment, Plaintiff's burden will be to present facts showing that the Executive Defendants knew about the unconstitutional conduct and "did more than play a passive role in the alleged violations or show mere tacit approval of the goings on." *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006); *Peatross*, 818 F.3d at 243. But this burden is not on Plaintiff at the pleading stage. *See Hart*, 973 F.3d at 638 n.4 (explaining that "[a] complaint need not set down in detail all the particularities of a plaintiff's claim against the defendant." (quoting *Dunn v. Tennessee*, 697 F.2d 121, 125 (6th Cir. 1982))).

*Id.*

By contrast, in the instant case, Plaintiff does not plausibly allege any specific conduct on Williams's part that he implicitly authorized, approved, or knowingly acquiesced in the allegedly unconstitutional conduct at issue.  *Heyerman*, 680 F.3d at 648; *cf. Coley v. Lucas Cty., Ohio*, 799 F.3d 530, 542 (6th Cir. 2015) (concluding that the plaintiff sufficiently alleged a county sheriff's knowing acquiescence in unconstitutional conduct by alleging that the sheriff intentionally covered up his subordinates' unconstitutional conduct to federal investigators).  Rather, Plaintiff contends that Williams is individually liable for the conduct of Grasha and Haggerty because he was their supervisor.  As explained in *Moderwell*, while Plaintiff "need not set down in detail" all of the

particularities of her claims against Williams, Plaintiff must at least allege *some* facts related to her individual capacity supervisory liability claims against Williams.  2021 WL 1897949, at *8.  As written, Plaintiff's Complaint fails to do so.

Accordingly, Williams's Motion to Dismiss Plaintiff's claims against him in his personal capacity is hereby GRANTED.[4]

## IV.    Conclusion

For the reasons set forth therein, the Defendants' Motions are GRANTED IN PART and DENIED IN PART, as follows.

The City's Motion to Dismiss is **GRANTED** with respect to: (1) Plaintiff's Counts I, II, III, IV, V, and VI under 42 U.S.C. § 1983; and (2) Plaintiff's state law claims under Counts I, II, III, IV, V, VI, and VII.  The City's Motion to Dismiss is **DENIED** with respect to Plaintiff's Count VII under 42 U.S.C. § 1983.

Defendants Grasha and Haggerty's Partial Motion to Dismiss is **GRANTED** with respect to: (1) Plaintiff's Count III under federal law against them; (2) Plaintiff's Count IV under state law against them; (3) Plaintiff's Count VI under federal law against them; (4) Plaintiff's claims against them in their official capacities; and (5) Plaintiff's claims against them related to prosecutorial conduct as set forth above.  Defendants Grasha and Haggerty's Partial Motion to Dismiss is **DENIED** with respect to: (1) Plaintiff's Count III under common law against them; (2) Plaintiff's Count IV under federal law against them; and (3) Plaintiff's Count VI under state law against them.

---

[4] Because the Court has dismissed Plaintiff's claims against Williams in both his official and personal capacities, the Court need not address William's arguments that Plaintiff's claims against him fail on the merits.  (Doc. No. 46 at 5-7.)

Defendant William's Motion to Dismiss is hereby **GRANTED**.  Defendant Williams is hereby dismissed from this suit.

**IT IS SO ORDERED.**


Dated:  March 23, 2023                    _s/Pamela A. Barker_____
                                          PAMELA A. BARKER
                                          UNITED STATES DISTRICT JUDGE