# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**GINA KUHLMAN,**                                    **Case No. 1:22-CV-536-PAB**

                    **Plaintiff,**

          **-vs-**                                   **JUDGE PAMELA A. BARKER**

**THE CITY OF CLEVELAND, et al.,**

                    **Defendants.**                  **MEMORANDUM OPINION & ORDER**

Currently pending is the Motion to Disqualify Plaintiff's Experts filed by Defendant City of Cleveland ("City"), Defendant Officer Samantha Lyon ("Haggerty"),[1] and Defendant Officer David Grasha ("Grasha") (together, the "Officers," and collectively with the City, "Defendants") filed on December 24, 2024 ("Defendants' Motion to Disqualify").  (Doc. No. 98.)  On January 3, 2025, Plaintiff Gina Kuhlman ("Plaintiff" or "Kuhlman") filed a Brief in Opposition to Defendants' Motion to Disqualify ("Plaintiff's Opposition to Defendants' Motion to Disqualify").  (Doc. No. 103.)  On January 10, 2025, Defendants filed a Reply Brief in Support of Defendants' Motion to Disqualify ("Defendants' Reply in Support of Motion to Disqualify").  (Doc. No. 110.)

Also pending before the Court are the City's Motion for Summary Judgment ("City's Motion") (Doc. No. 106) and the Officers' and John/Jane Doe Defendants' Motion for Summary Judgment ("Officers' Motion") (Doc. No. 108), both filed on January 6, 2025.[2]  On February 24,

---

[1] For clarity, the Court adopts Samantha Lyon's preference for referring to her by her former name, Samantha Haggerty. (Doc. No. 108 at PageID# 3545.)

[2] The Court notes that the Officers first attached a duplicate of the City's Memorandum in Support of the City's Motion before refiling their Motion for Summary Judgment the same day and properly attaching a Memorandum in Support of the Officers' Motion.  (*Compare* Doc. No. 107-1 *with* Doc. No. 108-1.)

2025, Kuhlman filed a Consolidated Brief in Opposition to the City's Motion and the Officers' Motion ("Plaintiff's Opposition").  (Doc. No. 113.)  On March 17, 2025, the City filed a Reply Brief in Support of its Motion ("City's Reply"), and the Officers and John/Jane Doe Defendants filed a Reply Brief in Support of their Motion ("Officers' Reply").  (Doc. No. 115; Doc. No. 116.)

For the following reasons, the Court orders as follows.  The Defendants' Motion to Disqualify is GRANTED.  The Officers' Motion is GRANTED, and the City's Motion is GRANTED.

## I.     Undisputed Material Facts

### A.     Kuhlman Drives to Chipotle

According to Kuhlman, on December 30, 2018, she was driving her father's red Chrysler from a Dunkin Donuts located on Mayfield Road in South Euclid, Ohio, to meet her daughter and sister at Angelo's Pizza in Lakewood, Ohio.  (Kuhlman Depo. (Doc. No. 100) at Tr. 122-23, 135; Grasha Call Comments (Doc. No. 105-3) at PageID# 3410; Field Case Report (Doc. No. 104-4) at PageID# 2917.) She was "trying to navigate without a navigation system[.]"  (Kuhlman Depo. at Tr. 133.)  She was "kind of lost" and not "familiar with where [she] was."  (*Id.* at Tr. 134.)  Kuhlman testified that while on Interstate 490 ("I-490"), she was driving under a bridge when "suddenly, there was a very loud sound.  It sounded like a gunshot and momentarily after that, glass was shattering all over [Kuhlman's] head and in [her] car."  (Kuhlman Depo. at Tr. 133-34.)  She "was in so much [dis]belief" and "had no idea what was happening," because the glass of her sunroof "just shattered."  (*Id.*) Kuhlman did not pull to the side of I-490.  (*Id.* at Tr. 135-36.)  During her deposition, she testified: "I didn't really know what was happening . . . I just know that I got off the road and I went to that Chipotle parking lot" to "figure out what was going on."  (*Id.* at Tr. 136, 142.)  At Chipotle, Kuhlman parked her vehicle over the pavement of the curb in the center of the parking lot.  (Kuhlman Depo. at

2

Tr. 140; Haggerty Video I (Ex. D-1, Haggerty WCS 1) at 23:33-23:37.)  She "went into the Chipotle to get some water [and] figure out what to do."  (Kuhlman Depo. at Tr. 140.)

　　　While Kuhlman was walking into the restaurant, two men exited their car and approached her. (Kuhlman Depo. at Tr. 145.)  Inside the restaurant, Kuhlman was "discombobulated" and "asked for some water."  (*Id.* at 149.)  The two men were trying to talk to Kuhlman, but she did not "know what happened.'"  (*Id.*)  To her best recollection, Kuhlman "was trying to call Myron Watson[,]" her then-romantic partner and current law partner, when the Officers arrived.  (*Id.* at Tr. 25-26, 149-50.)

　　　At approximately noon that same day, Officers Haggerty and Grasha received a dispatch call about a female who "seemed intoxicated" at a Chipotle restaurant on Loraine Avenue in Cleveland. (Haggerty Depo.  (Doc. No. 101, 102) at Tr. 22; Grasha Depo. (Doc No. 96) at Tr. 15; Doc. No. 104-4 at PageID# 2917; Second Amended Complaint (Doc. No. 43-2) at PageID# 265; Doc. No. 105-3 at PageID# 3410.)  Upon arriving, the Officers noticed a vehicle parked over the curb "on the sidewalk almost in the street."  (Doc. No. 105-3 at PageID# 3410; Haggerty Depo. at Tr. 50; Doc. No. 104-4 at PageID# 2917.)   Both Officers approached the vehicle, looked inside, and perceived that the sunroof was broken.  (Grasha Depo. at Tr. 16; Haggerty Depo. at Tr. 25.)  After inspecting the vehicle, the Officers entered the Chipotle restaurant to "see how she's acting."  (Grasha Depo. at Tr. 16; Grasha Video I (Ex. C-1, Grasha WCS 1) at 1:16.)

## B.　　The Officers' Altercation with Kuhlman at Chipotle

### 1.　　The Officers Approach Kuhlman

　　　Upon entering the restaurant, the Officers immediately noticed Kuhlman on her cell phone in the middle of the restaurant.  (Haggerty Video I at 1:30-1:35.)  Haggerty testified that Kuhlman "was acting in some way that [Haggerty] defined as impaired" because Kuhlman exhibited "slurred speech"

and "trouble walking[,]" and Grasha testified that "[t]here was a slurred - - it was a slurred speech.  I would - - stumbling when she walked.  I believe she was initially sitting and then she stood up and it seemed like she had a balancing problem."  (Haggerty Depo. at Tr. 44; Grasha Depo. at Tr. 17, 25, 30.)  Kuhlman testified that her speech was not slurred.  (Kuhlman Depo. at Tr. 150.)

Haggerty asked Kuhlman if the vehicle in the parking lot belonged to Kuhlman, which Kuhlman confirmed.  (Haggerty Video I at 1:38-1:41.)  A man standing with Kuhlman approached the Officers and told them that "she ran the curb."  (Grasha Video I at 1:42; Haggerty Video I at 23:37.)  Haggerty asked Kuhlman "do you have any ID on you?"  (Grasha Video I at 1:44; Haggerty Video I at 1:48.)  Without answering, Kuhlman began walking away, so Haggerty said, "why don't you sit back down?"  (Grasha Video I at 1:46; Haggerty Video I at 1:48.)  The man standing with Kuhlman pointed at the second man and told the Officers that "we were just going to get some food. Right.  I think she wanted to see her daughter or something, or her ex-husband or something."  (Grasha Video I at 1:58-2:00; Haggerty Video I at 1:50-2:03.)  Officer Grasha told Kuhlman "I have your keys," and Haggerty asked Kuhlman if her hands were cut.  (Grasha Video I at 2:01-2:02; Haggerty Video I at 2:04-2:05.)  Kuhlman leaned closer to Haggerty's face and said "what?"  (Grasha Video I at 2:05.)  Haggerty then rephrased her question, asking Kuhlman "are your hands bleeding?"  (Grasha Video I at 2:06; Haggerty Video I at 2:07.)  Kuhlman looked down at her hands and responded "no," but one of the two men monitoring Kuhlman pointed at her hands and remarked "yeah, there is a little - -" (Grasha Video I at 2:03-2:07; Haggerty Video I at 2:09.)

Grasha can then be heard asking Kuhlman "who's Myron?" (Grasha Video I at 2:08; Haggerty Video I at 2:09-10.)  Kuhlman said "He's my friend.  He's my attorney also."  (Grasha Video I at 2:10; Haggerty Video I at 2:14.)  Kuhlman then asked one of the two men: "I'm not sure - - uhh did

4

you see where I put my purse?" and Grasha can be heard saying to Kuhlman "let's go out this way, come on."  (Grasha Video I at 2:16-2:17; Haggerty Video I at 2:14-2:17.)  Haggerty told Kuhlman that her purse was in her car.  (Haggerty Video I at 2:20-2:21.)

### 2. Kuhlman Refuses to Sit in the Police Cruiser

Before she exited the restaurant with the Officers, Kuhlman turned around and slowly walked back to a table, took a sip from a Chipotle cup, and then began walking out of the restaurant while carrying the cup.  (Grasha Video I at 2:17-2:27.)  As Kuhlman took another sip, Haggerty put her hand on Kuhlman's back and said "why don't I hold on to you?  I don't know if you'll be able to walk on out."[3]  (Haggerty Video I at 2:27-2:28.)  Kuhlman stopped walking, and Haggerty said to Kuhlman "I am doing it for you.  No, you're not fine to walk, we are going to have you sit in the car until EMS comes, okay?"  (Grasha Video I at 2:33-2:37; Haggerty Video I at 2:33-2:38.)  Kuhlman tried stepping away from Haggerty, so Haggerty told Kuhlman, "[l]isten, I don't want to put handcuffs on you, so listen . . ."  (Grasha Video I at 2:38-2:40; Haggerty Video I at 2:39-2:41.)  Kuhlman asked the Officers to "talk to Myron."  (Grasha Video I at 2:41.)  Grasha responded that "Myron is not on the phone" while Haggerty gestured out the door, saying "come on, just come with me, let's get out of here.  Yeah, let's get out of the store" and Grasha said to Kuhlman, "work with us, it's okay."  (Grasha Video I at 2:42-2:50; Haggerty Video I at 2:45-2:51.)

While walking through the vestibule, Grasha asked Kuhlman "are you okay?" and then immediately said "obviously you're not."  (Grasha Video I at 2:53-2:56; Haggerty Video I at 2:54-59.)  Kuhlman did not initially respond, but then can be heard mumbling, "I'm depressed but this is

---

[3] At the same time, Grasha thanked the two men who were monitoring Kuhlman.  (Grasha Video I at 2:27-2:29.)

like illegal" and tried to walk away from the Officers.  (Grasha Video I at 2:58-3:01; Haggerty Video I at 3:01-3:04.)  Grasha stepped in front of Kuhlman and asked her "what's going on, what are you depressed about?" and Haggerty, now exasperated, said to Kuhlman "let me help you. You're not even able to walk right now."  (Grasha Video I at 3:01-3:03; Haggerty Video I at 3:05-3:06.)  Kuhlman declined, saying "I appreciate that but - -" and Grasha then said to Kuhlman "Relax.  Relax. I know you're intoxicated.  Okay?"  (Grasha Video I at 3:03-3:08; Haggerty Video I at 3:07-3:11.)  Kuhlman responded "no, I'm not."  (Grasha Video I at 3:10; Haggerty Video I at 3:12.)  Grasha asked her, "then what are you?" while Haggerty asked, "what did you take today?  You can barely even walk." (Grasha Video I at 3:09-3:11; Haggerty Video I at 3:12-3:15.)  After Kuhlman did not respond, Grasha asked "will you be honest with us?  Just talk to us for a second?"  (Grasha Video I at 3:11-3:15.) Haggerty informed Kuhlman that EMS would arrive soon and "they're going to come check you out." (*Id.* at 3:16-3:18; Haggerty Video I at 3:18-3:20.)

The Officers' bodycam footage shows that Kuhlman tried walking to her vehicle and mumbled "oh for G-d's sakes" to which Grasha responded, "well, ma'am, you're not in any type of shape to - -" (Grasha Video I at 3:18-3:22; Haggerty Video I at 3:24.)  The Officers directed Kuhlman away from her vehicle and pointed her towards their police cruiser, and Haggerty said to Kuhlman, "you're going to get in our car.  We're going to have you sit down in our car."  (Grasha Video I at 3:22-3:25; Haggerty Video I at 3:25-3:28.)  Kuhlman again tried to enter her own vehicle, but Grasha stood in her way, saying "you're not doing that" while Haggerty grabbed Kuhlman by the shoulders and faced her towards the police cruiser.  (Grasha Video I at 3:25-3:31.)  Haggerty repeated "you're going to come sit down in our car right now, okay?  Come sit down." (Grasha Video I at 3:32; Haggerty Video I at 3:34.)

6

As the Officers opened the door to the police cruiser, Kuhlman stopped, refused to sit, turned to the Officers, and said "you're not arresting me right now.  Will you please call Myron?"  (Grasha Video I at 3:33-3:36; Haggerty Video I at 3:37-3:40.)  Grasha can be heard repeating "ma'am" and Haggerty responded, "we're about to put you in handcuffs.  Do you hear me?"  (Grasha Video I at 3:34-3:41; Haggerty Video I at 3:38-3:42.)  Haggerty asked Kuhlman to turn around and sit in the police cruiser while Grasha agreed to call Myron, stating: "I'm going to call Myron.  If you sit in our car, we'll call Myron for you.  Okay?"  (Grasha Video I at 3:41-3:44; Haggerty Video I at 3:41-3:46.)

Haggerty asked Kuhlman, "you don't have anything on you, right?  Nothing that will poke, stick, or hurt us?  Go sit down.  Sit down."  (Grasha Video I at 3:45-3:48; Haggerty Video I at 3:47-3:52.)  Without responding, Kuhlman can be seen staring at the inside of the police cruiser while Haggerty again asked her to sit down, and Grasha asked her, "now who is this Myron?"  (Grasha Video I at 3:48-3:53; Haggerty Video I at 3:53-3:57.)  Kuhlman mumbled "he's my friend he's an attorney also" while Haggerty told Kuhlman, "I'm not putting you in handcuffs right now."  (Grasha Video I at 3:53-3:55; Haggerty Video I at 3:55-3:58.)  Haggerty and Grasha then again asked Kuhlman to sit down.  (Grasha Video I at 3:56-3:57.)

Next, Haggerty restated to Kuhlman that EMS would arrive soon and turned Kuhlman around to place her in the police cruiser, while Kuhlman, still refusing to sit in the police cruiser, exclaimed "you are not f***ing arresting me for going - - " (Grasha Video I at 3:58-4:00; Haggerty Video I at 4:00-4:04.)  Haggerty then shouted, "sit down in the car!  I'm not going to tell you again.  Sit down!" (Grasha Video I at 4:00-4:04; Haggerty Video I at 4:00-4:04.)  Kuhlman began wagging her finger at the Officers and stated "I'm - - I'm serious.  I didn't do anything."  (Grasha Video I at 4:04-4:05; Haggerty Video I at 4:04-4:09.)  Haggerty told Kuhlman "look at your car right now" to which

Kuhlman inquired, "look at my car what?  What is wrong with the - - state of the car that is wrong? What is the state of the car that is wrong?" (Grasha Video I at 4:05-4:19; Haggerty Video I at 4:10-4:21.)  As Haggerty placed handcuffs on Kuhlman, Grasha informed Kuhlman that "the car is parked onto the sidewalk.  That is what the state of the car is.  Alright?  Listen, you're going to have to cooperate with us.  I'm going to call Myron if you cooperate with us.  If you don't cooperate with us, we're just going to have to take you to jail.  If you cooperate, I will call him for you.  Understood? You have to start calming down, listening to what we say.  Please turn around." (Grasha Video I at 4:20-4:43; Haggerty Video I at 4:25-4:46.)  Kuhlman stated that "there is nothing to arrest me for right now" but Haggerty disagreed, stating, "yes, you're intoxicated," to which Kuhlman responded "no, I am not." (Grasha Video I at 4:54-4:58; Haggerty Video I at 4:55-4:59.)  Kuhlman then inaudibly responded, and then again requested "call - - yron - - Myron." (Grasha Video I at 4:55-5:01; Haggerty Video I at 5:00-5:03.)  Haggerty then restated "you are too impaired to drive right now.  Have a seat in the car." (Grasha Video I at 5:02-5:05; Haggerty Video I at 5:03-5:08.)

In their bodycam footage, Grasha can be heard reminding Kuhlman that EMS would be arriving to 'check out' Kuhlman, and the Officers repeated their request that Kuhlman sit down while Kuhlman again demanded that they call Myron. (Grasha Video I at 4:55-5:08; Haggerty Video I at 5:07-5:13.)  Kuhlman stated: "for real, I - - I'm not kidding" to which Grasha responded "I'm not kidding either." (Grasha Video I at 5:08-5:17; Haggerty Video I at 5:13-5:17.)  Kuhlman inaudibly responded and abruptly declared, "is a lie" and continued to refuse to sit, so Haggerty warned Kuhlman: "you're about to be arrested" at which point the EMS truck arrived in the parking lot." (Grasha Video I at 5:18-5:31; Haggerty Video I at 5:15-5:35.)

Kuhlman continued to request that the Officers call Myron, and Grasha asked Kuhlman for her first name.  (Grasha Video I at 5:31-5:35.)  After she refused to provide her first name and again insisted that the Officers call Myron, Grasha said "I am going to order you right now to sit in my car. Do you understand?"  (Grasha Video I at 5:36-5:50.)  But Kuhlman asserted "you're going to take me and put me in a jail without allowing me to call Myron."  (*Id.*)  The Officers disagreed, stating that they do not have to give Kuhlman that option.  (Grasha Video I at 5:51-6:00; Haggerty Video I at 5:55-6:00.)

Kuhlman then began to sit in the back of the police cruiser. (Grasha Video I at 6:01-6:05; Haggerty Video I at 6:04-6:08.)

### 3.    Kuhlman's Detention in the Police Cruiser and Haggerty's Second Search of Kuhlman's Vehicle

While in the police cruiser, Kuhlman stated "I don't need EMS.  I just need you to call Myron Watson."  (Grasha Video I at 6:01-6:05; Haggerty Video I at 6:04-6:08.)  Haggerty confirmed to Grasha, "well, she said she doesn't want EMS."  (Haggerty Video I at 6:09-6:11.)  Shortly thereafter, as the Officers gathered outside the police cruiser and Kuhlman remained in the back of the police cruiser, an EMS paramedic approached Kuhlman and asked her, "do you want anything from us, ma'am?" to which Kuhlman responded, "no, I'm sorry for taking your time."  (Grasha Video I at 6:06-6:20.)  Haggerty told the EMS paramedic that Haggerty did not see a cut on Kuhlman's hand. (Haggerty Video I at 6:12-6:13.)  After Kuhlman declined EMS treatment, Grasha told the EMS paramedic that Kuhlman was "physically impaired but she's not bleeding or anything."  (Grasha Video I at 6:22-6:28.)

Haggerty then began searching Kuhlman's vehicle.  (Haggerty Video I at 6:26-6:45.) Haggerty's bodycam footage shows dark, shattered glass scattered across the driver's and passenger's

seat.  (*Id.* at 6:33-6:40; Grasha Depo. at Tr. 23; Haggerty Depo. at Tr. 66.)  After concluding her search, Haggerty approached the EMS paramedics and a third police officer, Lieutenant Thomas ("Thomas"), who had just arrived at the scene, and told them, "well, she's already being very uncooperative, so I was just going to have her leave with EMS [because] she is way too intoxicated to be driving but uh she's sort of uh made it so I'm going to OVI her so . . ."  (*Id.* at 6:48-7:00.) Haggerty then stated, "I know she's too impaired, I don't know if she's on alcohol or not, I don't think - - she's probably on some type of . . . something else[.]"  (*Id.* at 7:00-7:13.)[4]

Haggerty asked Kuhlman where she was going when she stopped at Chipotle, and Kuhlman responded that she was "going to have her tire replaced" because the tires were "dry rotted." (Haggerty Video I at 9:00, 9:14-18.)[5]  Haggerty asked Kuhlman "where do you think you are at right now?" and Kuhlman did not respond.  (*Id.* at 9:20-9:25.)  Haggerty rephrased her question, asking Kuhlman if Kuhlman knew which city she was in, and Kuhlman stated that she was in Cleveland

---

[4] In her deposition, Kuhlman denied that there was any rubbing alcohol in her car on the day of the incident.  (Kuhlman Depo. at Tr. 124-27.)  Thomas's bodycam footage shows that he removed a black foam bag from the glove compartment and placed it on the passenger seat of Kuhlman's vehicle.  (Thomas Video I (Ex. F-1, Thomas WCS 1) at 14:30-14:32.) The footage also shows a half-empty bottle of orange "Fuego" on the floor.  (*Id.*)  Inside the trash bag is a bottle labelled "Rexall" above the words "91% Isopropyl Alcohol."  (*Id.*)  In his expert report, Dr. Joliff agreed that "[a] bottle of rubbing alcohol [IPA] was seen in Ms. Kuhlman's car on the day of her arrest."  (Dr. Joliff Report (Doc. No. 105-6) at PageID# 3459.)  Dr. Joliff asserted that Kuhlman's impairment was most likely caused by an alcohol that was not tested for such [as] IPA [isopropyl alcohol] or other newer drugs of abuse that could cause CNS [central nervous system] depression or the signs and behaviors exhibited by Ms. Kuhlman."  (*Id.*)  In her deposition, Gina Kuhlman testified that she has consumed rubbing alcohol "more than once[,]" including by mixing it with "some sort of fruit juice[.]"  (Kuhlman Depo. at Tr. 36-37, 49-53.)  For instance, Cuyahoga County Regional Forensic Science Laboratory tested a urine sample Kuhlman provided on April 30, 2018.  (Toxicology Laboratory Report, Doc. No. 100-1 at PageID# 1403; Kuhlman Depo. at Tr. 87-88.)  Kuhlman admitted that the April 30, 2018, report shows that her urine sample was positive for $113 \pm 13$ mg/dL of Acetone and for $246 \pm 13$ mg/dL of Isopropanol.  (*Id.* at Tr. 88; Doc. No. 105-6 at PageID# 3457.)  While Kuhlman nevertheless denied that there would have been any alcohol in her system in 2018, in her deposition, she conceded that she drank rubbing alcohol in 2019, 2020, and 2021.  (*Id.* at Tr. 49, 115-16.)  When asked, "[d]id you drink any rubbing alcohol on December 30 [2018]?" she responded, "[a]bsolutely not."  (*Id.* at Tr. 129.)

[5] Inside the police cruiser after leaving the Hospital, Kuhlman articulated a different rationale, explaining that she parked her car at the chipotle to get gas and cigarettes, but when Haggerty explained that there was no gas station near the Chipotle, Kuhlman replied "I pulled in there to use the phone."  (Haggerty Video III at 5:30-6:00.)

Heights, a suburb on the east side of Cleveland near her home in South Euclid, when in fact, the Chipotle in which the altercation occurred is located on the west side of Cleveland.  (*Id.* at 9:26-9:51.) Haggerty stated that she did not smell any alcohol, so Haggerty asked Kuhlman what substances Kuhlman had taken and if she had any medical issues, but Kuhlman stared at Haggerty before closing her eyes and waiting approximately twenty (20) seconds to answer that she "has had issues" including "migraines."  (*Id.* at 10:25-11:03.)

The Officers then began attempting to contact Myron using Kuhlman's cell phone.  (Grasha Video I at 12:45.)  Kuhlman gave the Officers the password to her cell phone.  (*Id.* at 13:00-13:20.) When Watson did not answer Grasha's call, Grasha left a voicemail that she has "some sort of problem" and the Officers were "trying to figure things out."  (*Id.* at 14:37-15:00, 16:10.)

Haggerty's bodycam footage also demonstrates that while discussing Kuhlman's state with Thomas, Haggerty stated "pretty positive it is not alcohol at all.  Her eyes are pretty point.  It might be some type of opiate, I don't know."  (Haggerty Video I at 14:35-14:43.)  Haggerty then began searching Kuhlman's vehicle again, and Haggerty noticed a cup in Kuhlman's vehicle that "smelled like alcohol."  (Haggerty Depo. at Tr. 68; Haggerty Video I at 17:30.)  While searching the vehicle, Haggerty found a clear bottle filled with orange liquid, which she stated, "smells a little bit like vodka but it's in an unmarked bottle.  I know for sure it is something else.  Her eyes are like pinpoint."  (*Id.* at 19:27-19:45.)  Haggerty testified that at that time, she believed Kuhlman was on a narcotic. (Haggerty Depo. at Tr. 33.)  Grasha also smelled the bottle and stated that "This is weird . . . its apple cider - - apple stuff."  (Grasha Video I at 21:30-21:50.)  Grasha then approached Kuhlman and asked what was in the bottle, to which Kuhlman responded that "it was Coca-Cola in that."  (*Id.* at 22:31-

11

22:37.)  Grasha said, "no, it's not" and Kuhlman then squinted her eyes as she recalled the contents

of the bottle, before stating, "there's uh juice.  Some sort of orange juice." (*Id.* at 22:38-22:46.)

Grasha then called Kuhlman's sister, Lisa Kuhlman ("Lisa"), who lived in Avon.  (*Id.* at

25:50-25:55; Haggerty Video I at 31:00.)  Grasha told Lisa that Kuhlman was "highly intoxicated"

and asked Lisa if they could come get her, but the bodycam footage does not pick up whether Lisa

responded to their request.  (Grasha Video I at 26:00-26:10; Kuhlman Depo. at Tr. 153-154; Grasha

Depo. at Tr. 64-65.)  Kuhlman testified that she did not know if the Officers asked Lisa to pick

Kuhlman up.  (Kuhlman Depo. at Tr. 154.)

### C.    The Officers Transport Kuhlman to Fairview Hospital

The Officers then discussed where, if anywhere, they should take Kuhlman.  (Grasha Video I

at 27:10- 30:30.)  Haggerty testified that "personally" she would always give everybody the option to

either go with EMS, have somebody come pick the detainee up, or be subject to arrest.  (Haggerty

Depo. at Tr. 37.)  However, Haggerty did not communicate those options to Kuhlman.  (*Id.*)

According to Haggerty, she and Grasha decided to transport Kuhlman to a hospital because the

Cuyahoga County Corrections Center ("CCCC") had implemented a new policy that would not accept

people who had "been in a car accident within 24 hours," "been tased," "fought with officers," were

"suicidal," or "were too impaired[.]"  (*Id.* at Tr. 39.)  In any of those situations, Haggerty testified,

"you have to go get a clear from the hospital first."  (*Id.*)

After discussing whether to take her to a hospital or take her directly to CCCC, Haggerty set

forth her plan:

> We have a drunk person that we can't just let go.  She doesn't even know where she's
> at.  Everybody else lives far away.  We can't let her drive in her car.  I think the best
> bet is to go to the hospital.  She was in an accident.  Technically, she could have
> whiplash or something.  She has something wrong with her in the sense that glass fell

> from the roof on top of her head.  She could have an injury on her head . . . I'll read her
> the BMV 2255.  She can either submit to taking - - letting them draw blood or not.
> Then if she doesn't her license is suspended either way.

(Haggerty Video I at 30:10-30:47.)   Grasha agreed with Haggerty's plan, which the Officers

subsequently communicated to Kuhlman.  (*Id.*; *Id.* at 35:00-36:00.)  In her deposition, Kuhlman

testified that the Officers told her they were transporting her to Fairview Hospital ("Fairview") to

check her head, and that Kuhlman "fully believed they just wanted blood and urine and [she] was

okay with that." (Kuhlman Depo. at Tr. 152.)  Kuhlman further testified that she could overhear

Haggerty saying that Haggerty wanted to get Kuhlman to the Hospital and get Kuhlman to refuse the

chemical test or submit a blood sample, but that Haggerty would then tell Kuhlman directly that the

purpose of taking her to the Hospital was "to make sure [Kuhlman was] okay."  (*Id.*)

While travelling to Fairview, Haggerty again called Myron, who this time answered his phone.

(Haggerty Video I at 37:40-37:45.)  Haggerty communicated to Myron that Kuhlman was in the back

of their police cruiser, that she mistakenly believed she was in Cleveland Heights, had parked over a

curb in a Chipotle parking lot, had consumed an alcoholic beverage, appeared too impaired to drive,

refused to listen to the Officers' commands to sit in the police cruiser, did not want to leave with

EMS, that the sunroof had broken, and that the Officers were transporting Kuhlman to a hospital.  (*Id.*

at 37:48-39:00.)  Haggerty also told Myron that Haggerty would read Kuhlman the BMV 2255 Form.

(*Id.* at 37:37-37:41.)  After arriving at Fairview, while the Officers and Kuhlman remained in the

parking lot, Haggerty passed the phone to Kuhlman so that she could talk with Myron, and although

Kuhlman requested that Myron pick up Kuhlman from Fairview, Myron refused to do so.  (*Id.* at

41:37-42:42.)  Haggerty then retrieved the phone from Kuhlman and informed Myron that they would

be going into Fairview.  (*Id.* at 43:46-44:05.)

13

D. **Kuhlman Submits to Chemical Testing at Fairview**

1. **Kuhlman Urinates on the Floor**

At approximately 1:32 PM, Kuhlman and the Officers arrived at Fairview. (Cudnik Declaration (Doc. No. 105-2) at PageID# 3053.)

Kuhlman and the Officers disagree about whether Kuhlman consented to chemical testing. According to Haggerty, the Officers did not "have a urine sample because [they] couldn't clearly get consent from her" in that Kuhlman "didn't give me clear consent to take it." (Haggerty Depo. at Tr. 57.) Haggerty reported in her Field Report that

> [a]fter arriving at the hospital, I attempted to read the BMV 2255 form to Gina. After the first paragraph she became irate. After several attempts to read and explain the BMV 2255 to her she continued to talk over me and would not comply with providing a sample. I asked Gina several more times if she was going to take the test and she said no. While the nurses were getting her changed into the gown to complete their medical intake, Gina stated that she changed her mind and wanted to submit to the tests. While Gina was being escorted to the bathroom to provide a Urine sample, Gina began urinating on the floor. One of the nurses was able to stick a Urine sample cup underneath Gina and was able to collect enough Urine for the test. While the nurse was packaging up the Urine sample, Gina then began yelling that she wanted to refuse the test again. Due to Gina's indecisiveness with deciding what to do for the test, the sample was discarded and the test was marked as refused.

(Doc. No. 104-4 at PageID#s 2917-98.)

Haggerty's bodycam footage shows that at approximately 1:43 PM,[6] Kuhlman was inside a hospital room in Fairview with Haggerty and a nurse, Ryan Kennedy, who assisted Kuhlman in removing her clothing. (Haggerty Video II (Ex. D-2, Haggerty WCS 3) at 0:03-0:30; Doc. No. 105-2 at PageID# 2982.) Haggerty can first be heard asking Kuhlman, "you're going to take the test?" (Haggerty Video II at 0:31.) Kuhlman paused, looked at the nurse, nodded, and muttered to Haggerty

---

[6] The approximate time of Kuhlman's urination is ascertainable by examining the clock on the wall of the hospital rooms in the bodycam footage. (Haggerty Video II at 0:05.)

14

"yes," as Kennedy continued to help Kuhlman remove her clothing.  (*Id.* at 0:33.)  Haggerty replied, "okay, that makes it easier," and Kuhlman added that "it takes like ninety (90) days to get it back from the state" to which Haggerty stated, "that's the best way for you to go."  (*Id.* at 0:34-0:43.) Kuhlman told Haggerty and Kennedy, "but I really gotta pee" and Kennedy replied, while still assisting Kuhlman with removing her clothing, "okay, so finish taking the clothes off and we need to get the gown on."  (*Id.* at 0:43-0:52.)  Kuhlman then said   "I'm like - - I'm peeing on the floor" and Kennedy exclaimed "oh my God!"  (*Id.* at 0:53-1:00.)  Kuhlman admitted that she urinated on the floor and that the nurse managed to collect some of the urine for testing.  (Kuhlman Depo. at Tr. 174.) According to Kuhlman, she "kept telling them [she] had to use the bathroom" and "made sure the nurse collected it."  (*Id.* at Tr. 158.)

> At 1:45 PM, Kennedy included the following in her provider notes regarding Kuhlman:
>
> Patient presents to the ER after an MVA chipotle staff called police due to patient acting with altered mental status talking nonsensical.  Patient's car found across the curb with shattered moon roof.  Police concerned that patient hit head.  Patient acting impaired. Patient denies drinking alcohol.  Patient acting as if she is drunk.  Patient arguing with police at bedside.  Patient belongings taken placed in purple gown.  Patient belongings in POC room.  Patient being monitored for safety.  Garage door down.

(Doc. No. 105-2 at PageID# 2984.)  At 1:55 PM, Kennedy added "Patient urinating on floor at this time, patient cleaned up."  (*Id.*)

> The urine test was negative for alcohol and drugs.  (Kuhlman Depo. at Tr. 194-95; Haggerty Depo. at Tr. 86; Grasha Video II at 0:36.)   According to Kuhlman, Haggerty told the hospital staff to "pour out" Kuhlman's urine sample at some point after Haggerty learned that the results were negative.  (Kuhlman Depo. at Tr. 173; Doc. No. 105-5 at PageID# 3417.)  According to Haggerty,

> The words I chose are poor because I didn't pour out any sample.  I didn't tell anybody else to pour it out, but I was trying to explain to somebody who I determined was impaired that the sample is gone, and those are the words I chose.

(Haggerty Depo. at Tr. 85.) However, during Haggerty's testimony in the underlying criminal trial, Haggerty testified that she asked Kennedy for the urine but that Kuhlman "stated she didn't want us to have it, so she didn't give it to us." (Doc. No. 105-2 at PageID# 3297, Trial Tr. at p. 193-94.)

Dr. Jeffrey Ruwe's notes in Kuhlman's medical records indicate that at 2:05 PM he performed a physical exam on Kuhlman. (Doc. No. 105-2 at PageID# 2988.) In his notes, he wrote that Kuhlman "smells of alcohol" and that Kuhlman was "[h]ere in the custody of Cleveland police. There is significant concern for OVI. Brought here out of concern for head injury given sunroof damage. CT head, C spine unremarkable. Urine without evidence of alcohol intoxication. Drug screen is negative." (*Id.* at PageID# 2989.)

### 2. The Hospital Staff Restrain Kuhlman to Administer a CT Scan and Collect a Blood Sample.

At 2:10 PM,[7] in another hospital room, Kennedy and two other members of the hospital staff attempted to administer a CT scan to Kuhlman. (*See generally* Thomas Video II (Ex. F-2, Thomas WCS 2).) Thomas's bodycam footage shows the three hospital staff members struggling to restrain Kuhlman as she tried to get up from the bed. (*Id.* at 0:20-0:29.) While grabbing Kuhlman's arm to restrain her, Kennedy told Thomas that Haggerty "needs to come in here" because Kuhlman was "getting worked up" and Kennedy gestured at Kuhlman, stating "she is going to climb out of the bed. This is like not okay." (*Id.* at 0:30-0:44.)

---

[7] As indicated above, the time of Kuhlman's CT scan can be ascertained by examining the clock on the wall of the hospital room. (Thomas Video II at 0:33-0:37.) Additionally, Clinical Technician Matthew Fee noted in Kuhlman's medical records that "Patient transported to CT with Nurse" at 2:10 PM. (Doc. No. 105-2 at PageID# 2984.)

Kuhlman can be heard asking Haggerty, "[a]re you telling Myron that I'm getting arrested?" (*Id.* at 0:44-0:46.) Haggerty answered that she was talking to him "right now" and ordered Kuhlman: "Get in the bed.  Do the test." (*Id.* at 0:47-0:49.) Kuhlman responded, "I just want to see my daughter, that's why I'm getting worked up." (*Id.* at 0:50-52.)

Kuhlman asked Haggerty what Haggerty was telling Watson, and Haggerty responded that she hasn't been able to talk to Myron "because of what [Kuhlman was] doing." (*Id.* at 0:53-0:56.) Kuhlman asked, "what I'm doing?" (*Id.* at 0:57-1:03.) After the hospital staff discussed which of Kuhlman's bracelets could go through the CT scan machine, Haggerty told Kuhlman, "you have to let them finish what they're doing, you're making it take longer" to which Kuhlman responded that "I just heard you tell Myron that you're going to have me arrested." (*Id.* at 1:04-1:14.) Haggerty replied "look at you. You are too impaired right now - -" and Kuhlman interrupted that "right now, you are making me very worried and more upset." (*Id.* at 1:15-1:22.) Haggerty then answered, "too bad. We are past this point. It doesn't matter if you are upset.  You need to do what you need to do. You are at the hospital." (*Id.* at 1:23-1:28.) Kuhlman then exclaimed, "I don't need to do this!" to which Haggerty replied, "you do need to do this." (*Id.* at 1:29-1:32.)

As Kuhlman laid down on the hospital bed and continued to refuse to enter the CT machine, Thomas more calmly said to Kuhlman, "Gina, I think the nurses want you to get over to the [CT scan] table" to which Kuhlman asked, "because that's what the officers say?" (*Id.* at 1:34-1:41.) Haggerty told Kuhlman "no, that's because that's what the nurses are saying" and then Kennedy assured Kuhlman, "no, we don't have anything to do with them.  We want to make sure you're okay so we can get you to do whatever you need to do.  That has nothing to do with us." (*Id.* at 1:42-1:47.) Kuhlman ignored Kennedy, pointed at Haggerty, and said, "I just heard you tell Myron you're going

17

to arrest me." (*Id.* at 1:48-1:51.) Both Kennedy and Haggerty then asked Kuhlman again: "just get on the table please." (*Id.* at 1:53.) When Kuhlman asked Haggerty "are you going to arrest me?" Haggerty shouted back, "yes, you are under arrest! I've told you this a million times, get on the table!" but Kuhlman disagreed, claiming that that was the first time she heard that she was under arrest. (*Id.* at 1:54-1:58.) Haggerty repeated, "I've told you this a million times, get on the CAT scan." (*Id.* at 1:59-2:01.) Kuhlman then mumbled "you better call Myron because there is no reason to arrest me." (*Id.* at 2:01-2:04.)

After that, Kennedy asked Haggerty to leave the hospital room, and Kuhlman asked Grasha, who had just entered the CT scan room, "why is she arresting me?" (*Id.* at 2:04-2:25.) Grasha told Haggerty to return to the car to fill out paperwork. (*Id.* at 2:26-2:30.) Kuhlman again asked Grasha, "for real, why is she arresting me?" and Kuhlman then shouted at hospital staff and Grasha, "I don't need a CAT scan! I don't need any of this." (*Id.* at 2:31-2:40.) Grasha then told Kuhlman "you're being arrested for OVI, driving while intoxicated." (*Id.* at 2:41-2:42.) After pausing, Kuhlman responded, "But that is so. . . there is no anything. Because of my background?[,]" while Kennedy attempted to get Kuhlman's attention, telling her "okay, we're going to worry about it in a minute. Let's get this over with." (*Id.* at 2:43-2:52.) Kuhlman then tried to get up from the bed and exclaimed "I don't really want to do any of this" as Kennedy continued to restrain Kuhlman and asked her not to get out of the bed. (*Id.* at 2:53-2:59.) Grasha then reminded Kuhlman, "remember, we are checking you out for" followed by inaudible audio. (*Id.* at 3:00-3:01.) Kuhlman asked Grasha, "you're seriously, what? Because you looked at my background? Cause *she* told you that?" (*Id.* 3:02-3:07.) As Kuhlman asked Grasha this question, Kuhlman repeatedly tried to get out the bed and Kennedy can be heard repeating "Gina" and is seen trying to restrain Kuhlman. (*Id.*) As Grasha ordered

Kuhlman to sit back, Kuhlman again attempted to get out of the bed, exclaiming "no! I'm not getting arrested for an OVI again.  I didn't do *crap*!" (*Id.* at 3:07-3:13.)  Kennedy then told Kuhlman, "[w]hether you're arrested or not, we need to get the CAT scan because they have other people to scan and stuff - -" but Kuhlman interrupted, "you don't need to do a CAT scan" and Kennedy responded, "yeah we do" before asking Grasha and Thomas to step out of the room.  (*Id.* at 3:14-3:22.)

Between 2:14 PM and 2:17 PM, Kuhlman's medical records reflect that the hospital staff completed the CT scan, and at 2:19, Clinical Technician Matthew Fee noted in Kuhlman's medical records, "Patient returned to the Emergency Department." (Doc. No. 105-2 at PageID#s 2991, 2994-95, 2984.)  At approximately 2:52 PM, the Hospital collected and tested a blood sample from Kuhlman, which, like her urine, was also negative for drugs and alcohol.  (Kuhlman Depo. at 159; Doc. No. 105-1 at PageID# 2931; Doc. No. 105-2 at PageID#s 2992-93, 3008; Doc. No. 105-5 at PageID# 3415-17.)  At 3:36 PM, Dr. Ruwe added to Kuhlman's medical records: "Drug screen, alcohol are negative.  Patient is coherent, walking with stable gait.  Respectful to me, although somewhat argumentative to police.  Patient has no slurred speech.  Stable for discharge.  Has no complaints.  Patient verbalized understanding and agreement with the plan." (Doc. No. 105-2 at PageID#s 2989-90.)

Before they left Fairview with Kuhlman, hospital staff informed the Officers that both the urine and blood tests were negative.  (Haggerty Depo. at Tr. 86; Grasha Depo. at Tr. 66.)  Additionally, the day after Kuhlman's arrest, on December 31, 2018, Kuhlman requested a drug test (the "AMS Test") from Advanced Medical Services ("AMS") which, according to its President/CEO Raj Saini, showed that Kuhlman was negative for "any alcohol, controlled substance, or metabolite

19

thereof, on December 30, 2018."  (Saini Depo. (Doc. No. 98-3) at Tr. 20-21; Saini Expert Report

(Doc. No. 98-3) at PageID#s 1274-75).[8]

### 3. Kuhlman Signs and Annotates the BMV 2255 Form

At an unspecified time before the Officers and Kuhlman left the Hospital, Kuhlman signed

the BMV 2255 Form, a form used to notify arrestees of possible license suspension following an OVI

arrest.  (Kuhlman Responses to Requests for Admission (Doc. No. 105-5) at PageID# 3416; Haggerty

Depo. at Tr. 74; Doc. No. 104-4 at PageID# 2908.)[9]  On the BMV 2255 Form, Haggerty certified that

she "requested the driver, by reading advice on the back, to submit to a chemical test(s) for alcohol

and / or for the presence of any controlled substance or metabolite.  My reasonable grounds for OVI

[arrest] before the test were: 'unable to stand without assistance slurred speech, drove car over curb.'"

(*Id.*)  Section E of the BMV 2255 Form required Kuhlman, as the driver, to sign a statement that reads

"The advice on the back of this form was read to me and I have a received a copy of this form."  (*Id.*)

Under the "Driver's Signature" line, Kuhlman added the following text beneath her signature:

"SUBMITTED URINE + BLOOD TO HOSPITAL."  (*Id.*; Kuhlman Depo. at Tr. 163.)  The box

labelled "REFUSED TO SIGN" was not checked.  (Doc. No. 104-4 at PageID# 2908.)

In her deposition, Kuhlman was asked if she understood that she was under arrest by the time

she became involved in filling out the BMV 2255 Form.  (*Id.* at Tr. 164.)  Kuhlman responded: "the

officer tried to keep telling me to sign it because I refused and I kept telling her I didn't.  And she

---

[8] Kuhlman concedes, however, that "Saini was ***not*** opining that Plaintiff was not impaired by *any* substance, but merely that she was not impaired by these specifically tested substances."  (Doc. No. 103 at PageID# 1894) (emphasis in original).

[9] The BMV 2255 Form shows that Haggerty circled "OVI," and noted that Kuhlman "[r]efused to submit to test(s)[,]" "was placed under an Administrative License Suspension (R.C. 4511.191)[,]" her "[l]icense was seized[,]" and she "was provided a copy of the form at the time of arrest."  (Doc. No. 104-4 at PageID# 2908.)

would not let up about signing it.  So I signed it and put - - but I gave it to them, but by this point, [Haggerty] had already told [the hospital staff] to throw out the urine." (*Id.*)  Kuhlman further testified that she "felt forced" to sign the BMV 2255 Form.  (*Id.* at Tr. 165.)

However, according to Haggerty, after Kuhlman signed the BMV 2255 Form, Kuhlman changed her mind and verbally revoked her consent.  (Haggerty Depo. at Tr. 75.)  Haggerty can be heard reminding Kuhlman that Kuhlman said three times that she wanted to submit to chemical testing, and one time that she did not, but Kuhlman stated that Haggerty "misunderstood." (Haggerty Video III (Ex. D-3, Haggerty WCS 3) at 1:30-2:00.)  Haggerty explained to Kuhlman that the City had no urine sample from Kuhlman because, "you told me no, so the Hospital was not allowed to give me [the urine.]" (*Id.* at 2:39-50.)

But in Kuhlman's deposition, Kuhlman testified that she "absolutely wanted this sample taken." (Kuhlman Depo. at Tr. 160.)  When asked in her deposition, "did you ever refuse to take a urine test?[,]" Kuhlman responded, "[n]o . . . I absolutely did not refuse.  I wanted them to." (*Id.* at Tr. 165-66.)  Then, when asked if Kuhlman "vacillated" in her refusal, Kuhlman testified that she "was getting concerned about why [Haggerty was] making me sign this [BMV 2255 Form] when I already said yes." (*Id.* at Tr. 166.)  Kuhlman denied that the Officers could have been confused about whether she consented to the chemical test.  (*Id.*)  In contrast, Haggerty testified that Kuhlman did not unequivocally consent: "We didn't have a urine sample because I couldn't clearly get consent from her, and I was trying to - - her Fourth Amendment right for unfair search and seizure, I wasn't trying to - - she didn't give me clear consent to take it." (Haggerty Depo. at Tr. 57.)  Thus, according to Haggerty, the reason the Officers did not take the urine sample to provide to the City for prosecution was because Kuhlman had not clearly provided consent for Officers to obtain the urine sample even

though Kuhlman had consented—through her signature on the BMV 2255 Form—to let Fairview test it.  (Haggerty Depo. at Tr. 75-76.)

### E.  The Officers Do Not Administer a Standard Field Sobriety Test or Breathalyzer Test to Kuhlman

Neither Officer administered a Standard Field Sobriety Test ("SFST") or breathalyzer test to Kuhlman on December 30, 2018.  (Haggerty Depo. at Tr. 32-33; Grasha Depo. at Tr. 43, 47; Kuhlman Depo. at Tr. 171.)   Haggerty testified that she did not administer the SFST because she "believed at that moment that [Kuhlman] was on some type of narcotic" but "[n]ot alcohol" and Grasha testified that the Officers did not administer a breathalyzer test because they instead "decided to go to the hospital to assess any injuries."  (Haggerty Depo. at Tr. 33; Grasha Depo. at Tr. 47.)

### F.  Kuhlman's Underlying Criminal Prosecution, Conviction, and Appeal

Despite the negative test results, the Officers transported Kuhlman from Fairview to CCCC for processing.  (*See generally* Haggerty Video III; Grasha Video II (Ex. C-2, Grasha WCS 3); Uniform Traffic Ticket No. 2455234 ("UTT 2455234") (Doc. No. 104-4) at PageID# 2913.)  Haggerty testified that even though the Officers had known that the test results were negative, negative test results "would not have changed her going to jail that day.  Once you are under arrest, you are still – the outcome was still the same once she was placed under arrest.  The results don't matter.  The results are what the suspension is once you go to court."  (Haggerty Depo. at Tr. 60-61.)  Haggerty explained:

Q.  So in terms of charging her with OVI, even if toxicology tests for both alcohol and drugs are negative, she is still going to be charged?

A.  She is still going to receive a citation if she gets convicted in court that has to do with the judge.  That day she – no matter what, once we went to the hospital, once we left Chipotle, she was under arrest; she was getting a ticket and then going to County.  That was not going to change once we actually leave.

22

***

> But no matter what, once we left there she was getting a ticket, and she was going
> to County.  Results don't change that.

(Haggerty Depo. at Tr. 61-62.)

Accordingly, on UTT 2455234, Haggerty cited Kuhlman for three crimes: (1) violating Ohio Rev. Code § 4511.19(A)(1)(a) by driving "under the influence of alcohol, a drug of abuse, or a combination of them" ("OVI Charge"); (2) violating Ohio Rev. Code § 4511.19(A)(2) by refusing to submit to a chemical test ("Refusal Charge"); and (3) violating Cleveland Municipal Ordinance § 431.34(a) for failing to control her vehicle ("Failure to Control Charge").  (Doc. No. 104-4 at PageID# 2913; Doc. No. 105-2 at PageID#s 2935-36; *City of Cleveland v. Gina Kuhlman*, Case No. 2018-TRC-037812, M.C. Cleveland.)   The Officers filed UTT 2455234 with the Clerk of Courts on December 30, 2018, which commenced the criminal action in Cleveland Municipal Court against Kuhlman.  (Doc. No. 105-2 at PageID# 2934.)

The Officers and Thomas turned over their bodycam footage to Prosecutor Jonathan Cudnik ("Cudnik"), who made the "independent prosecutorial decision[]" to prosecute Kuhlman based on the above charges, the bodycam footage, and Kuhlman's medical records, including her negative test results and the BMV 2255 Form Kuhlman had signed and annotated.  (*Id.* at PageID#s 2932-33.)

On January 3, 2019, Kuhlman was arraigned, posted bond, and pled not guilty to the charges.  (*Id.* at PageID# 2936.)  On May 17, 2019, the Cleveland Municipal Court conducted a jury trial.  (*Id.* at PageID# 2940.)[10]  The jury convicted Kuhlman for the OVI Charge, but acquitted Kuhlman on the Refusal Charge.  (Doc. No. 105-2 at PageID#s 3400, Trial Tr. at p. 296-97.)  On June 13, 2019, the

---

[10] Cudnik declared that "[a]t the trial of this case, the jury and the court were made aware of Ms. Kuhlman's lab results from Fairview Hospital and viewed portions of the body camera footage of Officer Grasha."  (*Id.* at PageID# 2934.)

23

Cleveland Municipal Court, sitting without a jury, convicted her of the Failure to Control Charge, and on June 18, 2019, Kuhlman filed a Notice of Appeal to appeal her two convictions.  (Doc. No. 43-2 at PageID# 279; Doc. No. 105-2 at PageID#s 2939-41.)  On June 25, 2020, the Ohio Eighth District Court of Appeals reversed both convictions because the "convictions were not supported by sufficient evidence." *Cleveland v. Kuhlman*, 2020 WL 3467729 at *1-2 (Ohio App. 8th Dist. June 25, 2020.)

### G.      Facts Relevant to Kuhlman's *Monell* Claim Against the City

The City maintains written policies through General Police Orders ("GPO") and periodic reminders of Divisional Notices ("DN").  (Smith Decl. (Doc. No. 104-2) at PageID# 1920.)  The City reiterates CDP policies and procedures "during daily roll calls" and enforces them "through a comprehensive system of in-service and on-the-job training." (Doc. No. 104-2 at PageID# 1920-21.)

GPO 8.2.05 describes the City's policy regarding OVI Enforcement.  (Doc. No. 104-2 at PageID# 2883.)  Section IV pertains to chemical tests.  (*Id.*)  It provides that

A.  Every effort shall be made to administer chemical tests within three hours of the violation. The breath test is the primary method used to determine the alcohol concentration.  Urine testing shall be used when breath test equipment is unavailable, or if drug use is suspected.  A refusal to submit to a urine test shall be treated as a refusal even if the violator has already submitted to a breath test.

B.  Blood tests shall only be used when breath and urine tests are unavailable, or it appears that medical treatment will extend beyond two hours. If violators are dead, unconscious, or otherwise incapable to refuse, they are deemed not to have withdrawn consent; therefore, a blood sample may be obtained.

C.  Urine and blood samples: Samples shall be immediately transported to SIU (or Central Prison Unit when SIU is closed) using the re-sealable specimen transport bag. The white copy of Form BVM 2255 and the ORIGINAL Alcohol/Drug Influence Report shall accompany samples.

(*Id.*)

24

DN 18-125 describes the City's policy regarding prisoner-handling.  (*Id.* at PageID# 2887.) In relevant part, it requires the City's police officers to "Convey prisoners requiring medical attention due to an arrest, to the hospital <u>before</u> transport to [Cuyahoga County Corrections Center] for booking and housing[.]"  (*Id.*)[11]

Both Haggerty and Grasha graduated from the Cleveland Police Academy, which required officers to receive instruction in probable cause determinations.  (Doc. No. 104-2) at PageID#s 1918-19, 1922.)[12]

## II.     Procedural History

### A.     Pleadings

On April 5, 2022, Kuhlman filed a Complaint in this Court against the City, the Officers, Former Cleveland Chief of Police Calvin D. Williams ("Williams"), and John/Jane Doe Defendants in their individual and official capacities.  (Doc. No. 1.)  On April 11, 2022, Kuhlman filed an Amended Complaint.  (Doc. No. 3.)[13]  On July 18, 2022 the City filed a Motion to Dismiss and the Officers filed a Partial Motion to Dismiss.  (Doc. Nos. 23, 24.)  On August 30, 2022, Williams filed a Motion to Dismiss.  (Doc. No. 39.)

---

[11] The City maintains additional policies regarding probable cause, GPO 2.3.04.  (Doc. No. 104-2 at PageID#s 2873-76.)

[12] According to the City, Kuhlman did not identify the City's "final policymaker" in discovery.  (Doc. No. 106-1 at PageID# 3485.)

[13] In the Complaint, Kuhlman failed to delineate the jurisdictional bases of her claims, so on April 3, 2022, the Court ordered Kuhlman to show cause as to why the case should not be dismissed for lack of subject-matter jurisdiction.  (Entry of April 3, 2022.)  In response thereto, Kuhlman filed the Amended Complaint on April 11, 2022 properly setting forth the jurisdictional basis for each claim.  (Doc. No. 3.)

On October 14, 2022, Kuhlman filed a Second Amended Complaint,[14] thereby rendering moot the Defendants' previously filed motions.  (Doc. No. 43-2.)  Therein, Kuhlman asserted the following eight (8) claims: (1) Malicious Prosecution and False Arrest under Ohio law and 42 U.S.C. § 1983 (Count I); (2) Abuse of Process under Ohio law and 42 U.S.C. § 1983 (Count II); (3) Spoliation/Fabrication/Suppression of Exculpatory Evidence under Ohio law and 42 U.S.C. § 1983 (Count III); (4) False Imprisonment under Ohio law and 42 U.S.C. § 1983 (Count IV); (5) Supervisor Liability under Ohio law and 42 U.S.C. § 1983 (Count V); (6) Reckless, Wanton, or Willful Conduct under Ohio Rev. Code § 2921.52 and 42 U.S.C. § 1983 (Count VI); (7) Violation of Civil Rights under 42 U.S.C. § 1983 (Count VII); and (8) Intentional Infliction of Emotional Distress (Count VIII). (Doc. No. 43-2.)[15]

On October 28, 2022, the City filed a Renewed Motion to Dismiss, Williams filed his own Renewed Motion to Dismiss, and the Officers filed a Renewed Partial Motion to Dismiss.  (Doc. Nos. 45-47.)  The Officers' Renewed Partial Motion to Dismiss sought to dismiss only Counts III, IV, and VI against them "in their official capacity or attempting to hold them liable for prosecutorial action." (Doc. No. 47 at PageID# 330.)  On November 9, 2022, all Defendants filed a single Motion for Judgment on the Pleadings in which they sought dismissal of all claims asserted against them.  (Doc. No. 50 at PageID# 373.)

---

[14] Although Kuhlman had already amended her Complaint, she nevertheless captioned this pleading as the "Amended Complaint."  (Doc. No. 43-2 at PageID# 262.)

[15] As noted in the Court's March 23, 2023, Memorandum Opinion and Order, Count V was alleged only against Defendant Williams and Defendants John/Jane Does in their individual and official capacities, but Kuhlman alleged all other claims against all Defendants in both their individual and official capacities.  (Doc. No. 75 at PageID# 612.)

On March 23, 2023, the Court granted in part and denied in part the Defendants' motions to dismiss as follows:

> The City's Motion to Dismiss is GRANTED with respect to: (1) Plaintiff's Counts I, II, III, IV, V, and VI under 42 U.S.C. § 1983; and (2) Plaintiff's state law claims under Counts I, II, III, IV, V, VI, and VII. The City's Motion to Dismiss is DENIED with respect to Plaintiff's Count VII under 42 U.S.C. § 1983.
>
> Defendants Grasha and Haggerty's Partial Motion to Dismiss is GRANTED with respect to: (1) Plaintiff's Count III under federal law against them; (2) Plaintiff's Count IV under state law against them; (3) Plaintiff's Count VI under federal law against them; (4) Plaintiff's claims against them in their official capacities; and (5) Plaintiff's claims against them related to prosecutorial conduct as set forth above.  Defendants Grasha and Haggerty's Partial Motion to Dismiss is DENIED with respect to: (1) Plaintiff's Count III under common law against them; (2) Plaintiff's Count IV under federal law against them; and (3) Plaintiff's Count VI under state law against them.
>
> Defendant William's Motion to Dismiss is hereby GRANTED.  Defendant Williams is hereby dismissed from this suit.

(Doc. No. 75 at PageID#s 638-39.)  The same day, the Court granted in part and denied in part the Defendants' Motion for Judgment on the Pleadings: "[A]s to Plaintiff's Count I under federal law against Defendants Haggerty and Grasha, Defendants' Motion for Judgment on the Pleadings is DENIED[;]" "as to Plaintiff's Count II under federal law, Defendants' Motion for Judgment on the Pleadings is GRANTED[;]" and "as to Plaintiff's remaining state law claims against Defendants Haggerty and Grasha, Defendants' Motion for Judgment on the Pleadings is GRANTED." (Doc. No. 76 at PageID#s 650-52.)

Therefore, Kuhlman's only pending claims against the Officers are the following, in their individual capacities: Malicious Prosecution and False Arrest under 42 U.S.C. § 1983 (Count I); False Imprisonment under 42 U.S.C. § 1983 (Count IV); and (7) Violation of Civil Rights under 42 U.S.C. § 1983 (Count VII).  Kuhlman's only pending claim against the City is Count VII, for Violation of Civil Rights under 42 U.S.C. § 1983.

27

### B.      Pending Motions

On December 24, 2024, the Defendants filed Defendants' Motion to Disqualify.  (Doc. No. 98.)  On January 3, 2025, Kuhlman filed Plaintiff's Opposition to the Motion to Disqualify.  (Doc. No. 103.)  On January 10, 2025, Defendants filed their Reply in Support of their Motion to Disqualify. (Doc. No. 110.)

On January 6, 2025, the City filed its Motion for Summary Judgment, and the Officers and John/Jane Doe Defendants filed their Motion for Summary Judgment.  (Doc. No. 106; Doc. No. 108.) On February 24, 2025, Kuhlman filed Plaintiff's Opposition.  (Doc. No. 113.)  On March 17, 2025, the City filed its Reply, and the Officers and John/Jane Doe Defendants filed their Reply.  (Doc. No. 115; Doc. No. 116.)

## III.    Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party."  *Henderson v. Walled Lake Consol. Sch*., 469 F.3d 479, 487 (6th Cir. 2006).  "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Kentucky Dep't of Transp*., 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986)).  A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law."  *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party."  *Pittman v. Experian Info. Solutions, Inc*., 901 F.3d 619,

628 (6th Cir. 2018).  In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 Fed. Appx 506, 508 (6th Cir. 2014).  The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 Fed. Appx. 758, 764 (6th Cir. 2008).  "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.*, 593 Fed. Appx. at 508-09.  "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F.Supp.3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

There is an "added wrinkle" where, as here, there is video evidence.  *See Scott v. Harris*, 550 U.S. 372, 378 (2007).  As the Sixth Circuit has explained, "[t]o the extent that videos in the record show facts so clearly that a reasonable jury could view those facts in only one way, those facts should be viewed in the light depicted by the videos." *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017) (citing *Harris*, 550 U.S. at 380).  However, "[t]o the extent that facts shown in videos can be interpreted in multiple ways or if videos do not show all relevant facts, such facts should be viewed in the light most favorable to the non-moving party." *Id.*; *see also Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015).

IV.     **Analysis**

A.      **Defendants' Motion to Disqualify**

Prior to reaching the substantive arguments raised by the pending Motions for Summary Judgment, the Court will first address Defendants' Motion to Disqualify Plaintiff's Experts, Mr. Timothy Dimoff ("Dimoff") and Mr. Rajeve Saini ("Saini"). (Doc. No. 98.) *See Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 667 (6th Cir. 2005) ("Generally, a district court should dispose of motions that affect the record on summary judgment before ruling on the parties' summary judgment motions."); *Goodwin v. Am. Marine Express, Inc.*, 2021 WL 848948 at * 8 (N.D. Ohio Mar. 5, 2021).

1.   **Mr. Timothy Dimoff**

a)      **Expert Report and Testimony**

Kuhlman retained Dimoff to "opine on the central issue in this case, i.e., whether probable cause existed for the arrest of" Kuhlman. (Doc. No. 103 at PageID# 1878.)

According to his CV, Dimoff "has over 40 years of experience in law enforcement procedures, high-risk security issues and private security procedures." (Dimoff CV (Doc. No. 98-2) at PageID# 1180.) In 1977, Dimoff graduated from Denison University with a B.A. in Sociology with an emphasis in Criminology. (Dimoff Expert Report (Doc. No. 98-2) at PageID# 1184; Dimoff CV at PageID# 1189; Dimoff Depo. at Tr. 6.) Dimoff did not receive any post-college education, but he completed the approximately four-month (4) Akron Police Training Academy shortly after he graduated from college. (Dimoff Depo. at Tr. 7.) After finishing the police academy, Dimoff served as a patrol officer with the Akron Police Department ("APD") for approximately two (2) years. (*Id.* at Tr. 8-10.) During that training period, he obtained "on-the-job training" from a "field training

30

officer" in investigating suspects for driving under the influence.  (*Id.* at Tr. 11.)[16]  Following his two

(2) years on patrol, Dimoff was "handpicked from the entire department" to be an officer in APD's

"Special Crimes Unit" investigating "higher level types of crimes," which also required him to be a

S.W.A.T. response officer.   (*Id.* at Tr. 12-13.)   Then, "[a]round 1985" Dimoff served as an

"undercover narcotics detective" for the Special Crimes Unit and eventually became a supervisor for

one of the narcotics enforcement units.  (*Id.* at Tr. 14-15.)   In that role, he was involved with

"trafficking," "dealing," and "manufacturing" of drugs, but not "street traffic enforcement and

patrol[.]"  (*Id.* at Tr. 15.)

Around 1990-1991, Dimoff was injured in a drug raid and entered APD's traffic division for

approximately two (2) years.  (*Id.* at Tr. 17-19.)[17]  Dimoff testified that he was "one of the main

training officers" for APD and was "certified by Ohio Police Officers Training Academy as a certified

law enforcement trainer," was not a "field training officer" but rather a certified part-time instructor

because he did not "drive around in a patrol car." (*Id.* at Tr. 23-25.)  Later in 1991, Dimoff officially

retired from the APD due to his previous injuries.  (*Id.* at Tr. 21.)

After retirement, however, Dimoff opened a private police academy which also offered

advanced police course training, and he operated it under the umbrella of his company, SACS

Consulting.  (*Id.* at Tr. 24-26.)  Dimoff testified that after "five or six years, we kind of moved away

---

[16] Administering SFSTs were part of Dimoff's training in the academy.  (*Id.* at Tr. 8.)  Administering a breathalyzer was not part of his training, but later he was trained on how to administer one.  (*Id.* at Tr. 10.)  He testified that he is "familiar with the procedures" but "could not give [] names" of the current, nationally accepted field sobriety tests.  (*Id.* at Tr. 8-9.)

[17] Dimoff testified that when he was an officer in the traffic division, he would not directly breathalyze suspects but would bring them back to the police building to be breathalyzed by a certified breathalyzer operator.  (*Id.* at 20.)  When suspects were already at a hospital, he "would seek to get a blood or urine there."  (*Id.* at Tr. 20-21.)

from that," but that SACS Consulting still provides specific seminars.  (*Id.* at Tr. 27-28.)[18]  While

operating the police academies—but not after—Dimoff instructed students "on OVI in traffic stops."

(*Id.* at Tr. 34.)  Dimoff acknowledged that since approximately 1994, he has not "done any training

on traffic or OVI or been certified or anything on traffic or OVI" and that his "drug and alcohol

experience in the last 25 years has been primarily workplace HR kind of components.  (*Id.* at Tr. 81.)

And Dimoff conceded that he does not do any narcotics or alcohol training for police departments.

(*Id.* at Tr. 30.)

In his report, Dimoff listed the following items that he reviewed to formulate his opinions:

"(1) Initial Disclosures Plaintiff; (2) Initial Disclosures; (3) Advance Medical Services Report; (4)

Kuhlman Criminal Trial Transcript; (5) Kuhlman Sentencing Transcript; (6) Kuhlman JT Transcript

Proceedings; (7) Kuhlman Final Transcript Proceedings; (8) City of Cleveland Training Documents;

(9) City of Cleveland Supplemental Training Documents; (10) OPOTA Training Documents; (11)

Officer bodycam videos; (12) Amended Complaint; (13) State Court of Appeals Ruling; (14) District

Court ruling on Motion to Dismiss; (15) Police report; (16) LEADS report; (17) Vehicle tow

supplement, police report; and (18) Police orders, OVI."  (Dimoff Expert Report at PageID# 1191-

92.)  However, he testified: "I don't think I reviewed any depositions of the Plaintiff or of the

officers."  (*Id.* at Tr. 37.)  Dimoff reviewed "[b]ody camera videos[,]" but when asked how many he

had reviewed, he responded that he could not "recall the details of all that" although he "remember[ed]

the hospital one."  (*Id.* at Tr. 40.)  When asked: "Did you watch video footage of Ms. Kuhlman and

---

[18] His role in SACS Consulting is "customer relationship building[,]" "management of my people[,]" training "people to
be trainers, security consulting[,]" and providing expert testimony.  (*Id.*)

the officers in the parking lot at Chipotle?" Dimoff testified, "[n]o I don't recall that."  (*Id.* at Tr. 41.)

Dimoff elaborated:

> Q.  Okay.  So you never watched the video to see what the officers observed before
>     they put her in the squad car?
>
> A.  Correct.
>
> Q.  So you wouldn't have seen if she was unsteady on her feet or slurring her words?
>
> A.  Correct.
>
> Q.  If she was argumentative or weepy?
>
> A.  No.
>
> Q.  That the car had jumped two curbs?
>
> A.  Yeah, I had the understanding about the car had jumped the curbs and that.  And
>     I knew that that was a factor in the officers' observation.
>
> A.  So you didn't see the body camera footage where Ms. Kuhlman indicated that
>     she had driven there?
>
> A.  No.

(*Id.* at Tr. 41-42.)  Dimoff testified that he did not "think he saw" the bodycam footage where

Kuhlman "started to disrobe" in Fairview.  (*Id.* at Tr. 44.)  He stated, "I believe I saw one at the

hospital and I can't remember to give you details" and Dimoff did not review the bodycam footage

taken during Kuhlman's trip from Fairview to CCCC.  (*Id.* at Tr. 44.)  Dimoff did not recall reading

Cleveland's "policies or procedures or divisional notices relating to taking an arrestee to the county

jail if they had been in some kind of accident or injury."  (Dimoff Depo. at Tr. 46.)

As to the information regarding Kuhlman's medical tests, Dimoff noted that the urine and

blood tests were negative, but he confirmed that he "did not see any evidence that the officers were

provided a copy of a negative blood or a urine test[,]" saw nothing that "would indicate that the

hospital's blood or urine test matches the scope of the Governmental test that would have been run[,]" and agreed that Kuhlman's medical records indicated that the results were "to be used for medical purposes only and [should] not [be used for] compliance monitoring, legal, or forensic, use[.]"  (*Id.* at Tr. 47-48; Doc. No. 105-1 at PageID# 2930.)[19]

Based on his review of the above materials, Dimoff set forth the following opinions in his Expert Report:

> The Arresting officers and their superior officers failed to independently evaluate the basis for the report of an intoxicated driver by a third party at the restaurant. Third parties are NOT trained professionals to make confirmed decisions that police officers should rely on.  Additionally, all information obtained from third parties needs to be objectively evaluated, reviewed and confirmed at the scene and not assumed to be true. The bodycam videos indicate that they assumed from their first contact with Plaintiff that she was intoxicated, and they told her that they thought she was intoxicated.
>
> \*\*\*
>
> No Field Sobriety Tests or Breathalyzer tests were conducted.  In order to charge a person of OVI there is a need to have objective and supportive indications and evidence that the subject is under some form of intoxication, such as positive breathalyzer test results.  Additionally, a series of Field Sobriety Physical Tests can also be utilized to support the potential of intoxication.
>
> \*\*\*
>
> The hospital did properly run the test as set forth under the law and Defendants ordered the specimen destroyed, which prevented further testing that would have confirmed the absence of alcohol or drugs.
>
> By instructing the hospital to throw out the exculpatory specimens, in spite of Plaintiff's non-refusal to provide specimens, Defendants, with supervisor authorization, ordered the destruction of exculpatory evidence, and pursued false claims against Plaintiff.
>
> \*\*\*
>
> Defendants maliciously prosecuted Plaintiff and falsely imprisoned Plaintiff in violation of her constitutional rights.  Defendants acted outside the color of the law and established police procedures.  The arresting officers and their superior officers failed to take into account the lack of basis for the false report of an intoxicated driver by a third party at the restaurant.

---

[19] Dimoff agreed in his deposition that "it's possible" that his conclusion that "Grasha testified he had no prior OVI training" was "just copied [] from the amended complaint" because he "did not have that officer's deposition[.]"  (Dimoff Depo. at Tr. 48-49.)

***

Defendants transported Plaintiff to the hospital under the guise of providing her with medical care, but the bodycam footage indicates that at least part of the reason for transporting Plaintiff to the hospital, as opposed to taking her directly to the local Ohio State Highway Patrol Post to obtain a Breathalyzer, was to obtain either the blood and urine tests or a refusal, which would presumably have given them probable cause.

***

Defendants decided to ignore the exculpatory evidence of the negative blood and urine tests conducted at the hospital and not only failed to seek a sample of the blood or urine Plaintiff willingly consented to at the hospital, but in fact instructed the hospital to throw out the samples. This only enhanced the defendants' false claims against plaintiff. The Officers then failed to mention the negative blood and urine tests in their police report.  Had they mentioned the negative tests in their report, it would have alerted the officer(s) reviewing the police report and prosecutors deciding whether to bring the case to trial that no probable cause existed.

The City of Cleveland has failed to adequately train, supervise and manage the Defendant Officers and even more importantly the City of Cleveland has failed to review/investigate the Defendant officers after learning of their misconduct.  Neither officer had ever really conducted an OVI arrest, they lacked training in this specific area and didn't know what to do in this specific situation.

Supervising officer(s) were aware, ratified and encouraged the unconstitutional conduct of Defendants Grasha and Haggerty.

The City of Cleveland, instructed, ratified and pursued baseless charges against Plaintiff and had no probable cause to arrest Plaintiff.

The arrest of Plaintiff was based upon legally insufficient evidence which is a direct violation of due process clearly established by law. A normal police OVI arrest must be able to distinguish between a person being drunk and a person being impaired because of health issues, physical limitations and/or injuries sustained.

***

The police report had omissions and contributed to the filing of false charges.  The police report said she appeared intoxicated, but it failed to mention important facts, such as that the blood and urine tests were negative.  When a police report omits relevant and potentially exculpatory evidence, this can be a violation of constitutional rights, or at least contribute to a violation of constitutional rights.

35

(Dimoff Expert Report at PageID#s 1197-1204.) Dimoff additionally cited as his "additional conclusions [] important to this case" his analysis of two legal opinions[20] which appear to copy verbatim the explanatory parentheticals Kuhlman inserted into her Second Amended Complaint. (*Compare* Dimoff Expert Report at PageID# 1200 *with* Doc. No. 43-2 at PageID# 274.)  As another of Dimoff's "additional conclusion[s]," he copied Kuhlman's allegations set forth in her Amended Complaint regarding the reversal of her convictions.  (*Compare* Dimoff Expert Report at PageID# 1200-02 *with* Doc. No. 43-2 at PageID#s 276, 280-81.)

**b)**  **Analysis**

Defendants assert that pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Court should exclude Dimoff's expert report in evaluating Defendants' Motions for Summary Judgment and at trial. (Doc. No. 98; Doc. No. 98-1.)

Defendants argue that (1) Dimoff lacks specialized knowledge regarding traffic stops or OVI arrests that would help the trier of fact because his only experience with traffic stops and OVI arrests was from "over thirty years ago[,]" citing *Meyerhoff v. Michelin Tire Corp.*, 70 F.3d 1175, 1182 (10th Cir. 1995); and (2) Dimoff's expert report is predicated upon a flawed methodology because Dimoff improperly assumed portions of the Second Amended Complaint to be true, failed to review all of the Officers' bodycam footage and any of the Officers' or Kuhlman's deposition testimony, failed to review Fairview's intake notes regarding Kuhlman, failed to consider all of the City's training materials, did not identify which training was missing from the Officers' backgrounds, and because

---

[20] *Cleveland v. Krivish*, 65 N.E.3d 279 (Ohio App. 8th Dist. 2016) and *City of Cleveland v. Bruner*, 2002 WL 31667855 (Ohio App. 8th Dist. Nov. 27 2002).

his report lacks a "basis and reasons" section as required under Fed. R. Civ. P. 26(a)(2)(B)(i) making it "merely conclusory."  (Doc. No. 98-1 at PageID#s 1069-71, 1071-75.)

In Plaintiff's Opposition to Defendants' Motion to Disqualify, Kuhlman first responds that Dimoff possesses the requisite specialized expertise for several reasons, to wit: Dimoff has "ample experience and training in police procedures, including OVI and traffic stoops [sic], both as a 14-year police officer in both the Traffic and Narcotics units, and as someone who has trained police officers, trained trainers, written about police training and obtained certifications for training police officers[,]" operates SAC Consulting, which "for years trained police officers and now concentrates on drugs in the workplace," and because he "still consults with police departments and conducts investigations of police officers suspected of wrongdoing."  (Doc. No. 103 at PageID#s 1880.)

Kuhlman attempts to distinguish *Meyerhoff* on the basis that it is non-binding, out-of-circuit precedent, and because the Tenth Circuit in *Meyerhoff* based its opinion on the additional bases that the expert "had never worked in the manufacturing of radial tires; did not know the manufacturing tolerances or related technical requirements for putting colored letters on truck tire sidewalls; and that no manufacturer was currently putting colored letters on tires the size of the Michelin XDHT's."  (*Id.* at PageID# 1880) (quoting 70 F.3d at 1182.  Dimoff, Kuhlman explains, continued to operate a police academy, give and receive trainings, "write about police procedures and in general, maintain his knowledge about police procedures."  (*Id.* at PageID# 1881.)  Kuhlman therefore faults Defendants for mistakenly assuming that "only someone who has recently been on 'on the streets' as a police officer is qualified to opine about the work that police officers do."  (*Id.*)

Second, Kuhlman responds to Defendants concerns about Dimoff's methodology by pointing to the *other* pieces of information Dimoff reviewed:  "Dimoff's report indicates that he reviewed

numerous documents, including the Advance Medical Services report from the day after the incident[,]" the underlying criminal trial transcript, Cleveland and Ohio training documents and policies, "various court orders, police reports and LEADS reports and court documents." (*Id.* at PageID#s 1881-82.)  Specifically, Kuhlman contends that "[a]lthough defendants question the sources of Mr. Dimoff's information in reaching this conclusion, he was able to reach his conclusion based on reliable information, particularly the officers' sworn testimony at the criminal trial, and based on applying reliable principles and methods to the facts of the case." (*Id.* at PageID# 1892.)

Kuhlman defends Dimoff's choice not to review the bodycam footage from before or after the incident at Fairview by quoting a large portion of Dimoff's testimony where Dimoff first concedes that the "bodycam footage of what symptoms" Kuhlman presented to the Officers would be "a factor," but then contends that even if the Officers *initially* concluded that Kuhlman was "potentially under the influence" at Chipotle, the function of testing would have been to "corroborate or not corroborate what [they] potentially think may have happened or may not have happened." (*Id.* at PageID#s 1887-88; Dimoff Depo. at Tr. 41-43.)  It was unimportant to consider the Officers' bodycam footage, according to Dimoff, because "this case is dependent upon the totality of all of the circumstances, all of the ones [Defendants' Attorney] mentioned all the way to the video at the hospital to the testing" and the Officers "really needed to look at the broad balanced, fair, objective level and they didn't." (*Id.*)[21]  Kuhlman compares Dimoff's expert opinion to the expert's opinion in *Osborne v. City of Columbus*, 2023 WL 5541773 at *8-9 (S.D. Ohio Aug. 29, 2023), because "similar to the expert in

---

[21] Kuhlman then notes that consideration of Defendants' Motion to Disqualify is "premature" because at the time Defendants' Motion to Disqualify was filed, Kuhlman had not yet relied on Dimoff's testimony.  (Doc. No. 103 at PageID# 1890.)  But "as anticipated[,]" Kuhlman did rely on Dimoff's expert report in Plaintiff's Opposition to Defendants' Motions for Summary Judgment, thereby mooting Kuhlman's argument about prematurity.  (Doc. No. 116-1 at PageID# 3679, n. 8)

*Osborne*, he opines that the defendants did not have probable cause to arrest plaintiff[.]"  (*Id.* at PageID# 1891-92.)

In Defendants' Reply in Support of their Motion to Disqualify, they first rebut Kuhlman's defense of Dimoff's specialized knowledge by repeating their assertion that Dimoff has not "worked in the field in over twenty-five years" and does not "hold current certifications or teach or consult in the relevant areas" of law enforcement related to drugs or OVI.  (Doc. No. 110 at PageID#s 3580-81.)  They distinguish *Osborne* on the basis that Dimoff "did not actually opine as to the indicia of probable cause, but just made a conclusion" and "could not testify to any industry practices related to the case" and that *Osborne* was decided before Rule 702 was amended to "emphasize the judicial gatekeeping role."  (*Id.* at PageID# 3581.)  Then, Defendants cite Sixth Circuit and district court cases where the court excluded expert reports opining on probable cause.  (*Id.* at PageID# 3582.)

Second, Defendants resist Kuhlman's claim that Dimoff's methodology was sound, restating the same arguments they assert in their Motion to Disqualify.  (*Id.* at PageID#s 3583-84.)  They reiterate specifically that Dimoff's expert report cannot pass Fed. R. Civ. P. 26(a)(2)(B)(i) because it is too conclusory in that it merely states that he reviewed the evidence, followed by a recitation of his conclusions.  (*Id.* at PageID# 3584.)

Federal Rule of Evidence 702 entrusts district courts with a "gatekeeping role" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant."  *Daubert*, 509 U.S. at 597; *see also In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin) Prods. Liab. Litig.*, 93 F.4th 339, 345 (6th Cir. 2024).  As recently amended, Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Thus, the opinion offered by the expert must satisfy three requirements to be admissible: "First, the witness must be qualified by 'knowledge, skill, experience, training, or education.'  Second, the testimony must be relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'  Third, the testimony must be reliable."  *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528-29 (6th Cir. 2008) (quoting Fed. R. Evid. 702); *accord United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016).

Notably, Rule 702 was amended in December 2023 to "clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."  Fed. R. Evid. 702, Advisory Committee's notes to 2023 amendments.  As the Advisory Committee Notes explain: "[M]any courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility.  These rulings are an incorrect application of Rules 702 and 104(a)."  *Id.*; *see also In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin) Prods. Liab. Litig.*, 93 F.4th at 348, n.7.  Additionally, "Rule 702(d) was rephrased to emphasize that an expert opinion must 'reflect[ ] a reliable application' of the expert's methodology."  *Id.* at 345, n. 4 (quoting Rule 702(d)).

40

Federal district courts have broad discretion to exclude proposed expert testimony. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 139 (1997); *see also In re Scrap Metal*, 527 F.3d at 528 ("[W]e will not substitute our own judgment for that of the district court and will reverse an evidentiary decision 'only where we are left with a definite and firm conviction that [the district court] committed a clear error of judgment.'") (citation omitted). Indeed, both the Supreme Court and the Sixth Circuit have emphasized that Rule 702 affords district courts "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *see also United States v. Simpson*, 845 Fed. Appx. 403, 409 (6th Cir. 2021).

For the following reasons, the Court finds that Kuhlman has failed to satisfy her burden to show that Dimoff's expert report and testimony is admissible, and therefore the Court excludes it.

First, Kuhlman has not shown what "specialized knowledge" Dimoff possesses that would "help the trier of fact to understand the evidence or to determine a fact in issue" because the determination of whether the Officers had probable cause to arrest Kuhlman is a legal, not a factual issue. *See, e.g.*, *B.R. v. McGivern*, 2016 WL 5661610 at *7 (N.D. Ohio Sept. 30, 2016), *aff'd*, 714 Fed. Appx. 528 (6th Cir. 2017) ("[C]ritically—whether a reasonable officer could believe there was probable cause to arrest and detain is not a jury question but one of law for the court to answer."); *Goodwin v. City of Painesville*, 781 F.3d 314, 333 (6th Cir. 2015) ("The reasonableness of an officer's probable cause determination is a question of law."). In Plaintiff's Opposition to Defendants' Motions for Summary Judgment, discussed below, Kuhlman exclusively and unambiguously introduces Dimoff's expert testimony because, as she puts it, Dimoff "opined that the officers did not

41

have probable cause because they did not look at the totality of the evidence[.]" (Doc. No. 113 at PageID# 3631.)

That concession is fatal to her argument. "Courts in the Sixth Circuit have repeatedly held that expert testimony regarding the existence of probable cause is improper." *Clark v. Louisville-Jefferson Cnty. Metro Gov't, Kentucky*, 2024 WL 55518 at *3 (W.D. Ky. Jan. 4, 2024) (collecting cases). Where a plaintiff's "expert's opinion [] state[d] that 'a reasonable officer on the scene would not have concluded at the time that there existed probable cause that [the plaintiff] posed a significant threat of death or serious physical injury to the officer or others[,]'" the Sixth Circuit has held that "[t]his testimony also expresses a legal conclusion, going beyond 'stating opinions that suggest the answer to the ultimate issue.'" *DeMerrell v. City of Cheboygan*, 206 Fed. Appx. 418, 426 (6th Cir. 2006) (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994)); *Caton v. Salamon*, 2024 WL 4226930 at *4 (S.D. Ohio Sept. 18, 2024) ("the Court will strike and not consider Corroto's report to the extent that he opines that Officer Salamon did not have probable cause to stop or arrest Amanda Caton."); *Thibault v. Wierszewski*, 2016 WL 3457941 at *12 (E.D. Mich. June 24, 2016) (quoting *Rizzo v. Edison, Inc.*, 172 Fed. Appx. 391, 394 (2d Cir. 2006)) ("[The Court] will not permit [the expert] to opine as to whether Wierszewski had probable cause to arrest Thibault. Such testimony would be improper because 'the existence of probable cause is a question of law that is not properly the subject of expert testimony.'").

Kuhlman attempts to introduce Dimoff's testimony for the same inadmissible purpose as the plaintiff did in *DeMerrell*:

> Q. Wouldn't the body cam footage of what symptoms or what presentation she's making to the officers be relevant to whether the officers had probable cause to think she was intoxicated?

A.  Yes, it's a factor, but I think this case is dependent upon the totality of all the circumstances, all the ones that you mentioned all the way to the video at the hospital to the testing and then, you know, the hospital tests being negative, the fact that there's an accident, the fact that the plaintiff has a bump on her head.

So what I did is I look at everything there. And a lot of things that an officer sees or encounters such as say slurred speech or trouble walking, yeah, you can automatically and initially say, "Hey, that person is potentially under the influence."  And the proper training for officers is to clearly take into consideration all initial encounters and observations of speech and physical, witness statement, body cam, that whole thing, but you also have the ability of testing and the testing can, you know, corroborate or not corroborate what you potentially think may have happened or may not have happened.

In this case here, there's a totality of facts or circumstances and indicators and then it leads up to Gina voluntarily giving samples at the hospital, the samples are negative, and now you go back to a potential – she has a bump on her head. She had an accident.

So now the question is did the accident – did the bump on the head, did the accident, did the physical impact to her head, is that what caused everything that you just listed to me?  And we know and you know that you get in an accident, you hit your head, it would be easy to be disoriented.  It would be easy to have slurred speech.

Q.  Okay.  I get it. I'm just trying to –

A.  So, I guess, I'm trying to explain to you, I look at the totality of the issues and quite honestly, the officers looked at a very narrow list of reasons for charging her.  And they really needed to look at the broad balanced, fair, objective level and they didn't.

(Doc. No. 103 at PageID# 1888; Doc. No. 113 at PageID# 3631-32.)[22]

Not only does Dimoff's testimony demonstrate that he is opining on the ultimate issue or legal conclusion as to whether there was probable cause, but Kuhlman insists four (4) times in her briefing that the purpose of Dimoff's expert report and testimony is to show probable cause:

---

[22] Moreover, even using the phrase "totality of all the circumstances" or "totality of the issues" renders the testimony inadmissible.  *See Henry v. City of Flint*, 2019 WL 2207669 at *7 (E.D. Mich. Apr. 19, 2019) ("Westrick's use of the phrase 'totality of the circumstances,' the legal scope of considerations for probable cause, further adds to the likelihood of confusion.").

43

> In the Narcotics unit, Mr. Dimoff was trained in the recognition of illegal drugs and he conducted traffic stops for suspected drugs. This experience alone, operating as an undercover narcotics officer and participating in drugs arrests, qualifies Mr. Dimoff to opine on the central issue in this case, i.e., whether probable cause existed for the arrest of plaintiff.

(Doc. No. 103 at PageID# 1878.)  Kuhlman continues at the end of that sub-section: "Defendants mistakenly presume that because Mr. Dimoff has not actually participated in an OVI arrest recently, he is not qualified to opine on whether the defendants had probable cause to make such an arrest."

(*Id.* at PageID# 1881.)  Later, she claims Dimoff satisfies Rule 702 because he

> opines that the defendants did not have probable cause to arrest plaintiff, in that they knew at a certain point that the blood and urine tests were negative for any type of drug or alcohol and they knew that there were no other objective means of determining whether plaintiff's apparent impairment was caused by any drugs or alcohol.  Although defendants question the sources of Mr. Dimoff's information in reaching this conclusion, he was able to reach his conclusion based on reliable information, particularly the officers' sworn testimony at the criminal trial, and based on applying reliable principles and methods to the facts of the case.

(*Id.* at PageID# 1892.)  She restates that "[e]ven if Mr. Dimoff has not had recent, hands-on experience in OVI arrests, he can still testify as to the requirements for probable cause."  (*Id.* at PageID# 1893.)

Therefore, on this basis alone, because Kuhlman exclusively relies on Dimoff's expert report and testimony to establish that probable cause did not exist for the Officers' arrest of Kuhlman, and because using expert testimony for that purpose is improper, the Court will not consider Dimoff's expert report or testimony.  *See DeMerrell*, 206 Fed. Appx. at 426.

Second, the Court also agrees with Defendants' contention that Dimoff's methodology was insufficient because he failed to consult the Officers' depositions, Kuhlman's deposition, Cleveland's policies and procedures related to the transport of arrestees, or, critically, the bodycam footage of Kuhlman at Chipotle.  (Dimoff Depo. at Tr. 41-42, 44, 46.)  Dimoff purports to offer an expert opinion on the "central issue in this case, i.e., whether probable cause existed for the arrest of" Kuhlman, but

44

as the Defendants highlighted, Dimoff did not examine the videos of Kuhlman being arrested or Kuhlman's own account of her arrest.  (Doc. No. 103 at PageID# 1878; Dimoff Depo. at Tr. 37)  Although he examined the underlying criminal trial transcript, he acknowledged that "Kuhlman did not testify at the trial."  (Dimoff Depo. at Tr. 77.)  Instead, Dimoff based his expert report regarding Kuhlman's arrest not even partially on Kuhlman's under-oath recollection of the incident, but rather on "whatever I read in that summary statement and the summary statement of conclusions and from talking to Attorney Myers[,]" i.e., Kuhlman's attorney.  (*Id.*)  Thus, while it is true that Dimoff could offer *an* opinion without consulting those resources, it could not plausibly "help the trier of fact to understand the evidence" because it is not based on the most important pieces of evidence in this case. Fed. R. Evid. 702.[23]

Accordingly, because Kuhlman introduces Dimoff's testimony for the improper purpose of opining on the existence of probable cause, and because Dimoff did not consult the bodycam footage or depositions in rendering his opinions, the Court GRANTS the Defendants' Motion to Disqualify Dimoff as an expert in this case.

### 2.    Mr. Rajeve Saini

Kuhlman claims that "Saini's report and testimony show that on the day after the incident, plaintiff went into an independent testing lab and gave a urine sample, which provided negative for alcohol and many commonly-ingested [sic] drugs."  (Doc. No. 103 at PageID# 1894.)  Defendants disagree, arguing that "Saini's limited testimony as to the test results taken the day *after* Plaintiff's

---

[23] While Kuhlman has not introduced Dimoff's expert report and testimony to establish that the City failed to train the Officers, Dimoff's expert report and testimony would be insufficient for that purpose as well because he did not consult the very policies and procedures upon which he could make that determination.  (Dimoff Depo. at Tr. 46.)

arrest is not outside the scope of the knowledge of a juror and is unnecessary for purpose of Rule 702." (Doc. No. 98-1 at PageID# 1077.)

The Court also concludes that Saini's expert report and deposition testimony cannot help the trier of fact determine a "fact in issue" under Rule 702(a). The parties agree that the test that Saini's company administered, and the Fairview test results, were negative as to the specific substances tested for. (Doc. No. 108-1 at PageID# 3554; Doc. No. 105-6 at PageID# 2998; Doc. No. 103 at PageID# 1895.) So, that fact is not "in issue." And neither is whether Kuhlman *actually* consumed alcohol or drugs on December 30, 2018, or on December 31, 2018, because the probable cause inquiry turns on what the Officers *perceived* on the day of the arrest. *See Bryant v. City of Berea*, 2025 WL 1746018 at *15 (N.D. Ohio June 24, 2025) (Barker, J.) (quoting *Illinois v. Gates*, 462 U.S. 213, 243-44 n.13 (1983)) ("Probable cause 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'"); *United States v. Sanginneto-Miranda*, 859 F.2d 1501, 1508 (6th Cir. 1988) (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983)) ("The probable cause requirement does 'not demand any showing that such a belief is correct or more likely true than false.'"). It is the Court that must determine the ultimate legal issue of whether the undisputed material evidence demonstrates that the officers had probable cause to arrest Kuhlman. Saini's expert report and deposition testimony offer no assistance in making this determination.

**B.     The Officers' Have Qualified Immunity Against Kuhlman's § 1983 Claims**

The Court next addresses the Defendants' arguments that they are entitled to summary judgment in their favor with respect to Kuhlman's § 1983 claims as set forth in Count I (malicious

prosecution and false arrest), Count IV (false imprisonment), and Count VII (violation of civil rights).[24]

To maintain a claim under 42 U.S.C. § 1983, a plaintiff must establish that she was deprived of a right secured by the Constitution or the laws of the United States, and that the deprivation was caused by a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Simescu v. Emmet Cty. Dep't of Soc. Services*, 942 F.2d 372, 374 (6th Cir. 1991). As the Supreme Court has explained, Section 1983 "is not itself a source of substantive rights," but merely provides "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979). *See also Albright v. Oliver*, 510 U.S. 266, 271 (1994). "The first step in any such claim is to identify the specific constitutional right allegedly infringed." *Albright*, 510 U.S. at 271. *See also Moniz v. Cox*, 512 Fed. Appx. 495, 498 (6th Cir. 2013); *Johnson v. Clark*, 2024 WL 970724 at * 3 (N.D. Ohio Mar. 5, 2024). Kuhlman satisfies the first step by asserting each claim on the basis that the Officers violated her Fourth Amendment rights when they arrested her on December 30, 2018, and when the City prosecuted her for her OVI Charge, Refusal Charge, and Failure to Control Charge. (Doc. No. 113 at PageID# 3625.) *See Pritchard v. Hamilton Twp. Bd. of Trs.*, 424 Fed. Appx. 492, 502 (6th Cir. 2011) (citing *Brooks v. Rothe*, 577 F.3d 701, 706 (6th Cir. 2009)) ("An individual who has been wrongfully arrested or seized under the color of law can make a § 1983 claim based on the Fourth Amendment."); *Weser v. Goodson*, 965 F.3d 507, 513 (6th Cir. 2020) (citing *Howse v. Hodous*, 953 F.3d 402, 409 (6th Cir. 2020)) ("This court has recognized that claims for false arrest and

---

[24] Because Kuhlman also asserts Count VII against the City, Count VII is a *Monell* claim addressed in Section C below. *See Kuhlman v. City of Cleveland*, 2023 WL 2652585 at *10 (N.D. Ohio Mar. 23, 2023) ("To the extent any claim against the City is grounded in 42 U.S.C. § 1983, such a claim is a *Monell* claim, and therefore duplicative of Count VII."); *Evans v. Columbia Cnty.*, 711 F. Supp. 3d 256, 304 (M.D. Pa. 2024) ("[A] *Monell* claim is a claim against a municipality or other similar entity.").

malicious prosecution are both constitutionally cognizable and both arise under the Fourth Amendment.").

In the Officers' Motion, they argue that they are entitled to qualified immunity with respect to Kuhlman's § 1983 claims.  Government officials "are immune from civil liability unless, in the course of performing their discretionary functions, they violate the plaintiff's clearly established constitutional rights." *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015).  To determine whether a government official is entitled to qualified immunity, courts "apply a well-established two-prong test: (1) whether the facts, when taken in the light most favorable to the party asserting the injury, show the [official]'s conduct violated a constitutional right; and (2) whether the right violated was clearly established such that a reasonable official would understand that what he is doing violates that right." *Id.*  These steps may be addressed in any order, and the defendant official need only prevail on one of them to be granted qualified immunity.  *See Coffey v. Carroll*, 933 F.3d 577, 584 (6th Cir. 2019); *Maben v. Thelen*, 887 F.3d 252, 269 (6th Cir. 2018).

With regard to the second step, "clearly established" means that the law is so clear at the time of the incident that every reasonable government official would understand the unlawfulness of his conduct.  *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). In evaluating whether a constitutional right was clearly established for purposes of qualified immunity, courts "must examine the particular situation that [the defendants] confronted and ask whether the law clearly established that their conduct was unlawful."  *Howse*, 953 F.3d at 407.

## 1.     The Officers Did Not Violate Kuhlman's Fourth Amendment Rights.

### a)     False Arrest and False Imprisonment Claim (Counts I and IV)

The Officers argue that they are entitled to qualified immunity as to Kuhlman's false arrest claim[25] because they had probable cause to arrest her.  (Doc. No. 108 at PageID# 3556-62.)  They contend that Kuhlman's *Terry* stop transformed into an arrest requiring probable cause when the Officers removed her from the Chipotle parking lot, not when the Officers later informed her at the Hospital that she was under arrest.  (Doc. No. 108-1 at PageID# 3558.)  The Officers then argue that the following facts, available before the Officers removed her from the parking lot, showed probable cause:

> In this case, upon arrival at Chipotle, the officers were presented with a person who appeared to be disoriented, unsteady on her feet, and argumentative.  She admitted that she drove herself to the restaurant though her account of how she got there was impossible.  Plaintiff's responses to the officers' questions were disjointed and confused, and she did not know where she was or why she was at Chipotle.  Her vehicle ran over a curb and was parked over a pedestrian sidewalk.  It appeared as if it had just been in some sort of an accident which Plaintiff could not explain and did not acknowledge.  At least one witness indicated that he saw her drive the vehicle over the curb.

---

[25] The Court notes at the outset that claims for false arrest and false imprisonment are identical under § 1983 because they are predicated on the same cause of action.  *See Weser v. Goodson*, 965 F.3d 507, 513 (6th Cir. 2020) ("When a false-imprisonment claim arises out of an alleged false arrest—as it does in this case—those claims are identical, so we will simply refer to those two claims together as a false-arrest claim.")*; Wallace v. Kato*, 549 U.S. 384, 389 (2007) (referring to "the two torts together as false imprisonment").  The Officers underscore this overlap in their Motion.  (Doc. No. 108-1 at PageID# 3567.)  In their Reply, the Officers note that Kuhlman did not respond to that argument in Plaintiff's Opposition, and therefore waived it, and that to the extent the separate false imprisonment claim is based on Kuhlman's pre-trial detention, it fails nonetheless because the initial arrest was supported by probable cause.  (Doc. No. 116-1 at PageID# 3680.)  *See, e.g.*, *Rideout v. Shelby Twp.*, 691 F. Supp. 3d 816, 827 (E.D. Mich. 2023) (quoting *Frantz v. Village of Bradford*, 245 F.3d 869, 873 (6th Cir. 2001)) ("[C]laims for false arrest and false imprisonment fail when there is probable cause to support the arrest.")  Citing *Weser*, this Court has already agreed with the Officers' position in its March 23, 2023, Order to refer to the claims together.  (Doc. No. 75 at PageID# 626.)  Given clear Sixth Circuit precedent, Kuhlman's lack of objection, and this Court's own previous reference to the claims together, the Court will refer to and analyze Kuhlman's false arrest and false imprisonment claims, although set forth in separate counts, together as Kuhlman's one "false arrest" claim.

(Doc. No. 108-1 at PageID# 3561) (internal citations omitted).  The Officers then analogize Kuhlman's arrest to that involved in a recent case, *Cleveland v. Clark*, 252 N.E.3d 632 (Ohio App. 8th Dist. 2024), where the Court determined there was probable cause.  (*Id.*)  The Officers conclude that her arrest for the OVI Charge was supported by probable cause because

> Plaintiff was driving while intoxicated based on her own actions, the location and condition of the car, her failure to provide a coherent explanation as to what happened or where she was, coupled with her slurred speech, disorientation, and unsteady feet, as well as eyewitness accounts that she drove the vehicle over the curb.  While the officers did not see her operate her vehicle, she admitted that she drove there.

(*Id.* at PageID# 3563.)

In Plaintiff's Opposition, Kuhlman claims that "there are least disputed facts as to whether probable cause existed for Grasha and Haggerty to arrest Ms. Kuhlman for OVI."  (Doc. No. 113 at PageID# 3623.)  According to Kuhlman, the Officers conceded that they did not know what caused Kuhlman's impairment, and "only used their initial observations of her being disoriented or 'impaired'" while they "ignored not only the evidence of her disorientation possibly being caused by her being involved in a car accident, but the clear evidence they discovered at the hospital of her blood and urine test being negative for alcohol and drugs."  (*Id.* at PageID# 3624.)  The Officers lacked probable cause, she contends, because they

> failed to conduct any field sobriety tests, failed to administer a Breathalyzer, failed to investigate the damage to her car, ordered her urine sample discarded at the hospital, labeled her as having refused testing despite the fact that she signed the 2255 consent form, omitted the fact that her tests were negative on their police report, and arrested her for failing to consent to EMS treatment at the scene and for failing to obtain a ride home.

(*Id.* at PageID# 3624.)  Kuhlman also stresses that "there was nothing in police policies or practice that dictated that they consider her to have been arrested once they left the scene with her" and "there was nothing preventing them from giving her a ride home or taking her to the hospital without

arresting her." (*Id.* at PageID# 3624-25.) Thus, per Kuhlman, Grasha decided to arrest her only "based on what [he] observed at the scene" at Chipotle, and Haggerty decided to arrest Kuhlman based on "Kuhlman's refusal of EMS assistance and the unavailability of a ride home[.]" (*Id.* at PageID# 3625.) Combined with Kuhlman's assertion that the Officers "ignored" and "sought the destruction of exculpatory evidence" from her negative urine tests, Kuhlman concludes that the Officers did "mot [sic] make their determination to arrest her based on the totality of the circumstances." (*Id.*)[26] She adds that a jury could interpret the bodycam footage of "a disoriented Ms. Kuhlman" at Chipotle in her favor because she was "complaining of medical issues, like a migraine" or "was disoriented because of an auto accident, as opposed to either alcohol or drug intoxication." (*Id.* at PageID# 3629.)

Aside from restating the general standard for probable cause, Kuhlman does not cite any cases for the Court to evaluate in determining whether there was probable cause for her arrest. (*Id.* at PageID# 3622-25.)[27]

---

[26] In the section of Plaintiff's Opposition nominally directed to establishing the "clearly established" prong of the qualified immunity analysis, Kuhlman abruptly returns to her discussion of whether the facts supported the existence of probable cause for the initial arrest. (Doc. No. 113 at PageID#s 3627-32.) At Pages 30-31 of her Opposition, Kuhlman repeats verbatim her analysis of whether there was probable cause from Pages 26-27. (*Compare Id.* at PageID#s 3628-29 *with Id.* at PageID#s 3624-25.)

[27] Kuhlman cites Dimoff's expert report and testimony, but as discussed in Section A above, his opinion applying the probable cause standard will not be considered. (Doc. No. 113 at PageID# 3631.) Kuhlman additionally argues that Dr. Heath Joliff's Expert Report, in which he opines that Kuhlman's conduct on December 30, 2018, was consistent with her having consumed rubbing alcohol, should be "completely disregarded." (*Id.* at PageID# 3630; Dr. Joliff Report at PageID# 3459.) In support, she contends: (a) that the Officers did not suspect rubbing alcohol intoxication; (b) Dr. Joliff's report is "partially based on Kuhlman's medical records, which were not used" "or known" by the Officers "at the time they made the arrest[;]" and (c) Dr. Joliff's opinion is "entirely speculative" and based on the "negative inference" that an untested for drug caused Kuhlman's impairment merely because the tested-for drugs yielded negative results. (*Id.*) The Officers respond by arguing that the "report is relevant for summary judgment purposes to address Plaintiff's unqualified (and recurrent) statements that she had tested negative for drugs and alcohol at the hospital (and the day after), and therefore conclusively was not intoxicated by any substance at the time of her arrest." (Doc. No. 116-1 at PageID# 3678.) His report, they contend, simply "explains that those tests results only relate to the specific, limited substances that were tested, as opposed to all possible substances of abuse, exhaustively." (*Id.*) For the same reasons that the Court

51

In the Officers' Reply, they assert that "the point at which an arrest takes place is a matter of law, not subject to the opinions of witnesses."  (Doc. No. 116-1 at PageID# 3674)  They claim that while the Officers detained Kuhlman in the police cruiser, she had not yet been arrested but only detained for investigation, and that she was legally "under arrest" when the Officers removed her from Chipotle and transported her to Fairview.  (*Id.* at PageID# 3675.)  They counter Kuhlman's critique that the Officers had not ruled out a medical cause (as opposed to an alcohol or drug-related cause) when they arrested her by emphasizing that that the Officers had no obligation to "determine *for certain* what was causing her impairment[,]" that Kuhlman had "no constitutional right to an investigation[,]" and the Officers had "no duty to continue [their] investigation and discover all the information that would have exculpated" Kuhlman.  (*Id.* at PageID# 3676-77) (emphasis in original).

The Fourth Amendment protects citizens from "unreasonable searches and seizures" and requires warrants to be issued "upon probable cause."  U.S. CONST., Amend. IV."  A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff."  *Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005).  As the Sixth Circuit has explained, "[a]n arrest is supported by the requisite probable cause when, at the time of the arrest, 'the facts and circumstances within [the officer's] knowledge and of which [he or she] had reasonably trustworthy information [are] sufficient to warrant a prudent man in believing that the [plaintiff] had committed or was committing an offense."  *Wesley v. Campbell*, 779 F.3d 421, 429 (6th Cir. 2015) (alterations in original) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)); *see also Tlapanco v. Elges*, 969 F.3d 638, 652 (6th Cir. 2020).  Probable cause "requires only a probability or substantial chance

---

is not considering Dimoff's opinion to determine the ultimate legal issue of whether the Officers had probable cause to arrest Kuhlman, it is not considering Dr. Joliff's opinions.

of criminal activity, not an actual showing of such activity." *Wesby*, 583 U.S. at 57 (quoting *Illinois v. Gates*, 462 U.S. 213, 243-44 n.13 (1983)).  "A showing of 'probable cause provides a complete defense to a claim of false arrest.'" *Tlapanco,* 969 F.3d at 652 (quoting *Halasah v. City of Kirtland*, 574 Fed. Appx. 624, 629 (6th Cir. 2014)).

The Court concludes that the Officers had probable cause to arrest Kuhlman and therefore are immune from liability. As set forth below, during Kuhlman's detention at Chipotle, the bodycam footage exhibited a driver for whom there was a 'fair probability' that she had "committed a crime." *Fowler v. Burns*, 447 Fed. Appx. 659, 661 (6th Cir. 2011) (citation omitted).  Specifically, the Officers had "reasonably trustworthy information" that was "sufficient to warrant" them to believe that Kuhlman "had committed" the offense of violating Ohio Rev. Code 4511.19(A)(1)(a) by driving "under the influence of alcohol, a drug of abuse, or a combination of them[.]"  *Wesley*, 779 F.3d at 429.

Kuhlman's claims based on the Officers' conduct at Chipotle (before the events at Fairview) concentrate on the facts that the Officers "failed to investigate the damage to her car[,]" did not conduct a SFST or breathalyzer test, "and "arrested her for failing to consent to EMS treatment at the scene and for failing to obtain a ride home."  (Doc. No. 113 at PageID# 3624.)  First, Kuhlman is incorrect that the Officers did not investigate the damage to her car. The bodycam footage clearly shows that Haggerty and Thomas investigated the damage to Kuhlman's car.  (Haggerty Video I at 6:26-6:35) (Haggerty opening the door and opining that the accident "did happen just now, there is glass."); (Thomas Video I at 14:30-14:32) (finding a bottle of "Rexall" above the words "91% Isopropyl Alcohol" in her car.)

Second, Kuhlman points to no caselaw obligating the Officers to conduct a SFST or breathalyzer test, and indeed, an officer can have probable cause for an arrest even if those tests are not administered.  "Probable cause to arrest may exist, *even without field sobriety test results*, if supported by such factors as: evidence that the defendant caused an automobile accident; a strong odor of alcohol emanating from the defendant; an admission by the defendant that he or she was recently drinking alcohol; and other indicia of intoxication, such as red eyes, slurred speech, and difficulty walking."  *Belmonte v. Cook*, 2013 WL 2371212 at *6 (S.D. Ohio May 30, 2013) (emphasis added), *report and rec. adopted*, 2013 WL 3568309 (S.D. Ohio July 11, 2013), *aff'd,* 567 Fed. Appx. 331 (6th Cir. 2014).[28]  The "'inquiry is not to determine the veracity of the charge, i.e., was the plaintiff *actually* intoxicated, but rather whether the officer had probable cause *to believe* that the plaintiff was intoxicated.'"  *Gouger v. Vanallman*, 2010 WL 1408381 at *4 (E.D. Tenn. Apr. 2, 2010) (quoting *Cain v. Irvin,* 286 Fed. Appx 920, 925 (6th Cir. 2008)) (cleaned up).

*Cain* provides an apt example of this principle.  There, Cain brought  § 1983 claims against officers for false arrest and other constitutional torts.  *See Cain*, 286 Fed. Appx. at 922-23.  Cain was "staggering and could not walk very good[,]" became confrontational, needed to be helped up by her friend, and denied repeated offers by others to drive her to the hospital.  *Id.* at 923.  Police officers were dispatched to "investigate the altercation" and found Cain "in the parking lot of [a] Pizza Hut."  *Id.*  One officer learned of Cain's previous disposition, observed that Cain's pupils were dilated, and

---

[28] *See also Bradley v. Reno*, 2014 WL 4955948 at *5 (N.D. Ohio Sept. 30, 2014), *aff'd*, 632 Fed. Appx. 807 (6th Cir. 2015) (concluding that "the facts and circumstances prior to the administration of field sobriety tests only point towards probable cause."); *Lustig v. Mondeau*, 211 Fed. Appx. 364, 367 (6th Cir. 2006) (noting that "an arrest may be based in whole or part on the results of a [preliminary breath test], but [a preliminary breath test] is not required to establish probable cause.").

witnessed Cain stumble several times. *See id.* The officer arrested her, transported her to the hospital, and cited her for public intoxication. *See id.*

The Sixth Circuit held that "[t]his record reveals ample support for the officers' probable cause determination" because it was "evident that Cain exhibited behavior that would provide sufficient grounds to arrest for violation of Ky. Rev. Stat. § 525.100, which prohibits appearing in a public place under the influence of a controlled substance." *Id.* at 924. The court reasoned that the officer had probable cause to believe that Cain was under the influence of a controlled substance because Cain appeared "to be inebriated on the basis of her inability to stand and her slurred speech[,]" other officers agreed with the arresting officer's observations, witnesses observed her erratic behavior, she slurred her speech, and her pupils were dilated. *See id.* at 924-25.

Kuhlman's case is analogous to *Cain*. While Kuhlman did not admit that she had been drinking alcohol, claiming "I didn't do anything" and responding "no, I'm not" when asked if she was intoxicated (Haggerty Video I at 4:04-4:09; *Id.* at 4:55-4:59), the bodycam footage clearly shows that the Officers observed other sufficient indicia of intoxicated driving: her slurred speech, unsteadiness, and general disorientation, as well as her damaged vehicle improperly parked on a sidewalk. (Doc. No. 113 at PageID# 3629.) Kuhlman slurred her speech at Chipotle numerous times, e.g., after Haggerty instructed Kuhlman to sit down (*Id.* at 1:49-1:50); when Kuhlman told the Officers that the men helping her "were just meeting up" (*Id.* at 1:56); when Kuhlman said "correct" in response to the man saying Kuhlman wanted to see her ex-husband (*Id.* at 2:04); when Kuhlman said "[h]e's my friend he's my attorney also" (*Id.* at 2:10-2:14); when Kuhlman asked, "I'm not sure where I put - - did you see where I put my purse?" which she had left in her car (*Id.* at 2:17-2:19); after being asked if she was "okay" in the vestibule (*Id.* at 3:01-3:04); when she said, "I appreciate

that but - -"  in response to Haggerty's offer of assistance with walking  (*Id.* at 3:07-3:11); and when Kuhlman refused to sit in the car, saying "I - - I'm serious."  (*Id.* at 4:04-4:09.)  She slurred her words again a couple minutes later when she requested that the Officers "call - - yron - - Myron"  and again when Kuhlman exclaimed "you're going to take me and put me in a jail without allowing me to call Myron."  (*Id.* at 5:00-5:03; Grasha Video I at 5:36-5:50.)[29]

The bodycam footage also shows that Kuhlman seemed unable to perceive or recall[30]  that there was any issue with her vehicle even though the sunroof was evidently shattered, and it was parked over the sidewalk.  After the officers asked Kuhlman to look at her own vehicle, she asked the Officers (also slurring her words), "look at my car what?  What is wrong with the - - state of the car that is wrong?  What is the state of the car that is wrong?"  (Grasha Video I at 4:05-4:19; Haggerty Video I at 4:10-4:21.)  Kuhlman additionally did not know which municipality she was in, mistakenly believing herself to be on the east side of Cleveland in Cleveland Heights when she was on the west side.  (*Id.* at 9:26-9:51.)  Also, the Officers spoke with one of two witnesses inside the Chipotle who identified Kuhlman as the driver of the vehicle that "ran the curb" and reported that Kuhlman was wanting to see her daughter or her ex-husband or something.

Accordingly, these undisputed facts, taken together, demonstrate a "substantial chance of criminal activity" to allow the Officers to have reasonably believed that Kuhlman had been driving

---

[29] She additionally had to lean in to understand Haggerty's question "is your hand cut?" (*Id.* at 2:05-2:07.)  And she rolled her eyes at the man helping her when he informed the Officers that it was Kuhlman who ran the curb.  (*Id.* at 1:48-1:49.)

[30] She testified that she pulled into the Chipotle because her sunroof shattered as she was driving on I-490 and she needed to "figure out what was going on."  (Kuhlman Depo. at Tr. 135-36, 142.)

while intoxicated in violation of Ohio Rev. Code § 4511.19(A)(1)(a), and therefore they had probable cause to arrest her at Chipotle. *Wesby*, 583 U.S. at 57.[31]

Kuhlman also grounds her § 1983 false arrest claim on the fact that the Officers' continued their arrest of Kuhlman for the OVI Charge even *after* the Officers knew that her tests were negative, thereby ignoring "exculpatory evidence," and for having also arrested Kuhlman on the Refusal Charge despite Kuhlman having "signed the 2255 consent form." (Doc. No. 113 at PageID#3624.) The Court is not persuaded by Kuhlman's arguments. First, the Sixth Circuit has explained: "The fact that an officer later discovers additional evidence unknown to her at the time of the arrest, even if it tends to negate probable cause, is irrelevant—we only care about what the officer knew at the time the decision was made." *Wysong v. City of Heath*, 377 Fed. Appx. 466, 470 (6th Cir. 2010) (quoting *Reynolds v. Jamison*, 488 F.3d 756, 765 (7th Cir. 2007). Thus, the Sixth Circuit "ha[s] already rejected the argument that when subsequent developments disprove the correctness of a previous police determination that probable cause exists, the police no longer have justification under the Fourth Amendment to continue the incarceration and must release the suspect." *Id.* (quoting *Peet v. City of Detroit,* 502 F.3d 557, 565 (6th Cir.2007)) (cleaned up). "In other words, a court may not consider either incriminating or exculpatory evidence gleaned after the police action was taken." *Richardson v. Nasser*, 2009 WL 4730446 at *8 (E.D. Mich. Dec. 9, 2009), *aff'd*, 421 Fed. Appx. 611

---

[31] Kuhlman emphasizes that Haggerty arrested Kuhlman because Kuhlman did not consent to EMS and because she could not find another person to pick her up. (Doc. No. 113 at PageID# 3625.) The City describes this as Haggerty's "personal habit of allowing a person who presumably could be suspected of an OVI the opportunity to be treated and transported by EMS." (Doc. No. 115-1 at PageID# 3652.) But "[o]fficers are not required to arrest every person who they have probable cause to believe committed a crime." *United States v. Affourtit*, 2023 WL 2110883 at *2 (E.D. Ky. Feb. 17, 2023). Kuhlman's argument mistakenly treats Haggerty's leniency in enforcing OVI laws as the causal basis for Kuhlman's own arrest. Once Haggerty had probable cause to arrest Kuhlman because of her seeming impairment, Haggerty could arrest her but was "not required to" do so. *Id.* at *2. Kuhlman sets forth no reasons why considering an OVI suspect's "opportunity to be treated and transported by EMS" is improper in determining whether to make an arrest assuming the other indicia of probable cause are present, and they were here.

(6th Cir. 2011).  Thus, the Sixth Circuit has rejected a "rule that police must release suspects from incarceration if exculpatory evidence arises because that 'would give investigators the responsibility to reevaluate probable cause constantly with every additional witness interview and scrap of evidence collected.'"  *Scott v. Kelly*, 2012 WL 479896 at *8 n.14 (E.D. Ky. Feb. 14, 2012), *aff'd sub. nom. Scott v. Sanders*, 482 Fed. Appx. 996 (6th Cir. 2012) (quoting *Peet*, 502 F.3d at 565); *Dodd v. Simmons*, 655 Fed. Appx. 322, 327 (6th Cir. 2016) ("[A] police officer has no duty to search for exculpatory facts if the facts within the officer's knowledge establish probable cause.").

Even if Kuhlman is correct that the negative test results the Officers learned of before leaving Fairview "disprove[ed] the correctness of [their] previous police determination that probable cause exists," in that those results were "exculpatory[,]" the test results were still "subsequent developments" which did not require the Officers to release Kuhlman.  *Wysong*, 377 Fed. Appx. at 470.  Thus, Kuhlman's later-revealed negative test results do not bear on the probable cause analysis, so they do not negate the probable cause determination for Kuhlman's initial arrest at Chipotle.

Finally, the Court need not resolve whether the Officers had probable cause to arrest Kuhlman for the separate Refusal Charge because, at the time of the purported refusal at Fairview, she was already under arrest.  *See Goins v. Carroll*, 2024 WL 1721129 at *3 (E.D. Tenn. Apr. 22, 2024) (quoting *D.D. v. Scheeler*, 645 Fed. Appx. 418, 424 (6th Cir. 2016)) ("The officer can lawfully arrest the plaintiff so long as there is probable cause to arrest her for some crime, even if the crime for which there is probable cause is different from the stated crime of arrest.")  In other words, the Officers did not need to re-establish probable cause for the *separate* crime of Kuhlman's refusal to submit to the chemical test because "the presence of probable cause for *any* crime is sufficient."  *Id.*  (citing *Scheeler*, 645 Fed. Appx. at 424. ).

58

Accordingly, and for all the reasons set forth above, the Court finds that the Officers are entitled to qualified immunity with respect to Kuhlman's false arrest claim (Counts I and IV) because the facts, even when taken in the light most favorable to Kuhlman, show that the Officers did not violate Kuhlman's Fourth Amendment rights when they arrested her on December 30, 2018 at Chipotle.

### b) Malicious Prosecution Claim (Count I)

The Officers argue that they are entitled to qualified immunity as to Kuhlman's malicious prosecution claim because: (1) the Officers did not influence the decision to prosecute Kuhlman; and (2) the charges against Kuhlman were supported by probable cause.  (Doc. No. 108-1 at PageID# 3562-66.)

The Officers contend that they cannot be "held [to]account for a decision to prosecute simply because [they] turn over to the prosecution [] truthful materials."  (*Id.* at PageID# 3653.)  They claim that Cudnik, as the City Proseuctor, "possessed not only all of the body cam footage, but he had knowledge of all of the additional facts that Plaintiff claims defeat probable cause for her prosecution. The prosecutor's decision to move forward with the prosecution was his alone, based on all of the evidence."  (*Id.* at PageID# 3653-54.)  Cudnik, the Officers note, was "aware of Plaintiff's vacillation between consent and refusal at the hospital, her abrupt urination on the floor, and the contents of the BMV 225 form" with Kuhlman's annotation.  (*Id.* at PageID# 3654.)  He "was aware of the officers' interaction with the hospital staff and the limited test results from the medical urine analysis

conducted at the hospital" but "none of it convinced the prosecutor to drop the charge nor influenced his decision to continue with the prosecution."  (*Id.* at PageID# 3564.)[32]

Regarding the probable cause element of this claim, the Officers set forth why the Officers had probable cause for each of Kuhlman's three (3) charges (i.e., her OVI Charge, Refusal Charge, and Failure to Control Charge). They reiterate their arguments that Kuhlman's conduct at Chipotle supported probable cause for the OVI Charge.  (*Id.* at PageID# 3565.)  As to the Refusal Charge, they claim there was probable cause for Kuhlman to be prosecuted because Kuhlman

> repeatedly changed her mind about whether she would consent to the test.  She signed the BMV 2255 form indicating that she was only giving a sample to the hospital.  BMV 2255.  Even the WCS showing the trip from the hospital to the jail shows that Plaintiff was confused about why giving a sample to the hospital was not the same as giving it to the police.  Further, in responding to Requests for Admissions, when asked to admit that she did not direct the hospital to provide the police with her urine sample, she refused to admit or deny the fact.

(*Id.* at PageID#s 3565-66) (internal citations omitted).  And as to the Failure to Control Charge, they claim that there was probable cause to prosecute Kuhlman because she

> admitted that she drove herself to Cleveland with no idea how she got there.  An eyewitness saw Plaintiff operate her vehicle onto a pedestrian sidewalk.  She had some sort of accident resulting in a shattered sunroof and Plaintiff was unable to provide an explanation of what had occurred.  [A] trial witness testified that Plaintiff drove her car over the curb, got stuck, and still attempted to keep driving back to the street.

(*Id.* at PageID# 3566) (internal citations omitted).

In Plaintiff's Opposition, she organizes her arguments in support of Counts I and IV under one umbrella section, titled "Count I and Count IV Malicious Prosecution/False Arrest (federal)." (Doc. No. 113 at PageID#s 3594, 3622.)  But her entire section omits any discussion of malicious prosecution.  (*Id.* at PageID#s 3623-32.)  Instead, she concentrates her analysis solely on her argument

---

[32] They also note that a "jury convicted Plaintiff knowing all of this evidence."  (Doc. No. 108-1 at PageID# 3654.)

that "in this case, there are at least disputed facts as to whether probable cause existed for Grasha and

Haggerty to **arrest** Ms. Kuhlman for OVI." (*Id.* at PageID# 3623) (emphasis added).[33]  She concludes

only that the "Officers had no probable cause to arrest her," but does not set forth any argument that

the Officers *influenced* Cudnik's decision to prosecute Kuhlman and does not otherwise respond to

the Officers' arguments.  (*Id.* at PageID#s 3622-32.)  And she introduces no new argument regarding

probable cause because, as noted above, she declined to distinguish the probable cause inquiries

governing her separate claims under § 1983 for false arrest and for malicious prosecution.  (*Id.*)

In the Officers' Reply, they underscore that Kuhlman failed to distinguish "between her false

arrest and malicious prosecution claims."  (Doc. No. 116-1 at PageID# 3679.)  They argue that

because "she has offered no evidence that the officers influenced the decision to prosecute Plaintiff

as required by this particular cause of action or offered any additional argument that her prosecution

lacked probable cause," she has therefore waived the argument.  (*Id.*)

Under federal law, a plaintiff must prove four elements to establish a malicious prosecution

claim: (1) that a criminal prosecution was initiated against the plaintiff and that the defendant made,

influenced, or participated in the decision to prosecute; (2) that the state lacked probable cause for the

prosecution; (3) that the plaintiff suffered a deprivation of liberty because of the legal proceeding;

and (4) that the criminal proceeding was resolved in the plaintiff's favor.  *Sykes*, 625 F.3d at 308-09;

*see also Lester v. Roberts*, 986 F.3d 599, 606 (6th Cir. 2021).  "The prototypical case of malicious

prosecution involves an official who fabricates evidence that leads to the wrongful arrest or

indictment of an innocent person."  *Mills v. Barnard*, 869 F.3d 473, 480 (6th Cir. 2017).  However,

---

[33] And as the Officers note, Kuhlman contradictorily claims that "Haggerty . . . schemed to find a way NOT to charge Ms. Kuhlman with OVI[.]"  (Doc. No. 113 at PageID# 3624; Doc. No. 116-1 at PageID# 3674, n.4.)

"the § 1983 version of 'malicious prosecution' is not limited to the institution of proceedings; it can also support a claim for 'continued detention without probable cause.'" *Id.* (citation omitted).

The Officers are correct that Kuhlman waived this claim because in her Opposition, Kuhlman did not address the Officers' argument that Kuhlman failed to satisfy the first element of a malicious prosecution claim under § 1983, i.e., that "a criminal prosecution was initiated against the plaintiff and that the defendant made, influenced, or participated in the decision to prosecute[.]" *Sykes*, 625 F.3d at 308. Thus, by not opposing the Officers' argument as to that element, Kuhlman has waived any opposition thereto. *See also DG Gas, LLC v. TA Franchise Sys. LLC*, 2025 WL 814928 at *28 (N.D. Ohio Mar. 14, 2025) (Barker, J.) (citing *Humphrey v. U.S. Attorney Gen.'s Office*, 279 Fed. Appx. 328, 331 (6th Cir. 2008)); *Adam v. Nakhle*, 2023 WL 8004712 at *23 (N.D. Ohio Nov. 2023) (Barker, J.); *Brown v. VHS of Michigan, Inc.*, 545 Fed. Appx. 368, 371-72 (6th Cir. 2013) (affirming summary judgment in favor of defendant because "[e]ven if two claims provide the same remedy, a plaintiff asserting both needs to establish the legal elements of each.") (citation omitted).

Accordingly, the Court finds that the Officers are entitled to qualified immunity with respect to Kuhlman's malicious prosecution claim (Count I) because Kuhlman has not shown that the Officers influenced the City's decision to prosecute her in violation of Kuhlman's Fourth Amendment rights.

### c)  Spoliation and Sham Legal Process (Counts III and VI)

On the first page of the Officers' Motion, they note this Court dismissed "all remaining state law [claims] as abandoned." (Doc. No. 108 at PageID# 3543) (citing Doc. No. 76.) Nevertheless, in Plaintiff's Opposition, Kuhlman claims that this Court did not dismiss her Ohio law spoliation claim

(Count III) or her Ohio law "sham legal proceeding" claim (Count VI).[34]  (Doc. No. 113 at PageID#s 3632-33) (citing Doc. No. 75.)  In the Officers' Reply, they point out that Kuhlman overlooked that while the Court denied the Officers' motion to dismiss as to those state law claims, the Court subsequently did dismiss all of Kuhlman's state law claims when it ruled on the Officers' motion for judgment on the pleadings.  (Doc. No. 116-1 at PageID# 3684; *Compare* Doc. No. 76 *with* Doc. No. 75.)

The Officers are correct.  This Court already dismissed *all* of Kuhlman's state law claims, including her claims for spoliation (Count III) and sham legal proceeding (Count VI), when it issued the order granting the Officers' Motion for Judgment on the pleadings: "In light of Plaintiff's complete failure to respond to Defendants' argument, the Court finds that Plaintiff has abandoned and/or waived any remaining state law claims as against Defendants Haggerty and Grasha.  Accordingly, as to Plaintiff's remaining state law claims against Defendants Haggerty and Grasha, Defendants' Motion for Judgment on the Pleadings is GRANTED."  (Doc. No. 76 at PageID# 652.)

### d)      Violation of Civil Rights Claim (Count VII)

The Officers note in their Motion for Summary Judgment  that they are "entitled to judgment as a matter of law on the remaining claims against them: federal §1983 claims alleging malicious prosecution (Count I), false arrest (also Count I), false imprisonment (Count IV), *and Count VII to the extent the §1983 claim contained in Count VII against the officers is not duplicative of Counts I and IV*."  (Doc. No. 108 at PageID# 3543) (emphasis added).  In Plaintiff's Opposition thereto, Kuhlman notes that "defendants have only moved for summary judgment as to Count VII as to the

---

[34] The Second Amended Complaint styled this claim as "Reckless, Wanton, or Willful Conduct under Ohio Rev. Code § 2921.52 and 42 U.S.C. § 1983, but the claim refers specifically to a "sham legal process."  (Doc. No. 43-2 at PageID# 302.).

City; and Counts I, IV *and Count VII* as to Grasha and Haggerty" but Kuhlman fails to list Count VII as a claim she continues to assert against the Officers—rather, Kuhlman enumerates Count VII only with respect to the City.  (Doc. No. 113 at PageID# 3620-21, 3634.)  In the Second Amended Complaint, the only reference to the Officers under Count VII avers that they were "acting under color of state law" and "had a duty to maintain and protect Plaintiff's constitution[al] rights including not subjecting her to a known malicious prosecution and/or false arrest, false imprisonment, prosecution involving spoilation of exculpatory evidence, abuse of process and other sanctions[,]" but the remaining allegations all refer to the City.  (Doc. No. 43-2 at PageID#s 304-08.)

Because the Officers moved with respect to Count VII on the basis that Count VII's factual predicates overlap with the same underlying cause of action Kuhlman asserts in Counts I and IV for malicious prosecution and false arrest/imprisonment, and because Kuhlman failed to defend that claim against the Officers, the Court concludes that the Officers are entitled to qualified immunity with respect to Count VII on the same bases for which they are entitled to qualified immunity with respect to Counts I and IV, as set forth above.

### 2.  Even if the Officers Violated Kuhlman's Fourth Amendment Rights, Kuhlman Has Not Demonstrated that the Constitutional Violations Were "Clearly Established."

As noted above, in determining whether a constitutional right was "clearly established[,]" the Court "must examine the particular situation that [the defendants] confronted and ask whether the law clearly established that their conduct was unlawful."  *Howse*, 953 F.3d at 407.  But "[t]he burden of convincing a court that the law was clearly established rests squarely with the plaintiff."  *Iswed v. Caruso*, 573 Fed. Appx. 485, 488 (6th Cir. 2014) (citing *Key v. Grayson,* 179 F.3d 996, 1000 (6th

Cir. 1999)); *Perez v. Oakland Cnty.*, 466 F.3d 416, 427 (6th Cir. 2006) (same); *Alexander v. Calzetta*, 2018 WL 1556233 at *5 (E.D. Mich. Mar. 30, 2018) (citation omitted).

In the Officers' Motion, as to the Officers' arrest for Kuhlman's OVI Charge, the Officers assert that no prior case could have placed them on notice that "arresting a person for OVI who was disoriented, stumbling on her feet, confused and argumentative with the officers, demonstrated clues of impairment, had a smashed roof and had driven her car onto a pedestrian sidewalk" violates a clearly established constitutional right. (Doc. No. 108-1 at PageID# 3568.) As to her Refusal Charge, they assert that the underlying statute, Ohio Rev. Code § 4511.19(A)(2), "does not explicitly address situations where the arrestee provides a sample to the hospital but vacillates on whether she consents to additional law enforcement testing." (*Id.* at PageID# 3570.) Citing *Jones v. Naert*, 121 F.4th 558, 568 (6th Cir. 2024), they claim that the "parameters of the underlying statute must also be clearly established for a claim relating to an arrest." (*Id.* at PageID# 3570.)[35]

In Plaintiff's Opposition, she only cites to this Court's opinion at the motion to dismiss stage, where the Court ruled in favor of Kuhlman, reasoning that the "freedom from arrest in the absence of probable cause is clearly established." (Doc. No. 113 at PageID# 3627) (citing Doc. No. 75.) She cites this Court's opinion to argue that "the same conclusion applies to this case at the summary judgment phase." (*Id.*) However, she does not address the Officers' argument regarding *Jones*.

In the Officers' Reply, they assert that Kuhlman has mistaken the applicable standard that applies at different stages of the proceeding. (Doc. No. 116-1 at PageID# 3677.) Unlike on a motion to dismiss at the pleading stage, they note, the Court can consider discovery documents at the motion

---

[35] They also assert that the "post-*Chiaverini* segmented analysis does not apply to this pre-*Chiaverini* arrest and prosecution[,]" but Kuhlman does not proffer a response to this argument, so the Court need not address it. (Doc. No. 108-1 at PageID# 3571; Doc. No. 116-1 at PageID# 3682.)

for summary judgment stage, and the Court was not considering the "thousands of pages of depositions, documents and additional body camera footage that are relevant for consideration here. The standards are different and one does not preclude the other." (*Id.* at PageID# 3678.)

The Court concludes, for the reasons below, that the Officers are correct that the standard changes from the motion to dismiss to the motion for summary judgment stage. Therefore, Kuhlman's singular reference to *this* Court's *previous* determination is inapposite.

The Sixth Circuit has explained that the standard for assessing the "clearly established" prong of the qualified immunity analysis shifts from the pleading stage to the summary judgment stage:

> The assertion of qualified immunity at the motion-to-dismiss stage pulls a court in two, competing directions. On the one hand, the Supreme Court has repeatedly stressed the importance of resolving immunity questions at the earliest possible stage in litigation. But on the other, when qualified immunity is asserted at the pleading stage, as defendants did here, the precise factual basis for the plaintiff's claim or claims may be hard to identify. We have thus cautioned that it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity. Although entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12. The reasoning for our general preference is straightforward: Absent any factual development beyond the allegations in a complaint, a court cannot fairly tell whether a case is 'obvious' or 'squarely governed' by precedent, which prevents us from determining whether the facts of this case parallel a prior decision or not for purposes of determining whether a right is clearly established.

*Guertin v. State*, 912 F.3d 907, 917 (6th Cir. 2019) (internal citations, brackets, and quotations omitted). The Supreme Court has additionally articulated the proper standard to assess the "level of generality" required for a "clearly established" constitutional violation:

> We have stressed that the specificity of the rule is especially important in the Fourth Amendment context. Probable cause turns on the assessment of probabilities in particular factual contexts and cannot be reduced to a neat set of legal rules. It is incapable of precise definition or quantification into percentages. Given its imprecise nature, officers will often find it difficult to know how the general standard of probable cause applies in the precise situation encountered. Thus, we have stressed the need to identify a case where an officer acting under similar circumstances was held to have

> violated the Fourth Amendment. While there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular arrest beyond debate.  Of course, there can be the rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances.  But a body of relevant case law is usually necessary to 'clearly establish' the answer with respect to probable cause.

*Wesby*, 583 U.S. at 64-65 (Thomas, J.) (internal citations omitted) (cleaned up).

The Supreme Court's explanation above directly contradicts Kuhlman's assertion that pointing to merely her "freedom from arrest in the absence of probable cause" satisfies her burden at the summary judgment stage to show that the constitutional right was "clearly established."  (Doc. No. 113 at PageID# 3627.)  The Supreme Court expressly stressed that "[g]iven its imprecise nature, officers will often find it difficult to know how the ***general*** standard of probable cause applies to the ***precise*** situation encountered."  *Wesby*, 583 U.S. at 64 (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 151 (2017)).  Thus, per *Wesby*, the "precise situation encountered" is necessarily more narrowly circumscribed than the "general standard of probable cause."  (*Id.*)  For example, in *Wesby*, the Court found that the violation of the plaintiff's constitutional right could not have been "clearly established" because the plaintiff could not point to a "robust consensus of cases" under the following "similar circumstances":

> The officers found a group of people in a house that the neighbors had identified as vacant, that appeared to be vacant, and that the partygoers were treating as vacant.  The group scattered, and some hid, at the sight of law enforcement.  Their explanations for being at the house were full of holes.  The source of their claimed invitation admitted that she had no right to be in the house, and the owner confirmed that fact.

583 U.S. at 65 (defining the above circumstances as the relevant "circumstances with which the officers were confronted" under *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

When this case entered the summary judgment stage, Kuhlman obtained access to the Court's discovery mechanisms so that she could develop the factual record to satisfy her burden

to show that the constitutional rights she alleged had been violated were "clearly established." Thus, while Kuhlman benefited from the "general preference" against dismissing qualified immunity cases at the motion to dismiss stage, i.e., by allowing Kuhlman to simply *state* her claim at a higher level of generality, that benefit does not apply at the summary judgment stage.  Now, Kuhlman has not directed the Court to any "robust consensus of cases" existing at the time of the alleged violation at any level of generality more particular than the general "freedom from arrest in the absence of probable cause."  *Wesby*, 583 U.S. 48, 64-65.  Indeed, as the Officers explain, she has not even attempted to distinguish or rebut any of the cases they present.  (Doc. No. 116-1 at PageID# 3681.)

Accordingly, the Court concludes that even if the Officers did not have probable cause to arrest Kuhlman, she has failed to establish that the Officers violated any of Kuhlman's "clearly established" constitutional rights, and therefore the Officers are entitled to qualified immunity.[36]

### C.    Kuhlman's *Monell* Claim Against the City of Cleveland (Count VII)

The Court next addresses Kuhlman's *Monell* claim against the City in Count VII.  A plaintiff may not sue a local government entity, such as City of Cleveland, for injuries inflicted solely by its employees or agents under § 1983.  *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *see also Baynes v. Cleland*, 799 F.3d 600, 622 (6th Cir. 2015); *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014); *Heyerman v. Cty. of Calhoun*, 680 F.3d 642 (6th Cir. 2012).  Rather, a plaintiff may only hold a government entity liable under § 1983 for that entity's own wrongdoing.  *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) ("Section 1983 does not permit a plaintiff to sue

--------

[36] The Officers correctly note that Kuhlman has not attempted to assert a *Brady* violation claim, and did not attempt to do so in her Opposition.  (Doc. No. 108-1 at PageID# 3571-72; Doc No. 116-1 at PageID# 3682.)

a local government entity on the theory of *respondeat superior*.") Or, as the Sixth Circuit has explained, a government entity "is liable under § 1983 only where, 'through its deliberate conduct,' it was 'the "moving force" behind the injury alleged.'" *D'Ambrosio*, 747 F.3d at 388-89 (quoting *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013)).

"Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  In the Sixth Circuit, a plaintiff may hold a government entity liable under four recognized theories: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence [to] federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013);  *see also D'Ambrosio*, 747 F.3d at 386.

At the outset, the Court notes that in the City's Motion, the City moves on the bases (1) that there was no underlying violation of Kuhlman's constitutional rights; and (2) that Kuhlman cannot satisfy *any* of the four recognized *Monell* theories of liability.  (Doc. No. 106-1 at PageID# 3483.) However, as the City makes clear, Kuhlman's Opposition *only* defends her *Monell* claim on the third and fourth *Monell* theories of liability (a "policy of inadequate training or supervision" and a "custom of tolerance or acquiescence to federal rights violations."). (Doc. No. 113 at PageID#s 3634-37; Doc. No. 115-1 at PageID#3653.)   Therefore, "[r]ather than expand the scope of its judgment by wading into complex and murky questions of constitutional law" uncontested by the parties, the Court "restricts its analysis [] so that it decides no more issues of law than necessary." *LaFleur v. Yardi Sys., Inc.*, 765 F. Supp. 3d 640, 662 (N.D. Ohio 2025) (Barker, J.)

### 1.   Third *Monell* Theory of Liability: Failure to Train or Supervise

The Court turns first to the third *Monell* theory of liability: the existence of a policy of inadequate training or supervision.

The City argues first that Grasha and Haggerty were properly trained because the training they received included mandatory coursework in "arrest[s], searches, and seizures; probable cause for arrests, searches, and seizures; OVI-related procedures, including standard field sobriety tests, breath, blood, and urine testing; booking and handling arrestees, interviews and interrogations; report writing; and ethics and professionalism." (Doc. No. 106-1 at PageID# 3500.)  Additionally, they both received training and "notice about new or updated policies and procedures." (*Id.*)  The City argues that Kuhlman's only evidence that the Officers were inadequately trained comes from Dimoff's expert opinion and testimony.  (*Id.*)  Second, the City then argues that Kuhlman has not shown *deliberate indifference* because she has not demonstrated a "history of abuse" such that the City was "clearly on notice that the training in this particular area was deficient and likely to cause injury." (*Id.* at PageID# 3501) (citations omitted).  The City attempts to distinguish the five cases Kuhlman cites in her Second Amended Complaint,[37] to argue that those cases do not provide a basis for finding a "history of abuse" sufficient to show "deliberate indifference." (*Id.* at PageID# 3502-03.)  Third, the City argues that Kuhlman has not demonstrated causation because "there is no evidence that any inadequate training was closely related to or actually caused Plaintiff's injury" and Kuhlman's assertion that "other or additional training should have occurred is of no consequence to this analysis[.]" (*Id.* at PageID# 3503.)

---

[37] *Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019), *State v. Buehner*, 2018 WL 5734615 (Ohio App. 8th Dist. Nov. 1, 2018), *State v. Sutton*, 2021 WL 1054507 (Ohio App. 8th Dist. Mar. 18, 2021), *Cleveland v. Krivich*, 65 N.E.3d 279 (Ohio App. 8th Dist. 2016), and *Cleveland v. Bruner*, 2002 WL 31667855 (Ohio App. 8th Dist. Nov. 27, 2002).

In Plaintiff's Opposition, Kuhlman's argument in support of her *Monell* claim is based entirely on Grasha's admission in his deposition that the Officers had a "lack of training to detect OVIs and to effectuate legal arrests" and that neither they nor their supervisor was "sure what to do with Ms. Kuhlman."  (Doc. No. 113 at PageID# 3636.)  She cites Grasha's deposition, where he testified that he was "fairly new and back to the road[,]" that the Officers were 'leaning' on each other, and that when Haggerty was communicating with their supervisor, the supervisor "said he doesn't know OVIs that well[.]"  (*Id.*) (quoting Grasha Depo. at Tr. 53-54.)  Kuhlman concludes:

> Had the officers been properly trained, they would have known that Ms. Kuhlman's disorientation, standing alone, did not give them probable cause to arrest her.  They would have known that they were required to administer a Breathalyzer and that if they did not have some objective evidence, they could not arrest her.  Their failure to adhere to basic procedures is evidence of their lack of proper training, and the fact that, according to Haggerty, their supervisor also did not know enough about OVIs to properly instruct them, is further evidence of improper supervision.

(*Id.* at PageID# 3637.)

In the City's Reply, the City notes that Kuhlman "makes no attempt to identify, let alone prove, how the training was inadequate for the tasks performed other than to merely assert that *because* Plaintiff was arrested for OVI, the training or supervision must have been inadequate" and does not address the City's proffered documentation showing that the Officers received training in the proper police training topics.  (Doc. No. 115-1 at PageID# 3656.)  The City emphasizes that in *Connick*, the Supreme Court stated, "that a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program."  563 U.S. at 61.  Thus, the City claims, Kuhlman has not "made an attempt to prove that Cleveland, *at a policy level*, failed to train its police officers[.]"  (*Id.*) (emphasis added).  The City further highlights that Kuhlman did not argue that her case fits

71

within the "single incident theory" of *Monell* liability.[38]  (*Id.* at PageID#s 3657-58.)  Finally, they reiterate that Kuhlman has not pointed to evidence that the Officers' lack of training caused Kuhlman's alleged constitutional right violation, and to a lack of supervision at a "policy level."  (*Id.* at PageID# 3658.)

A municipality can be liable under the Third Monell theory of liability for inadequate training theory if the inadequate training "amounts to deliberate indifference to the rights of persons with whom the [COs] come into contact." *Roell v. Hamilton Cty.*, 870 F.3d 471, 487 (6th Cir. 2017) (citation omitted).  This theory requires that Kuhlman show "(1) that a training program is inadequate to the tasks that the officers must perform; (2) that the inadequacy is the result of [the City's] deliberate indifference; and (3) that the inadequacy is closely related to or actually caused [Kuhlman's] injury." *Brown v. Chapman*, 814 F.3d 447, 463 (6th Cir. 2016) (citation omitted); *see also Franklin v. Franklin Cnty.*, 115 F.4th 461, 474 (6th Cir. 2024).

The Court finds that the City is correct that Kuhlman has failed to satisfy any of the three elements necessary to succeed on a *Monell* claim based on a theory of inadequate training or supervision.  Kuhlman failed to refute the City's contention that the Officers received proper training and did not point to any evidence demonstrating that the City has been "deliberately indifferent" to the particular constitutional rights violation which Kuhlman alleges she suffered.  In contrast, her only 'proof' that the City failed to properly train its officers is that on December 30, 2018, she suffered an alleged constitutional rights violation: "had the officers been properly trained, they would have

---

[38] Under that theory, a plaintiff's *Monell* claim for failure to train could survive even without showing additional instances of a failure to train where "the risk of the constitutional violation is so obvious or foreseeable that it amounts to deliberate indifference for the city to fail to prepare officers for it."  *Howell v. NaphCare, Inc.*, 67 F.4th 302, 319 (6th Cir. 2023) (subsequent history omitted).

known" that they lacked probable cause.  (Doc. No. 113 at PageID# 3637.)  But even "[a]ssuming that this single action was unconstitutional, proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless 'proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy.'"  *Whitfield v. Muskingum Cnty*. 2024 WL 4227040 at *8 (S.D. Ohio Sept. 18, 2024) (quoting *Phillips v. City of Cincinnati*, 2019 WL 2289277 (S.D. Ohio May 29, 2019)).  Kuhlman's argument inverts this logic.  Per Kuhlman, the existence of the incident *itself proves* the unconstitutional training and supervision policy, but Kuhlman needed to show both the incident and the policy separately, and then trace the incident to the policy.  (Doc. No. 113 at PageID# 3637) ("[The Officers'] failure to adhere to basic procedures is evidence of their lack of proper training[.]").  She did not make that showing, so her claim fails.

Accordingly, for the foregoing reasons, and because Kuhlman failed to show that the Officers violated her constitutional rights, the Court concludes that the City is entitled to summary judgment as to Kuhlman's *Monell* claim (Count VII) under a theory of inadequate training or supervision.

### 2.  Fourth *Monell* Theory of Liability: Custom of Tolerance or Acquiescence

Next, the Court turns to the fourth *Monell* theory of liability: the existence of a custom of tolerance of or acquiescence to federal rights violation.

In the City's Motion, it argues that Kuhlman has failed to show "a single incident or even a limited number of similar incidents to demonstrate that the custom [of tolerance for OVI arrests without probable cause] was so widespread and permanent as to have the force of law."  (Doc. No. 106-1 at PageID# 3505.)  The City again anticipatorily attempts to distinguish *Jackson*, *Buehner*, *Sutton*, *Krivich*, and *Bruner* and claims that even if the distinctions were ignored, "five arrests spanning 43 years prior to Plaintiff's 2018 OVI arrest would still not establish a clear and persistent

pattern of unconstitutional activity[.]"  (Doc. No. 106-1 at PageID# 3506.)  They also highlight that Kuhlman "failed to identify" "Cleveland's final policymaker" in discovery and has also failed to show which specific 'custom' causes her harm.  (*Id.*)

In Plaintiff's Opposition, Kuhlman states that the Officers both testified that the City has "an unwritten policy of using medical justifications as a pretext for getting blood and urine samples, or getting a refusal, which aids the criminal case."  (Doc. No. 113 at PageID# 3635-36.)  To support the City's attempt to obtain "blood or urine samples or get[] a refusal" at the hospital, Kuhlman asserts, the City has a "policy of requiring officers to take a suspect to a hospital to get medically 'cleared' before the officer can take the suspect to jail[.]"  (*Id.*)

In the City's Reply, the City argues that Kuhlman's proffered 'pattern'—what she describes as a 'policy'—is merely her misinterpretation of DN 18-125, which requires officers to transport arrestees who require medical attention to the hospital before "booking at [county] jail."  (Doc. No. 115-1 at PageID# 3659.)  They also underscore that Kuhlman "fails to address any of the requisite elements in her Opposition."  (*Id.*)  The City states that "absent in Plaintiff's Opposition is any identification of prior instances of conduct occurring in a similar manner to the facts at hand (or any prior incidents at all, similar or not)," and that Kuhlman did not demonstrate that the City "knew about this supposed pattern or was deliberately indifferent to its alleged illegality."  (*Id.* at PageID# 3660.)  Finally, the City argues that Kuhlman has failed to show causation because DN-18125 is a Cuyahoga County, not Cleveland municipality, requirement.  (*Id.* at PageID# 3661.)

"To sustain a *Monell* claim and hold a municipal entity liable for a custom of tolerance or acquiescence, a plaintiff must show: (1) the existence of a clear and persistent pattern of illegal activity; (2) notice or constructive notice on the part of the defendant; (3) the defendant's tacit

74

approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the defendant's custom was the 'moving force' or direct causal link in the constitutional deprivation." *Wallace v. Coffee County, Tennessee*, 852 Fed. Appx. 871, 876 (6th Cir. 2021); *see also D'Ambrosio*, 747 F.3d at 387-88.

The Court finds that the City is correct that Kuhlman has failed to satisfy any the four elements necessary to succeed on a *Monell* claim based on a theory custom of tolerance or acquiescence. Kuhlman's entire argument in support of this theory of Monell liability is only two sentences, so her argument necessarily omits critical details to succeed on her claim.  (Doc. No. 113 at PageID# 3636.) She again makes the mistake of using the particular incident that occurred on December 30, 2018, as itself evidence of the broader 'pattern,' but she completely fails to point to any other instances of such pretextual arrests, so she has not satisfied the first element.  She does not, as the City notes, direct the Court's attention to which City policymaker would need to be on "notice" to give their "tacit approval" to the alleged pattern of pretextual arrests, so she cannot satisfy elements two or three either.  Having failed to show such a 'pattern' under the first element, she then necessarily fails under the fourth because a non-existent pattern cannot be the "moving force" for a constitutional right violation.

Accordingly, for the forgoing reasons, and because Kuhlman failed to show that the Officers violated her constitutional rights, the Court concludes that the City is entitled to summary judgment as to Kuhlman's *Monell* claim (Count VII) under a theory of a custom of tolerance or acquiescence to federal rights violations.

### D.     Punitive Damages Against All Defendants

In the Officers' Motion, the Officers argue that "[p]unitive damages are only appropriate in a § 1983 lawsuit 'when the individual defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others," but that Kuhlman has not shown that this standard has been satisfied.  (Doc. No. 108-1 at PageID# 3574) (citation omitted).

In the City's Motion, the City argues that a municipality is immune from punitive damages for § 1983 claims.  (Doc. No. 106-1 at PageID# 3507.)

In Kuhlman's Opposition, she concedes that "Defendants have correctly stated the standard for punitive damages in a Section 1983 case."  (Doc. No. 113 at PageID# 3637.)  Kuhlman then argues that:

> In order to determine whether the defendants acted with evil motives, recklessly or with callous indifference to plaintiff's rights, and whether punishment of the defendants is appropriate, the Court should be able to assess the defendants' credibility and motives, which it cannot do at the summary judgment stage.  Since a claim for punitive damages is not actually a cause of action, but rather a remedy, plaintiff asks this Court to either deny the motion for summary judgment as to punitive damages without prejudice, or to defer a ruling on this issue until trial, when the Court can decide whether a punitive damages jury instruction is appropriate based on trial testimony.

(*Id.*)

In the Officers' Reply, they respond that "there is such an absence of evidence here [of 'evil motive or intent' or 'reckless or callous indifference'] and Plaintiff has not presented any evidence to rebut this absence."  (Doc. No. 116-1 at PageID# 3683.)

In the City's Reply, the City contends that it is entitled to judgment on Kuhlman's' request for punitive damages because municipalities are immune as a matter of law from punitive damages for § 1983 claims.  (Doc. No. 115-1 at PageID# 3661.)

76

The Defendants are correct that they are entitled to summary judgment on Kuhlman's request for punitive damages. As a threshold matter, Kuhlman acknowledges that punitive damages are a remedy, not a cause of action. However, no claims as to the Officers or the City remain.  Thus, "[a]lthough punitive damages are permissible under § 1983, they cannot be awarded independent of a judgment of liability under that section." *Griffin v. Summit Cnty.*, 2011 WL 646872, at *9 (N.D. Ohio Feb. 16, 2011) (quoting *Woodruff v. Ohman*, 29 Fed. Appx. 337, 343 (6th Cir. 2002)).  This Court has not found any basis for liability, and therefore, it cannot award punitive damages to Kuhlman as a matter of law.

Accordingly, Defendants are entitled to summary judgment against Kuhlman's request for punitive damages.

### E.      John/Jane Doe Defendants

The Officers argue that because Kuhlman has failed to identify the John/Jane Doe Defendants, and because the statute of limitations to sue them elapsed on June 25, 2022, the Court should dismiss the John/Jane Does Defendants with prejudice.  (Doc. No. 108-1 at PageID# 3573.)   As the Officers then highlight in their Reply, Kuhlman "has not addressed any claims against the John/Jane Doe Defendants in her Opposition.  Therefore, any and all claims should be considered abandoned, and the John/Jane Does should be dismissed with prejudice."  (Doc. No. 116-1 at PageID# 3682.)

The Court agrees with the Officers that Kuhlman has abandoned her claims against the Officers by failing to respond to their argument in their Motion for Summary Judgment.  As noted above, failure to oppose an argument constitutes a waiver of opposition thereto.  *See, e.g.*, *DG Gas, LLC v. TA Franchise Sys. LLC*, 2025 WL 814928 at *28; *Adam*, 2023 WL 8004712 at *23.

Accordingly, the Court dismisses the John/Jane Defendants with prejudice.

77

## V.      Conclusion

Accordingly, the for the reasons set forth above, Defendants' Motion to Disqualify (Doc. No. 98) is GRANTED.   The City's Motion (Doc. No. 106) is GRANTED, and the Officers' Motion is GRANTED. (Doc. No. 108.)

**IT IS SO ORDERED.**

Dated: July 21, 2025                              _s/ Pamela A. Barker_
                                                PAMELA A. BARKER
                                                UNITED STATES DISTRICT JUDGE